IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELBERTA BERNICE LIEBERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 96-523-GMS |
| | ) | |
| THE STATE OF DELAWARE, | ) | |
| THE FAMILY COURT OF THE | ) | |
| STATE OF DELAWARE | ) | |
| | ) | |
| Defendants. | ) | |

AFFIDAVIT OF EDWARD M. MCNALLY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) SS. |
| NEW CASTLE COUNTY | ) |

1.    I am counsel for the plaintiff in the above-captioned action.

2.    Attached are true and correct copies of the Deposition of Karen Disch of

February 28, 2005, and Exhibits 1-7 to the deposition of Karen Disch.

_____
Edward M. McNally

SWORN TO AND SUBSCRIBED before me, a Notary Public, this 4th day of
April, 2005.

_____
Notary Public

MARGARET M. TOUCHTON
Notary Public - Delaware
My Comm. Expires May 11, 2006

1131647



**WILCOX & FETZER LTD.**

In the Matter Of:

# Lieberman

## v.

# The State of Delaware

### C.A. # 96-523-GMS

Transcript of:

# Karen Disch

## February 28, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:96-cv-00523-GMS    Document 81    Filed 04/04/2005    Page 3 of 54

Lieberman
Karen Disch

v.

C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ELBERTA BERNICE LIEBERMAN,       )
                                 )
              Plaintiff,         )
                                 )    Civil Action
v.                               )    No. 96-523-GMS
                                 )
THE STATE OF DELAWARE,           )
THE FAMILY COURT OF THE          )
STATE OF DELAWARE,               )
                                 )
              Defendants.        )


          Deposition of KAREN DISCH taken pursuant to
notice at the law offices of Morris, James, Hitchens &
Williams, LLP, 222 Delaware Avenue, Wilmington, Delaware,
beginning at 10:00 a.m., Monday, February 28, 2005,
before Eleanor J. Schwandt, Registered Merit Reporter and
Notary Public.


APPEARANCES:

          EDWARD M. MCNALLY, ESQ.
          MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue
            Wilmington, Delaware  19801
            for the Plaintiff

          MARC P. NIEDZIELSKI, ESQ.
          DEPUTY ATTORNEY GENERAL
          DEPARTMENT OF JUSTICE
            820 North French Street - 6th Floor
            Wilmington, Delaware  19801
            for the Defendants



                  WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                   (302) 655-0477

Page 2

```
 1              (Disch Deposition Exhibits 1, 2, 3, 4, 5, 6,

 2    and 7 were marked for identification.)

 3                        KAREN DISCH,

 4              the witness herein, having first been

 5              duly sworn on oath, was examined and

 6              testified as follows:

 7                        EXAMINATION

 8    BY MR. MCNALLY:

 9        Q.   Ma'am, would you state your full name for the

10    record, please.

11        A.   Karen Disch.

12        Q.   And have you had your deposition taken before?

13        A.   No.

14        Q.   The process is that I ask questions and show you

15    some documents.  If there is any question you don't

16    understand, please let me know.  And if there is anything

17    you need to talk to Mr. Niedzielski about, feel free to

18    do that.  I don't really care.

19              And if in the course of the deposition you

20    think that you may have been misunderstood or misstated

21    something, just tell me and we will go back over it and

22    correct it.  It is not a memory contest.  I'm just trying

23    to get an understanding of what the documents are.

24        A.   Okay.
```

Page 3

1      Q.    Now, as I understand it, you have been offered by

2    the State of Delaware as a person to testify about the

3    funding of the Family Court and, in particular, any

4    federal funds that have been received directly or

5    indirectly by the Family Court.

6      A.    Yes.

7      Q.    Is that right?

8      A.    Yes.

9      Q.    And what is your present position?

10     A.    I'm the Director of Fiscal Services.

11     Q.    Of?

12     A.    Family Court.

13     Q.    And what do your job responsibilities include?

14     A.    I oversee the budget and the court receivables,

15   also includes payroll and attendance.

16     Q.    And how long have you had that position?

17     A.    Since April of '03.

18     Q.    I want to start with 1992, because that's the

19   relevant time period, believe it or not.  Were you

20   employed by Family Court in 1992?

21     A.    No.

22     Q.    By whom were you employed at that point?

23     A.    Justice of the Peace Court.

24     Q.    What was your job there?

Page 4

```
 1      A.    Support Services Administrator.

 2      Q.    And how long were you at the Justice of the Peace

 3   Court?

 4      A.    12 years.

 5      Q.    When did you leave the Justice of the Peace

 6   Court?

 7      A.    In April of '03.

 8      Q.    And that's when you took a job with the Family

 9   Court?

10      A.    Yes.

11      Q.    Is it fair to say then that your testimony here

12   today about any federal funding for the Family Court back

13   in the year 1994 is based upon either your review of

14   documents or your discussions with other people?

15      A.    Yes.

16      Q.    Because you weren't there at the time?

17      A.    Right.

18      Q.    Okay.  And in that regard, what documents did you

19   review prior to coming here for purposes of your

20   deposition?

21      A.    I was asked to pull out fiscal documents related

22   to '93, '94.  Most of our records from back then were --

23   they were with the archives and they have been destroyed,

24   so there wasn't that much from '93 to go on.
```

Page 5

```
 1      Q.    Okay.  Well, where did you get records?  Did you

 2   go to the archives of the State of Delaware for records?

 3      A.    We had limited files in Family Court.

 4      Q.    So you basically went through the Family Court

 5   files as best you could to find the documents?

 6      A.    Yes.

 7      Q.    Now, with respect to the Family Court, I'm now

 8   going to ask a series of questions that deal with

 9   generally how it gets its funding, and, in particular,

10   the relationship between Family Court and the State of

11   Delaware.  The Family Court itself functions as a sort of

12   separate agency of the State of Delaware?

13      A.    How do you mean separate?

14      Q.    Well, that's a bad question.  What are the

15   sources of funds, as you understand it today, for the

16   Family Court?

17      A.    We get general funds and appropriated special

18   funds.

19      Q.    You get general funds from the State of Delaware?

20      A.    Yes.

21      Q.    And appropriated special funds, did you say?

22      A.    Yes.

23      Q.    And who do you get those funds from?

24      A.    The appropriated special funds are funds that are
```

Page 6

```
 1    -- we receive a spending limit for a certain amount, and

 2    it is the funds that we receive from Division of Child

 3    Support that become our ASF.

 4         Q.   Become your?

 5         A.   Appropriated special funds.

 6         Q.   That's what you meant.

 7         A.   Sorry.

 8         Q.   That's all right.  The record should show we are

 9    joking.  I know that you will occasionally lapse into the

10    acronyms which I, of course, will be completely befuddled

11    by, so we will just have to deal with that.

12         A.   Okay.

13         Q.   All right.  Now, the Division of Child Support,

14    is it a division of another part of the State of

15    Delaware?

16         A.   Yes.

17         Q.   What part is it of?

18         A.   I believe it is under Health and Social Services.

19         Q.   So in a sense at the top it would appear to me

20    there is sort of a Department of Health and Social

21    Services, and then there is divisions in that department;

22    is that how you understand it?

23         A.   Yes.

24         Q.   And one of those is the Division of Child
```

Page 7

```
 1    Support --

 2         A.    -- Enforcement.

 3         Q.    -- Enforcement, and the Division of Child Support

 4    Enforcement gives money to the Family Court, and those

 5    are the special appropriations you have talked about?

 6         A.    Yes.

 7         Q.    What are those funds used for?

 8         A.    They represent about 25 percent of our operating

 9    budget.  They are used for salaries and operating.

10         Q.    Are any of those funds used to provide support to

11    children?

12         A.    How do you mean?

13         Q.    I mean does the Family Court disburse any money

14    to indigent children?

15         A.    No.

16         Q.    To the extent that they get any welfare, that

17    comes from the State of Delaware, not from the Family

18    Court?

19         A.    Right.  It does not come from Family Court.

20         Q.    Now, do you know whether the system that you just

21    talked about, where there are both general funding and

22    special appropriations, was the same system that existed

23    in '93/'94?

24         A.    Yes.
```

Page 8

1        Q.    And so in '93/'94 the Division of Child Support

2    Enforcement had funds that were appropriated to the

3    Family Court for purposes of its operations; is that

4    right?

5        A.    Not appropriated.   They reimburse us for expenses

6    that we incur.

7        Q.    And that's pursuant to a budget that you have?

8        A.    Can you --

9        Q.    I guess I'm trying to figure out, let me see, the

10   Division of Child Support Enforcement you say reimburses

11   Family Court for expenses, correct?

12       A.    Yes.

13       Q.    So do you send them a bill?

14       A.    Yes.

15       Q.    And then they send you a check?

16       A.    Basically, yes.   They deposit the funds, yes.

17       Q.    Now, do you know where the Division of Child

18   Support Enforcement gets its funds that are used to pay

19   the bills of Family Court?

20       A.    I, from what I've been told, it is federal funds.

21       Q.    And so as far as you know, that was the system

22   that existed in '93 and '94 as well?

23       A.    Yes.

24       Q.    I'm putting before you a document that's been

Page 9

1    marked as your exhibit Number 1, which has the Bates

2    numbers, these are these crazy little numbers at the

3    bottom of the page where it has been stamped on there,

4    the first page has got a stamp on it 1339.  Do you see

5    that, ma'am?

6        A.    Yes.

7        Q.    The top of it says it is the "National Court

8    Appointed Special Advocate Association 2003 State

9    Organization Cooperative Agreement Award."  Do you see

10   that?

11       A.    Yes.

12       Q.    Now, can you tell us generally what this document

13   is?

14       A.    This is a grant award from CASA, National CASA.

15       Q.    Okay.  What is National CASA?

16       A.    It is, well, other than what their abbreviation

17   is, they are an organization that gives us funding by

18   grants.

19       Q.    Okay.  The actual name of the organization is the

20   National Court Appointed --

21       A.    I'm sorry.

22       Q.    -- Special Advocate Association?

23       A.    Yes.

24       Q.    And so you folks abbreviate that national CASA,

Page 10

1    C-A-S-A; is that right?

2        A.    Yes.

3        Q.    And do you know where the National CASA gets its

4    funds?

5        A.    No, I don't.

6        Q.    Now, this system where they give you funds, the

7    amount of this award it says is $53,000.  Do you see

8    that, ma'am?

9        A.    Yes.

10       Q.    And so Family Court would have used those funds

11   in accordance with I guess paragraph 1 of this document

12   where it says "Use of Grant Funds"?

13       A.    Yes.

14       Q.    Now, the document also in paragraph 1 says that

15   the grantee, which is the CASA program, Family Court of

16   Delaware; is that right?

17       A.    Yes.

18       Q.    And it talks about a cooperative agreement with

19   the Department of Justice.  Do you see that, ma'am?

20       A.    Yes.

21       Q.    Is that the federal Department of Justice?

22       A.    I don't know.

23       Q.    Now, it goes on to say that the funds will be

24   "subject to the applicable restrictions and provisions of

Page 11

1    this federal funding as described in," and it says, "the

2    Catalogue of Federal Domestic Assistance."  Do you see

3    that, ma'am?

4        A.    Yes.

5        Q.    And somebody has circled the number there.  I

6    guess that's probably a Code of Federal Regulations.  Do

7    you know what that refers to?

8        A.    No, I don't.

9        Q.    So do you know whether the National CASA gets its

10   funding from the federal government?

11       A.    I'm not sure.

12       Q.    Now, in connection with receipt of funds under

13   this grant, does the Family Court provide a report on how

14   the funds were expended?

15       A.    Yes.

16       Q.    And who do you provide that to?

17       A.    Well, it depends on who the -- where the funds

18   come from.

19       Q.    All right.  Let's look at paragraph number 15 of

20   this document, which is on page 6 of it.  That begins or

21   is headed, rather, it says "Audit Requirements."  Do you

22   see that?

23       A.    Yes.

24       Q.    And in looking at that, does that help you tell

Page 12

1    us to whom any reports go about how the funds were spent?

2        A.    Well, this particular grant was from National

3    CASA, so the reports would be sent to them.

4        Q.    Now, if you turn in this document to page Bates

5    numbered 1349, it is another document that says it is

6    from the National Court Appointed Special Advocate

7    Association, and this I would guess is the same

8    association that we just talked about, the National CASA?

9        A.    I'm not sure about that.

10        Q.    This talks about a grant for the duration of July

11    1, 1993 through June 30, 1995.  Do you see that, ma'am?

12        A.    Yes.

13        Q.    Either by looking at this document or from your

14    general knowledge, is it your understanding that the

15    Family Court in that period of '93 to '95 did receive

16    money from the National Court Appointed Special Advocate

17    Association?

18        A.    Yes.

19        Q.    Let's put that one aside.  Now showing you a

20    document that's been marked as Exhibit Number 2, which is

21    headed "Administrative Plan," do you see that, ma'am?

22        A.    Yes.

23        Q.    Can you tell us what this document generally is

24    intended to do?

Lieberman
Karen Disch

v.
C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

Page 13

```
 1      A.    This was one of the or the plan at the time
 2   between Division of Child Support Enforcement and Family
 3   Court.
 4      Q.    And does this document, as you understand it,
 5   govern the use of funds received by the Family Court from
 6   the Division of Child Support Enforcement, at least back
 7   in the period covered by this document?
 8      A.    I'm not sure how you mean govern.
 9      Q.    How the funds were to be administered, is it
10   provided for by this plan?
11      A.    Most of it I think relates to operations, not
12   fiscal things.  Part of it was how we would be reimbursed
13   for the cost incurred by the court for Family Court
14   cases, for child support.
15      Q.    Okay.  What does it provided generally with
16   respect to how you would be reimbursed?
17      A.    The process?
18      Q.    Yes.
19      A.    Each quarter we would send them a bill
20   representing the amount of cases, child support cases
21   that Family Court handled, and they would reimburse us
22   that amount.
23      Q.    All right.  And those child support cases that
24   are covered by this particular plan, are those cases
```

Page 14

1    where the support was being provided by the Division of

2    Child Support?

3         A.    Support for?  I'm sorry.

4         Q.    Well, we are talking about child support, we are

5    talking about somebody makes a payment either to a parent

6    or to a child to support them, right?

7         A.    Yes.

8         Q.    And where does that money come from?

9         A.    Family Court doesn't get involved in that.

10        Q.    I understand.  The actual support payments do not

11   come from Family Court; we are agreed on that, right?

12        A.    Right, Family Court doesn't handle any of that.

13        Q.    Does that money come from the State of Delaware

14   or does it come from the federal government?

15        A.    I don't know.

16        Q.    Now, with respect to the money that's covered by

17   this document, the "Administrative Plan," those funds are

18   the cost that Family Court incurs such as for its

19   employees and other expenses it has in administering

20   these programs covered by this plan, right?

21        A.    Yes.

22        Q.    Now, those programs, are they different depending

23   upon who is providing the support payments?

24        A.    Not that I'm aware of.

Page 15

```
 1        Q.    Well, let's turn to page 2 where it talks about,

 2   in Roman Numeral II it talks about "Application for IV-D

 3   Services," do you see that, ma'am?

 4        A.    Yes.

 5        Q.    What are Roman Numeral IV-D Services?

 6        A.    To be honest, I'm not sure exactly what -- it is

 7   child support related cases that Family Court works on.

 8        Q.    Okay.  And let's see if we can work our way

 9   through it.

10        A.    Okay.

11        Q.    In paragraph 1 it says, "The Division," which I

12   think we can agree is the Division of Child Support,

13   "shall publicize the availability" --

14                    MR. NIEDZIELSKI:  Enforcement.

15                    MR. MCNALLY:  Pardon?

16                    MR. NIEDZIELSKI:  Division of Child Support

17   Enforcement.

18   BY MR. MCNALLY:

19        Q.    "Enforcement," right, "shall publicize the

20   availability of public services provided under Title IV-D

21   of the Social Security Act."  Do you see that?

22        A.    Yes.

23        Q.    It talks about, thereafter, providing

24   applications for people to sign and submit.  Do you see
```

Lieberman

Karen Disch

v.

C.A. # 96-523-GMS

The State of Delaware

February 28, 2005

Page 16

1    that?

2        A.    Yes.

3        Q.    Now, does Family Court keep track of those

4    individuals who are receiving support under this Title

5    IV-D?

6        A.    I'm not sure.  I don't know.

7        Q.    Does the Family Court send a bill to the Division

8    of Child Support Enforcement with respect to services

9    provided to families or children who are receiving Title

10   IV-D funding?

11       A.    I'm not sure if it is for D funding.

12       Q.    I think I'm getting it.  In Family Court some of

13   the expenses are passed along to the Division of Child

14   Support Enforcement, correct?

15       A.    Not passed on.

16       Q.    But they are billed to and then reimbursed by?

17       A.    Yes.

18       Q.    And some other expenses of Family Court are not

19   submitted to the Division of Child Support Enforcement

20   but are paid by the State of Delaware, right?

21       A.    Yes.

22       Q.    How does the Family Court differentiate who gets

23   the bills, is what it comes down to?

24       A.    Who gets which bill?

1      Q.    The bill, where the money comes from to pay for

2   the various expenses of Family Court.

3      A.    Family Court has a split coding where we -- every

4   expense basically is split 75 percent general fund and 25

5   percent ASF, appropriated special funds.

6      Q.    Okay.  And so if I were working there, 75 percent

7   of my salary would come out of one source of funding and

8   25 percent from the other source?

9      A.    No.  There are specific positions allocated to

10  appropriated special funds.

11     Q.    Okay.  And in the case of those positions, all of

12  the salary would be paid by allocated special funds?

13     A.    Appropriated special funds, yes.

14     Q.    Appropriated, excuse me.  I'll get that lingo

15  right eventually.

16            And those appropriated special funds are

17  funds, again, that ultimately come -- not ultimately but

18  initially come from the Division of Child Support

19  Enforcement, correct?

20     A.    Yes.

21     Q.    With respect to those positions of Family Court

22  where the cost of the position is paid through the

23  Division of Child Support Enforcement, do you know how

24  that particular decision is made to allocate those

Page 18

1    particular expenses to the Division of Child Support

2    Enforcement money?

3        A.    For the positions?

4        Q.    Yes.

5        A.    I don't know how it was originally set up.

6        Q.    Do you know how it is set up now?

7        A.    Well, I know there is positions particularly paid

8    out of appropriated special funds.

9        Q.    How do they pick those particular positions to be

10   paid out of appropriated special funds?

11       A.    I'm not sure how they determined which positions.

12       Q.    But as far as you know, there is some system that

13   that particular position gets funded out of appropriated

14   special funds?

15       A.    I'm sorry, could you say that again?

16       Q.    Sure.  What I'm trying to find out is when they

17   pick these particular positions, it is just not

18   haphazard?  There is a reason for it, as far as you know?

19   You just don't know what the reason is?

20       A.    The positions were always, as far as I know, were

21   always in ASF.  I'm not -- I don't know why they were

22   initially set up ASF.

23       Q.    Okay.  And as far as you know, that's the way it

24   has been since 1994, anyway?

Page 19

```
 1        A.    Yes.

 2        Q.    Do you know what an AFDC case is?

 3        A.    No.

 4        Q.    It is referred to in this document.  Maybe Aid to

 5   Families with Dependent Children, something like that?

 6        A.    I don't know.

 7        Q.    All right.  Would you turn to page 28, please.

 8   At the bottom there is a section XII headed "Financial

 9   Requirements"?

10        A.    Yes.

11        Q.    It goes on to say, "Responsibilities of the

12   Division," it says, "The Division shall reimburse the

13   Court," do you see that, ma'am?

14        A.    Yes.

15        Q.    And it talks about "direct and indirect

16   expenditures incurred under the Agreement at the

17   applicable Federal Financial Participation rate," right?

18        A.    Yes.

19        Q.    What is the Federal Financial Participation rate?

20        A.    I'm not sure what that means there.  Currently

21   there is a cost allocation plan that determines our

22   billable amount.

23        Q.    Sure.  You are allowed to bill the amount that's

24   been agreed upon under that plan, correct?
```

Lieberman
Karen Disch

v.
C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

Page 20

```
 1       A.    Yes.

 2       Q.    And do you know whose criteria, is it federal

 3   government imposed plan or is it from somebody else?

 4       A.    Which plan?

 5       Q.    The plan that determines how you allocate, what

 6   funds you are allowed to bill back to the Division.

 7       A.    I'm not sure.

 8       Q.    Do you have any understanding of whether the

 9   federal government dictates to the Division what expenses

10   the Division may reimburse Family Court for?

11       A.    I don't know.

12       Q.    But you do understand that some, at least, of the

13   Division of Child Support Enforcement's funds come from

14   the federal government?

15       A.    Yes.

16       Q.    This is Number 3.  The title of this document is

17   "Narrative Cost Allocation Methodology," do you see that,

18   ma'am?

19       A.    Yes.

20       Q.    And it is, of course, dated effective January 1,

21   '95.  Is it your understanding that this document's

22   methodology was in place in '95 or so?

23       A.    Yes.

24       Q.    Do you think it was in place before '95 or
```

Lieberman
Karen Disch

v.
C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

Page 21

```
 1    something like it?

 2         A.    I don't know.

 3         Q.    And is it still in place today, or something like

 4    it?

 5         A.    Something like it, yes.

 6         Q.    And if you turn to the first page of the actual

 7    document itself, it talks about in the background, "Child

 8    Support activities provided by the Family Court are

 9    reimbursed," do you see that, ma'am?

10         A.    Yes.

11         Q.    And it talks about "by Federal Title IV-D

12    funding," do you see that?

13         A.    Yes.

14         Q.    Do you know what Federal IV-D funding refers to?

15         A.    No.

16         Q.    I'm handing you Exhibit Number 4 to your

17    deposition.  And it is entitled "Cooperative Agreement,"

18    and it is dated December 1997, bears the Bates number on

19    the first page of 1284.  Do you see that, ma'am?

20         A.    Yes.

21         Q.    Can you tell us in general what this document is

22    designed to do?

23         A.    This is similar to the earlier plan, I believe,

24    just presenting the agreement between the Division of
```

Page 22

1    Child Support Enforcement and Family Court.

2         Q.    Let's turn to page 3 of the document, which is

3    under the section called "Definitions" and it talks about

4    "IV-D Activities," and it talks about six general types

5    of IV-D Activities.  Do you see that, ma'am?

6         A.    Yes.

7         Q.    Is it your understanding that those are the types

8    of activities done by the Family Court for which they are

9    to get reimbursement from the Division of Child Support

10   Enforcement?

11        A.    Yes.

12        Q.    Let's turn to page 7 where the photocopy is

13   awful, but I think we can agree to blame that on Mr.

14   Niedzielski.

15             Apart from that joke, you will see where it

16   says there, "The Court shall comply with all provisions

17   of 45 CFR"?

18        A.    Yes.

19        Q.    And it goes into Federal Financial Participation?

20        A.    Yes.

21        Q.    Do you see that?

22        A.    Yes.

23        Q.    What do you understand Federal Financial

24   Participation to mean?

Page 23

```
 1        A.    I'm not sure.

 2        Q.    Let's look at page 9 where it talks about,

 3    subsection N, it says, "The following costs incurred by

 4    the Court," do you see that, ma'am?

 5        A.    Yes.

 6        Q.    And it says those "qualify for Federal Financial

 7    Participation."  In that context do you know what Federal

 8    Financial Participation means?

 9        A.    No.

10        Q.    More specifically, you don't know whether those

11    really reference the funds that come from the federal

12    government?  You don't know one way or the other?

13        A.    I'm not sure.

14        Q.    Okay.  I'm handing you Exhibit Number 5.

15              MR. NIEDZIELSKI:  One bad page out of all

16    this photocopying, you have to make a point about it.

17              MR. MCNALLY:  Well, the record will show I

18    was teasing you.  It is a bad habit I have, for which I

19    apologize.

20              MR. NIEDZIELSKI:  That's okay.

21              MR. MCNALLY:  Since you are such a

22    good-natured person.

23    BY MR. MCNALLY:

24        Q.    Let's turn to Exhibit 5.  Can you tell us what
```

Page 24

1    this is, ma'am?

2         A.    These are from the budget acts from each year

3    that show what the funding was that the Family Court

4    received.

5         Q.    All right.  And on the first page, it has got

6    handwritten up there "7/1/92 to 6/30/93," that would be

7    the fiscal year ending in '93?

8         A.    Fiscal year '93, yes.

9         Q.    That's what I meant to say.

10        A.    Yes.

11        Q.    Now, it has three categories under the heading of

12   "Personnel," do you see that, ma'am?  On the right-hand

13   column.

14        A.    Oh, I'm sorry, over here, yes.

15        Q.    What does NSF mean?

16        A.    Nonappropriated special funds.

17        Q.    And then there is ASF?

18        A.    Appropriated special funds.

19        Q.    And it is those funds that are from the Division

20   of Child Support Enforcement?

21        A.    Yes.

22        Q.    Then it has got GF, is that general fund?

23        A.    Yes.

24        Q.    Tell me, I may have missed this, but the NSF

Page 25

1    funds, where do they come from?

2         A.    Those are typically through grants.

3         Q.    And the grants are typically from whom?

4         A.    It depends.  I'm not sure.

5         Q.    Sometimes they could be from private charitable

6    companies or organizations?

7         A.    Could be, yes.

8         Q.    Or it could be from some government agency some

9    place?

10        A.    Yes.

11        Q.    Let's turn to the next page, which I guess is the

12   same sort of material for the fiscal year ending June 30,

13   '94?

14        A.    Yes.

15        Q.    Would I be correct then to read this to say that

16   in the fiscal year ending June '94 the Family Court had

17   62 million dollars supplied to it by ASF funding?

18        A.    No.  Are you referring to this column over here?

19        Q.    Yes, ma'am.

20        A.    That's 62 positions.  Those are positions.

21        Q.    When it goes over to the other side, it then has

22   the numbers in dollars where it says "Line Item"?

23        A.    Yes.

24        Q.    So let's see if I have got it right for a change

Page 26

1    this time.   In that particular fiscal year ending in June

2    of '94 the Family Court had $1,765,000 reimbursed to it

3    by ASF funds?

4        A.   For personnel costs, yes.

5        Q.   Yes, ma'am.   And the total that was reimbursed to

6    it was two million, I guess it is nine thousand dollars

7    or so?

8        A.   This --

9        Q.   I'm sorry.   You are nodding and she doesn't take

10   down nods.

11       A.   I'm sorry.   Yes.

12       Q.   That's a yes?

13       A.   Yes.   Actually the two million-nine that's

14   reflected here is the appropriated -- it is the spending

15   level, our spending authority that we have.   That's not

16   necessarily how much was reimbursed by Division of Child

17   Support.

18       Q.   Okay.   But as a general matter you are not

19   supposed to spend more than that?

20       A.   Correct.

21       Q.   And as a number, it is a number that you would

22   have expected to spend in that year, because it is your

23   budget, correct?

24       A.   Yes.

Page 27

```
 1      Q.    So if somebody, for example, were to leave you

 2   might save some money, as an example?

 3      A.    Yes.

 4      Q.    Okay.  And that money, again, did you think that

 5   some or all of that money comes from the federal

 6   government?

 7      A.    Which?

 8      Q.    The two million nine thousand dollars we just

 9   talked about.

10      A.    That's the money that's reimbursed from the

11   Division of Child Support.

12      Q.    Yes.  So you are nodding yes?

13      A.    Yes.

14      Q.    It does come from the federal government?

15      A.    That's my understanding, that they receive

16   federal funds.

17      Q.    I'm going to show you this next exhibit.  What

18   I'm going to try to do here is see if I can figure out

19   what positions are funded by the funding we just talked

20   about, the ASF funding.

21      A.    Okay.

22      Q.    In looking at this chart of positions, can you

23   tell that?

24      A.    No.  This chart, it only reflects general fund
```

Page 28

```
 1    positions.

 2         Q.    The next page in the chart also just reflects

 3    general fund positions?

 4         A.    Yes.

 5         Q.    Would there be in your experience in Family Court

 6    a similar chart to this, say for this year, that would

 7    reflect positions that are funded by the ASF money?

 8         A.    Yes, for this year, yes.

 9         Q.    So now this particular chart, it only goes

10    through, I think it says as of April 1, '94.

11         A.    Yes.

12         Q.    But it is your understanding that none of the

13    positions on here are funded by ASF funding?

14         A.    Yes, that's right.

15         Q.    Did you look for a chart similar to this that

16    would have dealt with in '94 the ASF funding?

17         A.    No.  I wasn't looking for it.

18         Q.    If it was there you would have produced it; is

19    that fair to say?

20         A.    Yes.

21         Q.    It just wasn't there, that's all?

22         A.    I didn't see it.

23              (Discussion off the record.)

24         Q.    While we were off the record you were kind enough
```

Page 29

```
 1    to help me find Bernice Lieberman's position on this

 2    chart, and it is on the third page, Bates number 1289.

 3    Is that right?

 4              MR. NIEDZIELSKI:  Fourth page.

 5        Q.   1269, I'm sorry, and it is the fourth page.  And

 6    it is state position 524.

 7        A.   Yes.

 8        Q.   Do you see that, ma'am?

 9        A.   Yes.

10        Q.   Let me see if I understand this.  It says SO 524.

11    Do you know what SO means?

12        A.   It is state office.  It is one of the sections

13    under Family Court.  It is how the payroll is set up.

14        Q.   And was it a mediation/arbitration officer?

15        A.   Yes.

16        Q.   What does this next column, FLSA, mean?

17        A.   I'm not sure -- I'm trying to think what FLSA

18    stands for.  It is if they are eligible for overtime, I

19    believe.  That's what we put that in for.

20        Q.   What does that annotation there, NCV, mean?

21        A.   Not covered, I believe.

22        Q.   Not covered in what sense?

23        A.   I'm not sure.

24        Q.   I understand you are not sure.  What do you
```

Lieberman
Karen Disch

v.
C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

Page 30

1    think, what does not covered mean in that term?

2        A.    Not covered under FLSA.

3        Q.    Therefore, they would not get overtime if they

4    worked overtime, as you understand it?

5        A.    I believe.  I don't use that anymore.

6        Q.    Then it has got underneath there PG 11.  What the

7    heck --

8        A.    Pay grade.

9        Q.    Pay grade?

10       A.    Yes.

11       Q.    Of course, it has got the name?

12       A.    Yes.

13       Q.    And then it has got a wage?

14       A.    Yes.

15       Q.    What does a "Base Rate" mean?

16       A.    That's how much you receive each pay.

17       Q.    What does "Project Costs Through" mean?

18       A.    That's projected cost.  This report is actually a

19   projection report.  So it is projecting how much money,

20   how much funds are needed.

21       Q.    Between the date of the report, April 1, and the

22   end of the fiscal year?

23       A.    Yes.

24       Q.    What does "OEC" mean?

Lieberman                                    v.                          The State of Delaware
Karen Disch                            C.A. # 96-523-GMS                    February 28, 2005

Page 31

1       A.    Other employment costs.

2       Q.    What are those?

3       A.    Typically pension, unemployment insurance.

4       Q.    And the final column, which apparently does not

5   apply to Ms. Lieberman, is something that says "Notes"?

6       A.    Yes.

7       Q.    What does FLD 3/1 mean or that section?

8       A.    I believe filled.  I'm not sure.

9             (Discussion off the record.)

10      Q.    Now I'm going to give you Exhibit Number 7.  Can

11  you tell us what this document is?

12      A.    This is the last destruction notice that I had

13  for our fiscal documents, by current -- by fiscal year.

14  It is -- basically it allows the destruction for fiscal

15  year '98 and '99 records.

16      Q.    Why did you produce this?

17      A.    This was just to show -- the rest of it is the

18  retention schedule for the state -- we are not required

19  to hold fiscal records after so many years.

20      Q.    Where in this document does it refer to any

21  records from '94, for example?  Is there a specific page

22  there that does that?

23      A.    Not for that specific year.

24            MR. NIEDZIELSKI:  If I can be of assistance

Page 32

 1  here, the way that these retention schedules work is they

 2  characterize a group or a category of documents, and they

 3  will give those category of documents a retention

 4  schedule.  And the reason that we produced this was to

 5  show you why we didn't have all the detailed financial

 6  records that we normally would have, because they have

 7  been destroyed.

 8  BY MR. MCNALLY:

 9      Q.   And what Mr. Niedzielski says is generally your

10  understanding, correct?

11      A.   Yes.

12      Q.   Now, with respect to this, just so I get it,

13  let's just take an example, let's go to page 4 I guess,

14  which is page 864, Bates number, and on here it has got

15  something that says "Intergovernment Vouchers," do you

16  see that, ma'am?

17      A.   Yes.

18      Q.   And across from that it says, "Total Retention

19  Five Years; Successful Audit"?

20      A.   Yes.

21      Q.   And what that would mean is that after I guess a

22  successful audit they would be retained for five years?

23      A.   Yes.

24      Q.   Now, the funds provided to the Family Court by

Lieberman                                 v.                    The State of Delaware
Karen Disch                        C.A. # 96-523-GMS              February 28, 2005

Page 33

1    the Division of Child Support Enforcement, to your

2    knowledge, in 1994 did the Family Court get any grants

3    from the federal government or any federal agency?

4        A.   Not that I'm aware of.

5        Q.   All right.  And there weren't any records that

6    you could look at to determine that; is that fair?

7        A.   Yes, pretty much.

8        Q.   And of course, you weren't there in '94 so you

9    wouldn't --

10       A.   Right.

11       Q.   Now, as of today, in the last fiscal year, for

12   example, did Family Court get any direct funding from the

13   federal government?

14       A.   As of today, no.

15       Q.   Did they ever, to your knowledge, get any direct

16   funding from the federal government?

17       A.   I don't think we have been direct, not that I'm

18   aware of.

19       Q.   So they didn't receive any grants, for example,

20   from the federal government?

21       A.   Right.

22            MR. MCNALLY:  All right.  I think that's

23   really all the questions I have.  Do you have any?

24            MR. NIEDZIELSKI:  No.  I have no questions.

Page 34

1    We will read and sign.  I don't think it will be long.

2              (Proceedings conclude at 10:47 a.m.)

3

4                    I N D E X

5    DEPONENT:   KAREN DISCH                    PAGE

6        Examination by Mr. McNally              2

7

8                  E X H I B I T S

9    DISCH DEPOSITION EXHIBITS                 MARKED

10   1 - National Court Appointed Special
         Advocate Association 2003 Agreement      2
11   2 - Administrative Plan                       2
     3 - Narrative Cost Allocation Methodology     2
12   4 - Cooperative Agreement, Dec. 1997          2
     5 - Budget acts, 7/1/92-6/30/93               2
13   6 - Lists of personnel                        2
     7 - Destruction Notice                        2
14

15

     ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 35
16
     CERTIFICATE OF REPORTER                 PAGE 36
17

18

19

20

21

22

23

24

Page 35

1

2

3

4              REPLACE THIS PAGE

5              WITH THE ERRATA SHEET

6              AFTER IT HAS BEEN

7              COMPLETED AND SIGNED

8              BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Lieberman
Karen Disch

v.
C.A. # 96-523-GMS

The State of Delaware
February 28, 2005

Page 36

```
 1    State of Delaware )
                       )
 2    New Castle County )

 3

 4              CERTIFICATE OF REPORTER

 5

 6           I, Eleanor J. Schwandt, Registered
      Professional Reporter and Notary Public, do hereby
      certify that there came before me on the 28th day of
 7    February, 2005, the deponent herein, KAREN DISCH, who was
      duly sworn by me and thereafter examined by counsel for
 8    the respective parties; that the questions asked of said
      deponent and the answers given were taken down by me in
 9    Stenotype notes and thereafter transcribed by use of
      computer-aided transcription and computer printer under
10    my direction.

11           I further certify that the foregoing is a
      true and correct transcript of the testimony given at
12    said examination of said witness.

13           I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                     Eleanor J. Schwandt

18                     Certification No. 125-RPR

19                     (Expires January 31, 2008)

20
      DATED:
21

22

23

24
```

# EXHIBIT 1

## NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION
## 2003 STATE ORGANIZATION COOPERATIVE AGREEMENT AWARD
## TERMS AND CONDITIONS

**NAME AND ADDRESS OF GRANTOR:**

The National Court Appointed Special Advocate Association ("National CASA")
100 West Harrison
North Tower, Suite 500
Seattle, WA  98119

**NAME AND ADDRESS OF GRANTEE:**

CASA Program/ Family Court of Delaware
New Castle County Courthouse
500 King St, Floor LL-1, Suite 901
Wilmington, DE 19801-3761

**GRANT CONTRACT NUMBER:** DE386-2003-S

**AMOUNT OF AWARD:**    State Organization: $53,000

**DURATION:** July 1, 2003 - June 30, 2005, unless terminated earlier, pursuant to these terms and conditions.

1.    **USE OF GRANT FUNDS**                *CFDA # 16*

The grantee may use the grant funds solely for approved project activities and in accordance with the approved project budget. The grantee is a recipient of grant funds from the National CASA Association under a Cooperative Agreement with the Department of Justice, Office of Juvenile Justice and Delinquency Prevention and subject to the applicable restrictions and provisions of this federal funding as described in the Catalogue of Federal Domestic Assistance (CFDA) 16.547) The grantee shall adhere to cost principles established by the Office of Management and Budget in Circular A-122, which can be found online at http://www.whitehouse.gov/omb/circulars/a122/a122.html. The grantee shall comply with the attached policy on hiring contractors (Appendix A) and the attached travel policy as required by Federal Per Diem regulations (Appendix B).

2.    **LOBBYING**

Grant funds shall not be used to conduct activities directed at legislative or executive agencies, or to influence, directly or indirectly, legislation, executive orders or similar promulgations by federal, state or local agencies.

3.    **POLITICAL ACTIVITIES**

No grantee shall contribute or make available grant funds, personnel, or equipment to any political party or association, or the campaign of any candidate for public or party office. Grantees are prohibited from using funds to advocate for or to oppose any ballot measure, initiative, or referendum.

001339

Case 1:06-cv-00523-GMS   Document 81   Filed 04/04/2005   Page 42 of 54

2

## 4.    FUNDRAISING

Grant funds shall not be used for costs of organized fundraising, including financial campaigns, endowment drives, gift solicitation, and similar expenses incurred to raise capital or obtain contributions.

## 5.    CONFLICT OF INTEREST

No official, board member, volunteer or employee of a grantee organization shall participate personally through decisions, approval, disapproval, contract, or other particular matter in which award funds are used, where his/her immediate family has a financial or personal interest.

Any official, board member, volunteer or employee of a grantee shall avoid any action which might result in or create the appearance of using an official position for private gain or affecting adversely the confidence of the public in the integrity of the CASA program or National CASA.

## 6.    NONDISCRIMINATION

Neither the grantee nor any party with whom the grantee enters into a subcontract shall discriminate on the basis of race, color, sex, religion, nationality, marital status, sexual orientation, age, or handicap in the employment or application for employment or in the administration or delivery of services under this grant. The grantee shall comply fully with all applicable federal, state and local laws, ordinances, executive orders and regulations that prohibit such discrimination. Failure to comply shall be grounds for termination of the grant.

## 7.    DISBURSEMENT OF GRANT FUNDS

Grant funds will be disbursed in eight equal quarterly payments, except in situations where the approved grant budget for the first year of the grant and the second year greatly differ. In such cases, the budget amount for the first year of the grant will be dispersed in four equal payments in the first year, and the budgeted amount for the second year will be dispersed in four equal payments in the second year. An initial disbursement in an amount equal to one-eighth of the total award will be issued upon receipt by National CASA of the terms and conditions agreement signed by the executive/program director and board president. Subsequent grant payments will be made each quarter upon receipt and approval of quarterly expense reports that contain the actual expenditures and obligations as incurred for the reporting period.

National CASA offers one method for grantees to submit quarterly expense reports: the Grantee Budget Information System (GBIS). GBIS is an online service that allows grantees to electronically submit quarterly expense reports and submit requests for grant budget adjustments and supplemental funds. Disbursements in excess of one-eighth of the total grant amount may be requested if projected expenses warrant. To access GBIS, grantees must have access to the internet. National CASA requires the contact names and telephone numbers of individuals who will access GBIS on behalf of the grantee. Once the information is received, a complete information package is sent which contains the GBIS access password. The grantee is solely responsible for the security of this password.

Grant funds may be kept in an interest bearing account. However, interest earned in excess of $250 per year must be remitted to the National CASA Association.

001340

3

## 8.    GENERAL GRANTEE REQUIREMENTS

- Grantee must be a provisional or full program member of the National CASA Association prior to release of grant funds.

- Grantee must demonstrate compliance with National CASA standards by submitting the completed self-assessment to National CASA within the timeframe assigned to the program by National CASA. Programs will be notified several months in advance of the deadline for submission of the self-assessment tool.

- The grantee must send one representative to the 2003 National CASA Grantee Meeting, to be held September 9-10 in Chicago, IL, with the expectation that the representative participate in workshops throughout the day over the course of the meeting.

- The grantee will send at least one but no more than three representatives to the 2004 and 2005 National CASA annual training conferences, when using grant funds for conference related expenses, with the expectation that the representative(s) participate in workshops throughout the day over the course of the conference.

- Grantees will acknowledge affiliation with National CASA on all brochures, newsletters, news releases, stationery and annual reports produced during the grant period by including one of the following: the CASA logo; the words "A CASA Program;" or the words "A Member of the National CASA Association."

- The grantee shall complete and submit the annual Program Survey distributed by National CASA.

- The grantee shall comply with the Travel and Federal Diem Policy guidelines for approved travel expenses in original grant budget (Appendix B).

- Grantees shall notify National CASA if the director of the program, or the staff person responsible for oversight of grant activities, resigns or is removed from that position or when the absence of this individual is expected to exceed a continuous period of one month. In such situations, adequate alternative plans for the conduct of grant activities must be made.

- Grantees are required to acquire and maintain the technological capacity to access the internet and communicate via email.

- If the grantee has applied for and received this grant as an organization exempt from tax under Section 501(c)(3), the grantee will immediately inform National CASA of any change in or challenge to that status.

## 9.    REPORTING REQUIREMENTS

Grantees must report their expenses to National CASA on a quarterly basis using the Grantee Budget Information System (GBIS). Quarterly expense reports must contain the actual expenditures and obligations as incurred for the reporting period. Expense reports will be due on or before October 15, 2003; January 15, 2004; April 15, 2004; July 15, 2004; October 15, 2004; January 15, 2005; April 15, 2005; and July 15, 2005. Narrative reports that present information relative to the performance of the grant

001341

4

9.    **REPORTING REQUIREMENTS** (continued from page 3)

project will be due on a semi-annual basis. Narrative report forms are provided by National CASA prior to the reporting deadline and will be due on or before January 31, 2004; July 31, 2004 and January 31, 2005. The narrative for the last six months of the grant will be included in the final two-year narrative report. The final narrative report will be due on or before July 31, 2005.

10.    **CONSEQUENCES OF NON-COMPLIANCE WITH REPORTING REQUIREMENTS**

Failure to submit an accurate quarterly expense report or semi-annual narrative report by the provided due dates will be considered a violation of this agreement, and may result in withholding of grant payments until corrective action as specified by National CASA has been completed. Failure to meet corrective active conditions in a timely manner may result in suspension or termination of grant funds.

11.    **NATIONAL CASA GRANT MONITORING POLICY**

National CASA will conduct both telephone and on-site visits to selected grantee programs to assess the progress of the CASA program in implementing the grant activities, and to assure that accurate financial records are being maintained and that adequate controls are in place. Programs will be selected for monitoring both randomly and when problems are suspected.

When notified that the program is being scheduled for monitoring, the grantee agrees to cooperate by making the requested personnel and documentation available. When the monitoring is complete, a report will be issued to the director and president of the grantee program, the presiding juvenile court judge, and to the state organization, if the grantee is a local program.

12.    **GRANT ADJUSTMENTS**

Grantees may make minor changes in methodology, approach, or other aspects of the grant to expedite achievement of grant objectives without prior approval of National CASA. Major changes in scope, grant objectives, grant budget, duration of activities, or program staffing must be approved by National CASA in advance. In requesting the adjustment, grantees must set forth the reasons and basis for the proposed adjustment and any other information that would support the request.

13.    **REPAYMENT OF FUNDS**

Grantees must repay funds for expenditures that are found to be unallowable.

14.    **ACCOUNTING SYSTEM**

Grantees must establish and maintain an adequate system of accounting and internal controls. An acceptable system is one which accounts for receipt of funds under each funding source by category of expenditure; assures that expended funds are applied to the appropriate budget category; presents and classifies historical costs of the grant as required for budgetary and evaluation purposes; provides adequate cost controls to assure optimal use of grant funds; is integrated with a system of internal controls adequate to safeguard the funds and assets of the program; meets the prescribed requirements for periodic financial reporting of operations; and provides financial data for planning and evaluation of costs and budget projections.

Case 1:06-cv-00523-GMS   Document 81   Filed 04/04/2005   Page 45 of 54

5

## 15.   AUDIT REQUIREMENTS

Grantees may be subject to audit requirements as set forth by the Federal Government under Office of Management and Budget (OMB) Circular A-133, which can be found online at http://www.whitehouse.gov/omb/circulars/a133/a133.html. Under these requirements, organizations which expend $300,000 or more in federal financial assistance in any fiscal year are required to conduct an A-133 Single Audit in accordance with Generally Accepted Accounting Practices (GAAP) for that fiscal year. A copy must be provided to National CASA within nine (9) months after the end of the grantee's fiscal year.

Grantees not subject to the audit requirements of OMB A-133 are required to provide National CASA with a copy of their IRS Form 990 or a year-end financial statement prepared by an independent Certified Public Accountant or state or local agency authorized to audit government agencies if the program is administered by a court or public agency.

Grantees with audit findings are required to provide National CASA with a written corrective action plan for addressing any unresolved audit findings from the prior year end, as well as addressing any current findings. The plan should provide the name of the contact person responsible for the corrections and the projected completion date. Failure of the grantee organization to resolve audit questions may result in suspension or termination of grant funds.

## 16.   MAINTENANCE OF RECORDS AND EQUIPMENT

The grantee will maintain books and records in accordance with Generally Accepted Accounting Principles. The grantee will keep records of receipts and expenditures of grant funds as well as copies of the reports submitted to the NCASAA and supporting documentation for at least four years after the completion of the use of the grant funds. Books, records, and supporting documentation will be made available to NCASAA for inspection at reasonable times from the date of the acceptance of this grant through such period.

Equipment and materials purchased with grant funds must be used by the grantee in the program or project activity for which it was acquired for as long as needed, whether or not the project or program continues to be supported by grant funds. Title to equipment acquired under the grant will vest in the grantee.

## 17.   RISK MANAGEMENT

Grantees must establish and maintain a comprehensive plan for managing the risk to the program, its employees, volunteers, and board members.

## 18.   DEBARMENT OR SUSPENSION

The grantee assures that neither the program nor any of its principals are presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of federal benefits by a state or federal court, or voluntarily excluded from covered transactions by any federal department or agency.

## 19.   FUTURE SPENDING

The grantee acknowledges that National CASA has made no actual or implied promise of funding except for the amounts specified by this agreement. If any of the grant funds are returned or if the grant is rescinded, the grantee acknowledges that National CASA will have no further obligations to the grantee in connection with this grant as a result of such return or rescission.

001343

6

## 20.   CLOSING OUT THE GRANT

Within fifteen (15) days following the end of the grant period, grantees are required to submit a final financial status report. Within thirty (30) days following the end of the grant period, grantees are required to submit a final narrative progress report.

The final financial status report must show all expenditures for the last quarter of the grant and indicate the exact balance of unobligated funds. Any unobligated/ unexpended funds must be remitted to National CASA. In no case will any unused funds remain with the grantee beyond the submission of the final financial status report.

The final progress report should be made on the form provided by NCASAA and describe the project activities during the final calendar quarter of the project; provide a summary of activities for the entire project; specifying whether all the objectives set forth in the approved application or an approved adjustment thereto have been met and, if any of the objectives have not been met, giving an explanation; and a discussion of what, if anything, could have been done differently that might have enhanced the impact of the project or improved its operations.

## 21.   EXTENSIONS

Extensions to the grant period will not be permitted by National CASA except in rare circumstances. If a grantee believes that an extension is necessary, a written extension request must be submitted at least fifteen (15) days before the end of the grant period. Extensions will be granted for ninety (90) days only and National CASA staff will make every effort to assure that the grantee completes the close out activities within the 90-day extension period.

## 22.   CONSEQUENCES OF NON-COMPLIANCE WITH TERMS AND CONDITIONS AGREEMENT

In the case of any violation of the terms and conditions of the grant, or in the event of the loss of federal funds from which this grant is made, the National CASA Association reserves the right in its absolute discretion to terminate the grant. If the termination results from acts or omissions of the grantee, including but not limited to misappropriation, nonperformance of required activities, or fiscal mismanagement, the grantee shall return to National CASA immediately any funds, whether misappropriated or unexpended, which have been paid to the grantee by National CASA.

National CASA will review both the quality of the work done and progress toward achieving the goals of the grant. If National CASA determines at any time that the grantee is incapable of satisfactorily completing the work of the grant, National CASA may, at its discretion, declare the grant terminated. The determination as to the quality of work being performed, the progress being made toward the goals of the grant and the grantee's ability to satisfactorily complete the work of the grant will be final and will be binding and conclusive.

Upon completion of the grant period or termination of this grant for any reason, the grantee will repay to National CASA any remaining unexpended grant funds.

001044

Case 1:06-cv-00523-GMS     Document 81     Filed 04/04/2005     Page 47 of 54

7

## 23.    APPLICABLE LAW

The grantee will operate in accordance with all applicable federal, state and local laws and ordinances. This agreement shall be interpreted in accordance with the laws of the State of Washington.



**A POWERFUL VOICE IN A CHILD'S LIFE.™**

# APPENDIX A

## NATIONAL CASA ASSOCIATION
## 2003 GRANT TERMS AND CONDITIONS

This is an excerpt from the IRS tax code to help you determine when it is appropriate to hire a person as an independent contractor or an employee. Grantees are expected to review and adhere to all IRS regulations, beyond this summary.

## INDEPENDENT CONTRACTOR VS. EMPLOYEE

To determine whether a worker is an independent contractor or an employee, you must examine the relationship between the worker and the business. All evidence of control and independence in this relationship should be considered. The facts that provide this evidence fall into three categories – **Behavioral Control, Financial Control, and the Type of Relationship** itself.

Behavioral Control covers facts that show whether the business has a right to direct and control how the work is done, through instructions, training, or other means.

Financial Control covers facts that show whether the employer or business has a right to control the business aspects of the worker's job. This includes: The extent to which the worker has unreimbursed business expenses, The extent of the worker's investment in the business, The extent to which the worker makes services available to the relevant market, How the business pays the worker, and The extent to which the worker can realize a profit or incur a loss.

Facts covered by Type of Relationship include: Written contracts describing the relationship the parties intended to create, The extent to which the worker is available to perform services for other, similar businesses, Whether the business provides the worker with employee–type benefits, such as insurance, a pension plan, vacation pay, or sick pay, and The permanency of the relationship.

**National CASA Association Policy:**

To coincide with the Federal tax code, NCASAA places the following requirements on hiring people in CASA programs with NCASAA grant funds.

All individuals hired for programmatic positions must be employees, and the taxes and benefits for these positions must be paid with NCASAA funds, in equal proportion to the associated salary. Programmatic positions include Program Director, Receptionist/Office Assistant, Volunteer Coordinator/Supervisor/Recruiter, Community Outreach, and others.

The use of contractors is allowable only for non-central or short term functions such as data entry, public relations, systems consultants, or other project-specific work.

# APPENDIX B

### NATIONAL CASA ASSOCIATION
### 2003 GRANT TERMS AND CONDITIONS

### TRAVEL AND FEDERAL PER DIEM POLICY

All events that are supported partially or fully with these Federal funds that involve 30 or more participants must not exceed Federal per diem rates for lodging costs.

- This policy affects grant sponsored training, seminars, workshops, or any other gathering of 30 or more participants that requires lodging.
- This policy applies to events partially or fully funded with Federal funds. If an event is not funded by Federal funds, yet the travel costs of the participants are paid with Federal funds, then lodging costs may be up to 150% of the Federal per diem lodging rate.
- The threshold is 30 participants in the conference, training, etc. It does not include speakers, unless the speaker is also a participant.
- For meetings involving fewer than 30 participants, lodging costs may be incurred up to 150% of the Federal per diem lodging rate.

Other travel requirements:
- Lodging bills must be itemized and a receipt for payment attached if applicable. These are to be remitted to the CASA program.
- All travelers must remit the passenger coupon for air transportation to the CASA program.
- Any day's ground transportation which exceeds $16.00 must have receipts attached.
- The maximum Federal reimbursement rate for mileage is .365 cents per mile.

Please review the Federal per diem website for a complete description of Federal per diem policies: http://policyworks.gov/org/main/mt/homepage/mtt/perdiem/travel.shtml.

# THE NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION:

## *GRANTOR:*

Organization:                         The National CASA Association

Name, Title:                          Michael Piraino, Chief Executive Officer

Signature:                            *Michael A. Piraino*

Date:                                 7/1/03

## *GRANTEE:*

Organization Name:                    Family Court of the State of Delaware

Executive/Program Director Name:      Lynn Shreve

Signature:                            *Lynn Shreve*

Date:                                 June 9, 2003


Administrator/Board President Name:   Randall Williams

Signature:                            *Randall Williams*

Date:                                 6/17/03



**A POWERFUL VOICE IN A CHILD'S LIFE.™**



**A child's voice in court®**

# The National Court Appointed Special Advocate Association
2722 Eastlake Ave. E., Suite 220 • Seattle, Washington 98102 • 206-328-8588

## TERMS AND CONDITIONS FOR NCASAA GRANTS

**Name and Address of Grantor:**

The National Court Appointed Special Advocate Association
(NCASAA)
2722 Eastlake Ave E, Suite 220
Seattle, WA  98102

**Name and Address of Grantee:**

Lynn Shreve, State Coordinator
CASA Program
Family Court of the State of Delaware
900 King St
P.O. Box 2359
Wilmington, DE 19899

**AMOUNT OF AWARD: $25,000**

**DURATION:** July 1, 1993 - June 30, 1995, unless terminated earlier, pursuant to these terms and conditions.

1. **USE OF GRANT FUNDS:**

   The Grantee may use the grant funds solely for the implementation or expansion of a CASA/GAL program.

2. **MEMBERSHIP IN NCASAA:**

   Grantee will retain a current program membership in NCASAA and has submitted a signed affidavit of compliance (or intent to comply option) with National CASA standards.

3. **DISBURSEMENT OF GRANT FUNDS:**
   Grant funds will be disbursed in quarterly payments of no less than $5000.00 each.  An initial payment of $5000 of grant funds will be issued by NCASAA upon completion and return of a signed copy of this statement of terms and conditions.  The remaining disbursements will be made upon satisfactory review by the Grantor of each quarterly financial report, which includes an accounting of all expenditures to date, obligated funds, and a request for funds based on estimated expenses for the following quarter.  Grant funds may be kept in an interest bearing account, however any interest earned over and above $100 per grant year on grant funds must be remitted to NCASAA.

001349

If the Grantee fails to comply with any term or
conditions of this agreement, NCASAA may withhold any
payment requested by the Grantee until NCASAA is
satisfied that corrective action, as specified by
NCASAA, has been completed. This right is in addition
to and not in lieu of NCASAA's right to terminate this
agreement as provided in section 7 of this agreement.

4.   **REPORTING REQUIREMENTS:**

Financial reports will include an accounting of all
expenditures made from grant funds to date and a
request for funds based on estimated expenses for the
following quarter.  Quarterly financial reports are due
no later than 15 days after the end of the preceding
quarter (October 15, January 15, April 15, July 15).
Narrative progress reports will provide information on
grant activities as per the proposal activity plan, and
indicate the progress made toward the goals of the
grant. Narrative progress reports are due on or before
January 15, 1994; July 15, 1994; January 15, 1995; and
July 15, 1995. Failure to submit grant reports in a
timely manner will be considered a violation of these
terms and conditions, and will result in termination of
the grant.

5.   **MODIFICATION**

Prior approval is required from Grantor for any budget
revisions in excess of 10% of total budget or if the
scope and objective of the project is changed.  Any
modification or amendment will be made only in writing
and signed by an authorized officer of the Grantee and
of NCASAA.

6.   **MAINTENANCE OF RECORDS:**

The Grantee will maintain books and records in such a
manner that the receipts and expenditures of the grant
funds will be shown separately on such books and
records in any easily checked form.  The Grantee will
keep records of receipts and expenditures of grant
funds as well as copies of the reports submitted to the
NCASAA and supporting documentation for at least four
years after the completion of the use of the grant
funds, and will make such books, records, and
supporting documentation available to NCASAA for
inspection at reasonable times from the date of the
acceptance of this grant through such period.

7.   **VIOLATION OF TERMS; TERMINATION**

In the case of any violation of the terms and
conditions of the grant, or in the event of any change
in or challenge by the Internal Revenue Service of the
status of the Grantee as a Public Charity (if

applicable), the NCASAA reserves the right in its
absolute discretion to terminate the grant. The
NCASAA's determination of any such violation or change
in or challenge to the Grantee's status will be final
and will be binding and conclusive upon the Grantee.
If the termination results from acts or omissions of
the Grantee, including but not limited to
misappropriation, nonperformance of required
activities, or fiscal mismanagement, the Grantee shall
return to NCASAA immediately any funds, misappropriated
or unexpended, which have been paid to the Grantee by
NCASAA.

Both the quality of the work done and progress toward
achieving the goals of the grant will be reviewed by
the Grantor. If the Grantor is not satisfied with the
quality of the Grantee's work or the progress toward
achieving the goals of the grant, or the Grantor is of
the opinion that the Grantee is incapable of
satisfactorily completing the work of the grant, the
NCASAA may, in its discretion, declare the grant
terminated. The Grantor's determination as to the
quality of work being performed, the progress being
made toward the goals of the grant and the Grantee's
ability to satisfactorily complete the work of the
grant will be final and will be binding and conclusive.

Upon completion of the grant period or termination of
this grant for any reason, the Grantee will repay to
NCASAA any remaining unexpended grant funds.

8.    **FUTURE SPENDING**

The Grantee acknowledges that the NCASAA has made no
actual or implied promise of future funding except for
the amounts specified by this agreement. If any of the
grant funds are returned or if the grant is rescinded,
the Grantee acknowledges that the NCASAA will have no
further obligations to the Grantee in the connection
with this grant as a result of such return or
rescission.

9.    **MAINTENANCE OF EXEMPT ORGANIZATIONS STATUS**

If the Grantee has applied for and received this grant
as an organization exempt from tax under Section
501(c)(3) of the Code and is not a private foundation
under Section 590(a) of the Code (referred to hereafter
as a "Public Charity"), the Grantee will immediately
inform NCASAA of any change in or challenge to that
status. Furthermore, the Grantee hereby affirms that
this grant will not cause failure to qualify as a
Public Charity. The Grantee will comply with the
provisions of the Code and the regulations thereunder
applicable to the Grantee as a Public Charity and will
not violate any other statute or regulation applicable

001851

to the Grantee where such violation materially affects
the Grantee's ability to carry out the goals of the
grant.

10. **NONDISCRIMINATION**

Neither the Grantee nor any party subcontracting under
the authority of the Grantee shall discriminate on the
basis of race, color, sex, religion, nationality,
creed, marital status, sexual orientation, age, or
handicap in the employment or application for
employment or in the administration or delivery of
services under this grant. The grantee shall comply
fully with all applicable federal, state and local
laws, ordinances, executive orders and regulations
which prohibit such discrimination.  Failure to comply
shall be grounds for termination of the grant.

11. **APPLICABLE LAW.**

This agreement is in accordance with the laws of the
State of Washington.


**THE NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION:**

NAME AND TITLE     Beth Waid, Executive Director

SIGNATURE:     _Beth Waid_

DATE:     7/1/93


**GRANTEE ACCEPTANCE:**

NAME AND TITLE:   Vincent J. Poppiti, Chief Judge

SIGNATURE:

DATE:     6/28/93

Checks to be issued to:

_Family Court of the State of Delaware_

001352