1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ELBERTA LIEBERMAN,                    )
                                      )
            Plaintiff,                )
                                      )  Civil Action
v.                                    )  No. 96-523
                                      )
FAMILY COURT STATE OF DELAWARE,       )
                                      )
            Defendant.                )


          Deposition of ELBERTA BERNICE LIEBERMAN
taken pursuant to notice at the law offices of Morris,
James, Hitchens & Williams, LLP, 222 Delaware Avenue,
10th Floor, Wilmington, Delaware, beginning at 10:00
a.m., on Monday, November 8, 2004, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

     EDWARD M. McNALLY, ESQ.
     MORRIS JAMES HITCHENS & WILLIAMS LLP
        222 Delaware Avenue - 10th Floor
         Wilmington, Delaware  19801
       For the Plaintiff

     MARC P. NIEDZIELSKI, ESQ.
     STATE OF DELAWARE DEPARTMENT OF JUSTICE
        820 North French Street - 6th Floor
         Wilmington, Delaware  19801
       For the Defendant




               WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
               (302) 655-0477

2

```
 1                    ELBERTA BERNICE LIEBERMAN,

 2             the deponent herein, having first been

 3             duly affirmed under oath, was examined

 4             and testified as follows:

 5                            EXAMINATION

 6      BY MR. NIEDZIELSKI:

 7          Q.   Would you just state your name for the record,

 8      please?

 9          A.   Elberta Bernice Lieberman.

10          Q.   Have you ever been deposed before?

11          A.   No, I have not.

12          Q.   I will ask you and perhaps your own attorney

13      may ask you a series of questions.

14          A.   Okay.

15          Q.   And you will respond to those questions if you

16      understand them.

17                  If you don't understand them, you should

18      stop me and let me know you don't understand the

19      question.

20          A.   Okay.

21          Q.   So I can rephrase the question.

22                  If you answer a question, it will be

23      assumed that you understood the question.

24          A.   Okay.
```

Elberta Bernice Lieberman                3

1    Q.   Is that fair?

2    A.   (The witness nodded.)

3    Q.   If at any time you need to take a break, you

4    let me know.

5    A.   Mm-hmm.

6    Q.   One other important thing is your responses to

7    questions have to be verbal so Mr. Fetzer can

8    stenographically record what you're saying.  Okay?

9    A.   Okay.

10   Q.   Now, it's unlike conversation where we might

11   engage in conversation in hand gestures and face

12   gestures and that's part of the conversation.

13   Unfortunately, he can't get that on the record so

14   sometimes we may stop you and ask you for a verbal

15   response.  Okay?

16   A.   Okay.

17   Q.   What I would like to do first is ask you some

18   basic biographical information on you and your family.

19   Okay?

20   A.   All right.

21   Q.   What's your date of birth?

22   A.   April 23rd, 1947.

23   Q.   That makes you how old?

24   A.   I'm 57.

Elberta Bernice Lieberman                4

1    Q.   Where were you born?

2    A.   In Brooklyn, New York.

3    Q.   Are your parents, either of your parents

4  living?

5    A.   No, they are not.

6    Q.   Do you have any brothers or sisters?

7    A.   Yes, I do.

8    Q.   Would you tell me, first of all, how many

9  brothers do you have?

10   A.   Are we talking living or dead or both?

11   Q.   Both.

12   A.   I have had two brothers.

13   Q.   And how many sisters?

14   A.   I have had two sisters.

15   Q.   How many of your brothers are alive?

16   A.   One.

17   Q.   What's his name?

18   A.   David Lieberman.

19   Q.   Where does David Lieberman reside?

20   A.   It's in Everett, near Seattle, Washington.

21   Q.   And your sisters, how many sisters do you have

22  that are alive?

23   A.   One.

24   Q.   What's her name?

Elberta Bernice Lieberman                5

1      A.    Deborah, D-e-b-o-r-a-h, Auerbach,

2    A-u-e-r-b-a-c-h.

3      Q.    And where does she reside?

4      A.    In Philadelphia.

5      Q.    Do you know the address?

6      A.    7303 Brookhaven Road, Philadelphia, PA,

7    19151.

8      Q.    How long have you lived in Delaware?

9      A.    We moved to Delaware when I was 2 and I lived

10   in New York for one year so that would be three, so a

11   total of 54 years.

12     Q.    Just so I have this correct, when you were 2

13   years old you moved to Delaware?

14     A.    Yes.

15     Q.    Your family moved here to Delaware.  Is that

16   correct?

17     A.    Yes.

18     Q.    Then you said something about a year in New

19   York.  I don't understand that.

20     A.    Okay.  I went to graduate school for one year

21   at C. W. Post College of Long Island University.

22     Q.    Where did you go to high school in Delaware?

23     A.    John Dickinson High School, the one on Milltown

24   Road.

Elberta Bernice Lieberman                6

1      Q.   And what other education did you have after

2   high school?

3      A.   I went to the University of Delaware for four

4   years and got a bachelor's of arts degree with a major

5   in psychology and a minor in sociology.

6      Q.   Do you remember what year that was that you got

7   your degree?

8      A.   In '68.

9      Q.   Then what did you do after you graduated and

10  got your degree from the University of Delaware?

11     A.   Next I worked that summer and then in September

12  I went to C. W. Post College of Long Island

13  University.

14     Q.   And what was your intended course of study at

15  C. W. Post?

16     A.   It was a master's in experimental psychology.

17     Q.   Did you complete that graduate degree?

18     A.   No, I didn't.  I left there in August, the end

19  of August of '69.

20     Q.   Where did you go in August of '69?

21     A.   I came back to Newark, Delaware and lived with

22  a friend and went to work.

23     Q.   Where did you first work?

24     A.   Actually, within two weeks I got two jobs.  One

Elberta Bernice Lieberman                7

1    was at Delaware State Hospital.  I was a psychiatric

2    research technician.  That was part time during the

3    school year and in the summer it was full time.

4              And then also I had then two weeks later I

5    got a job as a child counselor at the Terry Children's

6    Psychiatric Center.  So that was I think in October of

7    '69 I started working there.

8    Q.   I forgot to ask you this question earlier on.

9              Is there anything that would prevent you

10   from understanding questions and answering them as

11   accurately as possible?

12   A.   I can't think of anything, except I am a little

13   nervous.  I do also have attention deficit

14   hyperactivity disorder which sometimes I can get

15   distracted, but it doesn't usually happen.

16   Q.   In other words, there's no condition or medical

17   or medicines you're taking that interferes with your

18   ability to understand the question or answer it?

19   A.   No.  No.  No.  I might just in my mind get

20   distracted by something and need to ask you again, if

21   that's all right.

22   Q.   Sure.  That's fine.

23   A.   Okay.

24   Q.   So in October 1969 you began working at the

Elberta Bernice Lieberman                8

1    Terry Center, correct?

2       A.   Yes.

3       Q.   As a child counselor.  And also you had another

4    job with the State Hospital as a research technician,

5    correct?

6       A.   Right.

7       Q.   How long did that continue?

8       A.   Okay.  The Terry Center job continued until, it

9    was almost three years, until '72, until, yeah, until

10   it was the end of August of '72 and the Delaware State

11   Hospital job continued until '74.

12      Q.   And what happened in '72?  Did you get another

13   job?

14      A.   No.  I decided to try graduate school again,

15   but again I chose experimental psychology.  I went for

16   one semester at the University of Delaware.

17      Q.   Okay.  Then eventually at some point you got a

18   job with the state.  Is that correct?

19      A.   Yes.

20      Q.   When was that?

21      A.   February 16th of 1974.  I believe that's a

22   correct date.

23      Q.   And what agency were you employed by?

24      A.   Family Court of the State of Delaware.

Elberta Bernice Lieberman                9

1    Q.   And in 1974 when you started with the Family

2    Court, what was your job duties?

3    A.   Back then Family Court had jurisdiction over

4    probation and I was a probation counselor and I

5    supervised -- so I worked with children and their

6    parents and also adults who were put on probation by

7    Family Court.

8    Q.   How long did you continue to be a probation

9    counselor or probation officer?

10   A.   You know, I don't remember the exact years.

11   I'm approximating a year, maybe a little longer, until

12   I was promoted.

13   Q.   To what position?

14   A.   It was called -- when I started I was in a

15   counselor trainee position and I was promoted to a

16   counselor position.  I was told I was promoted fairly

17   quickly and then I was transferred into -- do you want

18   to know that?  You didn't ask that.

19   Q.   Yes.

20   A.   I don't think you asked it.

21        Then I was transferred into what was then

22   called the intake unit.  And my duties there?  I think

23   you've been asking about my duties.

24   Q.   Yes.

Elberta Bernice Lieberman            10

1      A.   My duties there are what are I think still now

2    called mediation of civil petitions, such as custody,

3    visitation, child support, and also arbitration, but

4    it wasn't called that back then where I would meet

5    with, if it were a complaint against a child, I would

6    meet with the child and parents and the complainant.

7            And in arbitration you had more authority

8    than in mediation, so it was a little different.  But

9    of course they could always appeal what you wanted,

10   but you were trying in arbitration to divert, if it

11   were a child to divert them to come up with something

12   that if they didn't want a court hearing, and they

13   always had a right to a court hearing, but to divert

14   them from further criminal charges.

15     Q.   How long did you continue in that position?

16     A.   That I'm not exactly sure of.  Okay?  I didn't

17   memorize these dates.  I was in that position for a

18   number of years.  I believe it was till approximately

19   '77, but I could be wrong with that.

20     Q.   What happened in approximately '77?  What

21   happened?

22     A.   I was promoted into -- the court had gotten a

23   federal grant for a person, for an employee to develop

24   a resource manual for the judges and the staff and

Elberta Bernice Lieberman            11

1     that was my responsibility.

2        Q.   And how long did you hold that job?

3        A.   I held it for -- well, on January 1st of '79

4     was when I was given another job.  The job that I had

5     of doing the resource manual, I basically had almost

6     completed the resource manual.  We didn't have

7     computers back then, so it was handwritten and so

8     forth.

9              And they were applying for a grant for a

10    restitution by juvenile defenders project, "they"

11    meaning the Family Court of the State of Delaware.

12    And two other people and I cowrote the whole grant,

13    developed the whole program and the Family Court was

14    awarded a three-year grant.  It was called a million

15    dollar grant, but it actually was I think $872,000,

16    not a million dollars, but that's what it said in the

17    newspaper.

18             And I applied for the second position.

19    The first position you had to have a master's in

20    social work and I really didn't have the experience to

21    be in the top position.

22             But I applied for the second position.  It

23    was called the coordinator and I coordinated to make

24    sure that the program was handled the same statewide,

Elberta Bernice Lieberman          12

1     but my main duties were in supervising probation

2     counselors and human service workers who found

3     community service and jobs for the children who had

4     been found delinquent and were ordered to make

5     restitution of one of three types.

6         Q.   And where was this grant from?

7         A.   This grant was from the federal government.

8     And I cannot remember -- it was federally funded.  I

9     cannot remember which part of the government.

10        Q.   Well, did you actually have reporting

11    requirements, federal reporting requirements?

12        A.   Yes.  I didn't, I didn't have to do them.  That

13    was the director.

14        Q.   Was this a grant that you applied for from --

15    did you apply for it to another state agency?

16        A.   No.  This was, as I understood it -- actually,

17    I know it was.  It was directly to the federal

18    government and, forgive me, I forget which part of the

19    federal government, which agency.

20        Q.   And that was in 1979, correct?

21        A.   No.  They got it in '78.  And my employment

22    and -- I'm hesitating because I don't know if I

23    misspoke earlier whether I was promoted or not, but I

24    was definitely promoted in '79 because I became a

Elberta Bernice Lieberman          13

1     supervisor of these people and coordinator of the

2     program.  And I helped to develop more of the

3     specifics of how is this going to work and learned

4     what we had to provide the federal government in terms

5     of verification and so forth.

6        Q.   You indicated the grant was for three years,

7     correct?

8        A.   Yes.

9        Q.   Do you recall when it ended?

10       A.   It ended early because the director misused

11    some of the federal funds and so it ended sometime in

12    '81 and it was I believe early in '81, but I don't

13    remember the exact time.

14       Q.   And your position, you indicated that you were

15    promoted in '79 you believe to the supervisor

16    position?

17       A.   That I know by then was a promotion.  I think I

18    said earlier I was promoted and I don't know if that

19    was correct, if that was a promotion.

20       Q.   How long did you hold that position that you

21    were promoted to in 1979?

22       A.   Well, I held that position and it was called

23    various things I found out through paperwork until

24    '86.  I did different functions, but I held the

Elberta Bernice Lieberman          14

1    position until it was in '87.  Excuse me.

2        Q.    1987?

3        A.    Mm-hmm.

4        Q.    What happened in 1987?

5        A.    In 1987 I asked for a voluntary demotion to

6    what was called then -- I had been the supervisor of

7    the criminal investigation unit.  Okay?  And I asked

8    for a voluntary demotion to the investigative services

9    officer.

10       Q.    And why did you ask for a voluntary demotion?

11       A.    I had had emotional problems that started --

12   well, I always had emotional problems.  I had been in

13   therapy that didn't have any impact on work and I

14   didn't know why I had the emotional problems until

15   much later.

16            But I had a breakdown in '81 after losing

17   these federal funds.  It was devastating to me.  We

18   had worked so hard and it was a good program and the

19   state did not pick it up.

20            And so then I had another period when I

21   had to go on temporary disability in it was at the

22   beginning, the very last day of '86 through the first

23   three months of '87.  And I was hospitalized during

24   that time and when I came out I was given the first

Elberta Bernice Lieberman                15

1     bad evaluation I had ever been given.  And I consulted

2     with an attorney and did an appeal of that evaluation.

3     And my attorney suggested that I consider the

4     voluntary demotion.

5          As it turns out now I know I have, you

6     know, the attention deficit hyperactivity disorder

7     which affected my ability to handle paperwork, keep up

8     with paperwork and so forth and remain organized and

9     focused.  I didn't know that back then.

10          And so I asked for the voluntary demotion

11    and it was granted.

12    Q.   Now, you indicated that was right after you had

13    been on temporary disability?

14    A.   Yes.

15    Q.   How long were you on that temporary disability?

16    A.   That one?  For three months.

17    Q.   Three months?

18    A.   Mm-hmm.

19    Q.   And that was from the very end of 1986 you

20    indicated to the very beginning of 1987?

21    A.   Until the end of March, I believe, maybe the

22    beginning of April.  I might have used -- temporary

23    disability back then was three months and I may have

24    used some sick leave before that.

Elberta Bernice Lieberman          16

1    Q.   And the reason for this disability, what was

2    the reason?

3    A.   The reason...

4          MR. McNALLY:  I'm sorry.  The question is

5    a little vague.  By "the reason" you mean what medical

6    condition she had?

7          MR. NIEDZIELSKI:  Yes.

8    BY MR. NIEDZIELSKI:

9    Q.   What was the medical condition or the reason

10   why you took temporary disability for three months?

11   A.   Depression and migraines.  I had had migraines

12   for years and once Claritin was developed later that

13   helped.  It was that sinus headaches were setting off

14   migraines was one of the reasons I had migraines.

15         And it was an evaluation, a reevaluation

16   and I had been put on too many medicines, conflicting

17   medicines.  In this three months the doctor, the

18   psychiatrist who was assigned to me brought in, like

19   had me see different specialists and found out that

20   some of the medicines were making me sicker.  And so

21   it was a real total readjustment of my medicines.

22   Q.   So you came back to work you believe in March,

23   perhaps April 1987?

24   A.   It was April, mm-hmm.

Elberta Bernice Lieberman                17

1      Q.    April.  What was your position when you came
2    back?
3      A.    I was the supervisor of the criminal
4    investigation unit.
5      Q.    I thought you took a voluntary demotion.
6      A.    After that.
7      Q.    I see.  Okay.  You came back --
8      A.    I came back and then they did this evaluation
9    that I appealed then and basically lost.  I won one
10   point and lost the rest and my lawyer suggested that I
11   ask for a voluntary demotion and it was granted.
12     Q.    And then you started working in 1987 as the
13   investigative service officer, correct?
14     A.    Position, yes.
15     Q.    How long did you hold that position?
16     A.    I held that position I believe it was --
17   forgive me.  I did not memorize these dates so don't
18   hold me to this.  But I believe it was until June of
19   '89.
20     Q.    What happened in June of 1989?
21     A.    I had asked for a transfer earlier to the
22   mediation unit and both supervisors were in agreement.
23   Ana DePaul, who was supervisor of mediation, had
24   supervised me in the intake unit and at the end of my

Elberta Bernice Lieberman                18

1    time there and said she would be happy to have me.  In

2    there there was a delay in when it was granted, but it

3    was granted.

4       Q.   Now, in 1981 when you had your first temporary

5    disability, do you recall how long that one was?

6       A.   I was out a long time and it wasn't on

7    disability.  I was on sick leave first and I used up

8    almost all of my sick leave.  And Robert Jackson back

9    then was the personnel director and he met with me and

10   told me I had the right to apply for temporary

11   disability.

12      Q.   And did you do that in 1981?

13      A.   Yes.

14      Q.   Do you recall how long you were on temporary

15   disability in 1981?

16      A.   I think it went over until the beginning of

17   '82, the three months.  I can't remember the specific

18   dates.  Forgive me.

19      Q.   Was it temporary disability in '81 to '82?

20      A.   Yes.  Mm-hmm.

21      Q.   Then you had another temporary disability in

22   '86-87?

23      A.   Yes.

24      Q.   And what was the medical condition or reason

Elberta Bernice Lieberman          19

1    for the temporary disability in 1981?

2       A.   In 1981...

3            I'm hesitating because it's often very

4    hard to misdiagnose a person like me and I was

5    misdiagnosed, but the condition was I was diagnosed as

6    having bipolar disorder.  I had stopped -- you can

7    have different diagnoses.  I had stopped being able to

8    eat or sleep.

9       Q.   So it was diagnosed as bipolar, you believe

10   wrongfully diagnosed?

11      A.   No.  I thought it was wrong, but my present

12   psychiatrist has explained that with the symptoms I

13   had you can have, you can have more than one disorder,

14   psychiatric disorder, and back then it looked like I

15   was bipolar.  And so certainly not being able to eat

16   and sleep for weeks was a problem.  I couldn't

17   function at work.

18      Q.   You couldn't do the work at all in 1981 then

19   when you had this problem?

20      A.   Actually, I was very creative.  You can become

21   very productive and I developed a whole program at my

22   supervisor's request.  That was Mary Lawson.  And she

23   had suggested I suggest something to the court to take

24   the place of what we had lost.

Elberta Bernice Lieberman          20

1     Q.   From the grant you mean?

2     A.   Yes.

3     Q.   The Robert Jackson that you mentioned that was

4     head of personnel, did he later become a magistrate?

5     A.   You know, I don't think so because -- I don't

6     know.  I met him once in a framing store and he told

7     me he's working at this big -- forgive me.  I

8     sometimes lose words when I get...

9             It's like a Hilton or something, so I

10    don't think he's a magistrate.

11    Q.   Could you describe Robert Jackson to me?  Could

12    you do that?

13    A.   Back then?

14    Q.   Yes.

15    A.   I'm not really great at describing people, but

16    I would say he's medium height, he had brown hair.

17    White, if you want to know that.

18    Q.   Now, when you are on temporary disability does

19    the state pay you?  Do you get funds when you're on

20    temporary disability?

21    A.   Yes.

22    Q.   Do you get your regular paycheck?

23    A.   Yeah.

24    Q.   And what happens?  I mean, who determines the

Elberta Bernice Lieberman          21

1    temporary disability is over with?

2              MR. McNALLY:  I'm sorry.  Excuse me.

3    We're talking back then or today?

4              MR. NIEDZIELSKI:  Yes.  I'm talking in

5    1981.

6    BY MR. NIEDZIELSKI:

7      Q.   Who determined when you, for instance, now

8    could come back to work?

9      A.   Well, it changed.  I really don't know.  I

10   don't feel qualified to answer that because I can tell

11   you what I learned later in applying for disability

12   that either the law had changed, the state had

13   changed, the law or the state had changed their

14   policy.  I don't know what the policy was in '81, to

15   be honest.

16     Q.   In '81 there was a period of time when you were

17   on temporary disability?

18     A.   Yes.

19     Q.   At some period of time did you want to or you

20   thought you were well enough that you could go back to

21   work?

22     A.   Yes.  My doctor thought so, but sometimes it

23   became later that the state decided also.

24     Q.   In other words, they might ask for some records

Elberta Bernice Lieberman              22

1    or some follow-up examination or something like that?

2    Is that what you're saying?

3       A.   Well, yes.  They would expect that, but they

4    also changed the rules, that you couldn't be out on

5    temporary disability for less than three months.

6       Q.   In other words, once you were approved for

7    temporary disability, you had to remain on temporary

8    disability for three months?

9       A.   Yes.  It didn't make any sense to me, right.

10      Q.   And during that period of time your wages, your

11   salary was continued, correct?

12      A.   Yes.

13      Q.   And all other employment benefits were

14   continued?

15      A.   Yes.

16      Q.   Now, did it change in 1987 when you were on

17   temporary disability?

18      A.   In 1987 there was -- did what change?  I'm

19   sorry.  Let me ask you.

20      Q.   The way that you would get temporary

21   disability.

22      A.   No. The way you got it wasn't different.  It

23   was how long you had to stay on it was different.

24      Q.   And how did that change in 1987?

Elberta Bernice Lieberman          23

1      A.   It actually didn't change.  It changed earlier

2      than in '87.  I was on temporary disability I believe

3      it was in '84.

4      Q.   Okay.

5      A.   Okay.  And it was then that I went -- my

6      doctors said actually I wasn't ready to go back to

7      work, but I was so concerned about my unit.  My work

8      is an important part of, has always been an important

9      part of my life and I did feel a responsibility to my

10     unit, to the community and so forth.

11          And I went back early and it turned out

12     that the state had changed the rules but never

13     notified us that you had to stay out three months or

14     you had to repay all of that money and I appealed

15     that.  Luckily I had a friend who worked for the

16     Department of Labor.  They had been told.  We hadn't.

17     And so they did -- I didn't have to pay back the

18     money, but they had changed the rules which didn't

19     make a lot of sense to me, but that's what happened.

20     Q.   Earlier in your testimony you had indicated you

21     had took a temporary disability in 1981?

22     A.   Yes.

23     Q.   Then we talked about a disability, temporary

24     disability in 1987.

Elberta Bernice Lieberman          24

1    A.   Yes.

2    Q.   Now you just mentioned that you also had a

3    temporary disability in 1984.

4    A.   Yes.

5    Q.   Was that for three months as well?

6    A.   No.  It was less.  I can't remember the exact

7    amount of time, but it was less and then, as I

8    explained, they eventually granted it.

9    Q.   What was the medical or other reason for that

10   temporary disability in 1984?

11   A.   Depression and anxiety.  There had been many

12   changes in how Family Court -- what's the correct

13   word? -- was organized and there were many changes in

14   supervisors and just how it was looked at was

15   different.  So often I would make it, you know --

16   often?  In that case I made it through a very

17   difficult time.  I had very constructive supervisors

18   before and I felt that this one did not offer

19   constructive criticism and was not clear.  It was

20   difficult.

21        I mean, I got a good evaluation as I

22   recall from him, but it was a difficult, a very

23   difficult time.

24   Q.   And this is in 1984 we're speaking about?

Elberta Bernice Lieberman              25

1    A.   Yes.

2    Q.   Any other disability periods of time where you

3    were not employed because you were disabled?

4              MR. McNALLY:  After '84?

5              MR. NIEDZIELSKI:  After '84.

6              MR. McNALLY:  We have already talked about

7    '87.

8    A.   The one in '87.

9              MR. McNALLY:  Anything after '87 I think

10   he's now asking.

11   A.   I'm drawing a blank and I'm not trying to

12   mislead you in any way.  The records are there.  Why?

13   I am being distracted.  I found a note last night when

14   I was reviewing something that I actually was out of

15   work for two weeks, but that was just on sick leave in

16   I believe it was '88.

17             MR. McNALLY:  Let me prompt you.  Are you

18   talking about your cancer, where you had the cancer?

19             THE WITNESS:  Thank you.

20             MR. McNALLY:  Does that help you?

21             THE WITNESS:  That was later in '88.

22   You're right.  Thank you for reminding me.  Yes.

23   A.   I had cancer, breast cancer in '88.

24   Q.   And that was in 1988?

Elberta Bernice Lieberman          26

1     A.   And I did have to go on disability because the

2     chemotherapy made me so ill.

3     Q.   And how long was that disability?

4     A.   I had to stay out the three months because I

5     didn't have enough -- I had used my sick leave for all

6     of the operations and the treatment.  But then after

7     the treatment was done, I became very ill, both

8     treatments, the radiation and chemo.  And the rules,

9     either the law or state rules said you had to stay out

10    three months.

11    Q.   So at the end of that disability period what

12    position did you come back to?

13    A.   I was still a mediator.

14    Q.   Had they changed your job at all when you came

15    back to it in 1988?

16    A.   This was at the end of '88.  I don't remember

17    the specific dates.

18         As I recall, I mean some of the procedures

19    may have changed but, no, my job was -- they added

20    responsibilities to all of us.  There were

21    responsibilities, there were responsibilities of

22    mediators back then that I do not believe existed

23    after I left.  They were changing it.

24    Q.   Now, from the period of 1988 when you returned

Elberta Bernice Lieberman          27

1    back to your work as a mediator, did you continue work

2    as a mediator?

3      A.   Yes.

4      Q.   And until you left in 1994?  Is that correct?

5      A.   As I recall, yes.

6      Q.   And had the duties of the job, that position

7    had it changed?

8      A.   They had increased, yes.

9      Q.   But did it increase for everyone?

10     A.   It increased my answer is for the state-funded

11   mediators.  And yesterday Mr. McNally asked me not to

12   say that, but it increased for the state-funded

13   mediators.  The court was concerned and I was glad

14   they were, we all were, that people were having to

15   come in for many mediations.  Nobody was looking at

16   their files.  They were not -- computers weren't in

17   yet and nobody was seeing that these people were

18   continually having to take off from work.

19           So one of our jobs was to go through the

20   files and make sure before a mediation was even

21   scheduled to make sure that there weren't any other

22   pending mediations or, excuse me, pending petitions

23   that had to be mediated so that we would consolidate

24   them.

Elberta Bernice Lieberman          28

1              We also had to review -- things were not

2    being done that needed to be done.  You know what a

3    summons is where the respondent gets the notice.  That

4    was not being done.  The notices were to incorrect

5    addresses.  So that was one of the big

6    responsibilities and the other is that we were asked

7    to do all of the clerical functions following the

8    mediation that used to be done by clerical staff just

9    because if we could do it, you know, like hand out --

10   we had to give out or mail out all of the notices.  We

11   had to do the wage attachments and mail them out.  We

12   had to do all of the docketing of what had happened

13   and so forth.  So those were in addition.

14              That's the type of thing that took time

15   and were in addition.

16      Q.   Have your doctors presently said it's okay for

17   you to go back to work now?

18      A.   My doctor -- I think that was in your last

19   request.  My doctor feels that when this case is

20   resolved, he feels that I am able to work.

21      Q.   You're presently capable of working?

22      A.   Except I'm not -- I'm able to be focused and so

23   forth.  But this has had, this case has such an impact

24   on me that I can't go back to work until it's

1    resolved.

2      Q.   Well --

3      A.   Well, at least at this moment that's where I am

4    about it, yes.

5              MR. McNALLY:  Let me explain something to

6    you, Bernice.

7              THE WITNESS:  Okay.

8              MR. McNALLY:  The two of you had

9    overlapping conversations just then and while

10   Mr. Niedzielski was asking you a question you were

11   answering a slightly different question.  And I think

12   the questions got overlapped, so it's a little

13   confusing.

14             So remember what we talked about

15   yesterday.  Please wait for him to ask a question and

16   then you can give whatever answer you want, but be

17   patient with him.

18             THE WITNESS:  Okay.

19             MR. McNALLY:  He requires a lot of

20   patience I found over the years.

21   BY MR. NIEDZIELSKI:

22     Q.   Let me see if we can clarify that.

23             When was the last day that you worked at

24   the Family Court as a mediator?

Elberta Bernice Lieberman                30

1      A.    October 28th of 1994.

2      Q.    Now, on that day or thereafter, on the day

3   after that were you capable of going back to work?

4      A.    The day after that?  No.

5      Q.    When is the first day that you would be capable

6   of going back to work?

7      A.    I'm still not capable of going back to work.

8      Q.    Okay.  And why is it that you're not capable of

9   going back to work?  In other words --

10      A.    That's a very hard question to answer.

11      Q.    Well, would you be able to do the work?

12      A.    It's very hard to answer because it includes

13   this case, what Family Court did to me in not giving

14   me accommodations I'm alleging.  I don't know how to

15   answer that.  Family Court's having put me on

16   suspension with pay and then threatening that if I

17   didn't go on permanent disability that they would fire

18   me has caused -- I'm in a dilemma, I've been in a

19   dilemma ten years.  It certainly made me very ill.  My

20   work helped give me worth.  I did something important,

21   to me in my mind I did.  I did it well.  I showed

22   people respect in a difficult system.

23            I need a resolution that what was done to

24   me, what was not given to me, what was not afforded to

Elberta Bernice Lieberman              31

1    me was incorrect.  It's still very much emotionally

2    affecting me and I'm still under the threat from

3    Mr. Closiewicz that if I try to go back to work for

4    the State of Delaware, the next day they will schedule

5    a hearing to fire me.  Now, that's my understanding.

6        Q.   You put in for a disability pension, correct?

7        A.   Yes.

8        Q.   And did you get it?

9        A.   Yes.

10       Q.   Did you put in for a disability pension with

11   Social Security Administration?

12       A.   Yes.

13       Q.   Did doctors offer evidence in support of your

14   getting a disability in both of those, Social Security

15   and --

16       A.   Yes.

17       Q.   Did the doctors say on your behalf that you

18   were incapable of working?

19       A.   At that time, yes.

20       Q.   Is that still true today or has that changed

21   from --

22       A.   Yes.

23       Q.   It's still true today?

24       A.   That I cannot work.

Elberta Bernice Lieberman          32

1              MR. McNALLY:  That's fine.  The answer was

2    fine.  That was another example --

3              THE WITNESS:  Where I jumped?

4              MR. McNALLY:  Where you jumped.  Just be

5    patient, Bernice.

6      A.   It's complicated.  May I add that?

7      Q.   Well, that's fine.  Why don't you go ahead and

8    add that.

9      A.   Thank you.  I added it.

10     Q.   I thought you wanted to --

11     A.   No.

12     Q.   Since October 29th of 1994, have you sought or

13   attempted to be employed?

14     A.   No.  And let -- may I broaden my answer?

15     Q.   Sure.

16     A.   I consider volunteer work employment, but I've

17   not -- and I have sought to have a volunteer job, yes.

18     Q.   Have you ever sought full- or part-time

19   employment?

20     A.   No.

21     Q.   Now I'm going to ask you about your physical

22   conditions and other conditions which are at issue

23   here.  And I guess I would like you -- first I want to

24   ask you as of 1994, prior to October 28, 1994, what

Elberta Bernice Lieberman          33

1   were your physical and medical conditions?

2      A.   I have had osteoarthritis, had been diagnosed

3   with that for a number of years and I could not be

4   treated for it because I also have a lot of

5   gastrointestinal issues and the medicines for the

6   osteoarthritis I can't take because of my

7   gastrointestinal problems.

8              I was -- I had a lot of my

9   gastrointestinal problems had been taken care of by

10  just changing my diet.  I have a lot more bulk in it.

11  But then I do have reflux esophagitis, stage 3, and

12  I'm still on medication for that.  I was put on

13  medication when I worked there.

14             It was also found -- I'm going to check.

15  Are we talking just '94?  Just before I left?

16     Q.   Yes.

17     A.   Okay.  I had been -- may I include the year

18  before?

19     Q.   Absolutely.  If you want to be as accurate as

20  possible, that's fine.

21     A.   The reason why I say that is that when I went

22  to the Department of Labor to the EEO representative

23  and consulted with him, Steven Paikin was his name, he

24  suggested that I get evaluations by my different

Elberta Bernice Lieberman          34

1     doctors and provide that to the court.  And I found

2     out in one of those evaluations that I also had a

3     bleeding ulcer.

4        Q.    Okay.

5        A.    Also one of the other -- let me try and take

6     medical conditions first.  Okay?

7              So I also had problems, major problems

8     with my teeth.  I had switched dentists because I took

9     advantage of the state's dental plan.  And I had teeth

10    that were abscessed and I was working with them and

11    they got worse.  They got very bad at the end, in

12    October they were increasingly getting worse and they

13    weren't resolved until after I left.

14             I think in -- yeah.  So I had that.  Let

15    me think what else.  I have chronic venous

16    insufficiency which makes it difficult for me to stand

17    for long periods of time.  I'm trying to think what

18    else I left out about physical.

19             Then I also had an evaluation about a

20    possible learning disability and on January 21, I

21    believe the date of the report is, I was found by

22    Dr. Lynn Erb to have, in effect, attention deficit

23    hyperactivity disorder.  She apparently can't diagnose

24    that I've learned since.  It had to go to a

Elberta Bernice Lieberman                35

1    psychiatrist.  And I was having there were other --

2    okay.

3            So then the other thing that happened was

4    I started developing some other emotional symptoms.

5    And so my psychiatrist had me go for an MM --

6    Q.   MMPI?

7    A.   No.  Sorry.  That's the psychological test.

8    Q.   MRI?

9    A.   MRI.  And it was read incorrectly.  And this is

10   early in '94 and they said that I had cancer in two

11   parts of the outside of my brain, in my head, not in

12   my brain.  It wasn't -- and so then I had to go to all

13   these doctors and so forth and it was finally

14   determined that that wasn't true.  It was misread, but

15   I had to go through -- I missed a lot of time from

16   work because I had to have those spinal punctures.

17   What do they call them?  Spinal?  Where they test in

18   your spine.

19           And when they all kept coming up fine,

20   then my neurologist went and found out it had been

21   misdiagnosed.  That was very difficult.  You know,

22   during the same time I was struggling with issues in

23   Family Court.

24           Then we found out that I had been

Elberta Bernice Lieberman          36

1    misdiagnosed and I had been on lithium since 1981, so

2    this was found out in March of '94.  I had been on

3    lithium practically that whole time and I had problems

4    with explosions of diarrhea in the morning that

5    affected my attendance, my promptness being at work.

6    And so that was a medical condition that once I had

7    been off of the lithium it virtually went away and I

8    did not know all of those years.  I had been trying to

9    deal with it by getting up at 5:00 in the morning so

10   the explosions would be over in time.

11           MR. McNALLY:  Okay.  You're getting

12   sidetracked.  Just stick to your medical conditions in

13   1994.

14           THE WITNESS:  Medical conditions?  Okay.

15   Thank you.

16     A.   All right.  So then also I'm trying to think

17   if -- Ed, please help me if I have forgotten.

18           The psychiatric condition -- excuse me.

19   In addition to the psychiatric or part of it was the

20   question about a sleep disorder and I had also been

21   evaluated as having a sleep disorder and that's on

22   record.

23     Q.   Did you have a sleep disorder?

24     A.   I have trouble with sleep.  It's not totally

Elberta Bernice Lieberman                37

1    analyzed now.  I'm supposed to have another test for

2    sleep apnea.  My psychiatrist wants me to have it and

3    I haven't and I will soon.  I have sleep problems,

4    going to sleep.  I don't have sleep medication, take

5    medicine.

6              And my psychiatric disorder it was very

7    difficult because I was told that I had been

8    misdiagnosed and so my psychiatrist at the time said

9    she couldn't be my psychiatrist anymore.

10             MR. McNALLY:  I'm sorry.  There's no

11   question.  The question pending is:  Do you have a

12   sleep disorder?  And now you're getting into this

13   other stuff.

14             THE WITNESS:  Sorry.

15   BY MR. NIEDZIELSKI:

16    Q.   Now I would like, if you would -- I consider

17   psychiatric problems a medical problem.

18    A.   Yes.

19    Q.   But you treat them differently or you describe

20   them differently.

21    A.   I was trying to -- I consider them medical

22   also.

23    Q.   Okay.

24    A.   I was trying to categorize in my mind so I

Elberta Bernice Lieberman          38

1    stayed with medical.

2      Q.   I understand.  What I would like you to do is

3    turn your attention to what they call psychiatric

4    problems or emotional disorders, whatever you want to

5    call them.

6      A.   Mm-hmm.

7      Q.   Why don't you go ahead and describe those?

8    This is as of prior to October of 1994.  Okay?

9      A.   Prior?

10     Q.   Right.

11     A.   Okay.

12          MR. McNALLY:  Excuse me.  Before you

13   answer, I need a clarification.  You mean sort of the

14   year before?  Is that all right?

15          MR. NIEDZIELSKI:  That's fine.

16          MR. McNALLY:  We don't want to go back to

17   '86?

18          MR. NIEDZIELSKI:  No.  She's going to

19   describe I think a history of some of these things

20   that were misdiagnosed.

21   BY MR. NIEDZIELSKI:

22     Q.   But as far as 1984 and the year prior to

23   that --

24     A.   '94?  You just said '84.

Elberta Bernice Lieberman          39

1    Q.   I'm sorry.  I meant '94.  I meant '94 and the

2    year prior to that, '93.

3              What were your problems or your

4    conditions, psychiatric conditions?

5    A.   Well, I was diagnosed as having bipolar

6    disorder.  I suffered from depression and then....

7              MR. McNALLY:  We're talking about '94 and

8    '93, Bernice.  Is that what you're talking about?

9              THE WITNESS:  Yes.  Thank you.

10   A.   '94 and '93.  So it was depression and they

11   said I was bipolar.  And then in March of '94 I had an

12   evaluation by Alan Gruenberg, Dr. Alan Gruenberg, who

13   was a psychopharmacologist, because Dr. Mathisen, my

14   psychiatrist, thought maybe I was on the wrong

15   medicine.

16             And he said that yes, she's on the wrong

17   medicine, but she's totally misdiagnosed.  But it was

18   a tentative diagnosis.  So anyway it was diagnosed

19   that I had dissociative disorder at that point, not

20   which type.  And it became -- and so then I changed

21   and got a different psychiatrist.

22   Q.   And have you been treated for that since 1994?

23   A.   Yes.

24   Q.   Successfully treated for it?

Elberta Bernice Lieberman          40

1     A.   I think the question is what do you mean by

2     "successfully"?

3     Q.   I mean to the point where -- well, let me ask

4     you this.  Let's just go through these one at a time.

5               Reflux, how does that affect your life,

6     having reflux?

7     A.   As long as I'm on the medicine, there is no

8     effect.

9     Q.   The medicine you take is Prilosec?

10    A.   No.  Right now I have been changed to Prevacid.

11    I was on Prilosec back then.

12    Q.   Then your dental problems, have they been

13    rectified?

14    A.   I ended up having the abscessed teeth, yes.

15    That's rectified.  I have no teeth left.

16    Q.   But does that have any influence or effect on

17    your life?

18    A.   On which part of my life?

19    Q.   Is it a good thing now that you've had your

20    teeth problem solved?  It doesn't negatively influence

21    your life anymore?

22    A.   It negatively influences my life, but if I were

23    working it didn't negatively affect my working.  So

24    I'm not sure what you mean by life.

Elberta Bernice Lieberman          41

1    Q.   The venous insufficiency, how does that affect

2    the normal things that you do during the day?

3    A.   I just can't stand for long periods of time and

4    walking can be difficult.

5    Q.   And was that ever a problem when you worked?

6    A.   It had started.  I don't think it was -- after

7    I was no longer working, there was time to go to other

8    doctors.  For instance, about my allergies that I had

9    never been -- I didn't take the time during work when

10   I worked to address that.

11   Q.   And that's when you found out that they weren't

12   migraine headaches but they were actually sinus?

13   A.   Actually, I found that out earlier when

14   Claritin came to be and my medical doctor gave me

15   Claritin.  The migraines decreased majorly.

16   Q.   And you indicated that you also had

17   osteoarthritis?

18   A.   Yes.

19   Q.   In what joints?

20   A.   I have it in my back, throughout my back.  They

21   tell me the pain in my hips is from the arthritis in

22   my lower back.  I have it in my knees, in many of my

23   joints, my hands.

24   Q.   And over the years has it gotten worse or has

Elberta Bernice Lieberman                42

1    it gotten better?

2      A.    I would say it varies at times.  I think the

3    osteoarthritis as I experience it in my lower back has

4    gotten worse.

5      Q.    Since 1994 it's gotten worse you believe?

6      A.    Yes.  So like the way that affects me is in

7    walking up steps and down the steps.

8      Q.    In other words, it makes it more difficult for

9    you to walk?  Is it more painful?  Is that why?

10     A.    Not the walking.  It's walking up steps and

11   down steps, which I have to do to get into my

12   apartment so it affects my life.  Not walking in

13   general.

14     Q.    Now, you indicated in 1994 you had been

15   misdiagnosed -- well, earlier you had been diagnosed

16   with depression and I think you said bipolar, correct?

17     A.    Mm-hmm.

18     Q.    Whatever they called it in 1994, how did those

19   psychiatric conditions, how did they affect your life?

20   What do they prevent you from doing?

21     A.    When?  Now?

22     Q.    No.  In 1994 and up until the present.  If you

23   want to, up until the present time.

24     A.    Oh, I didn't understand the scope of the

Elberta Bernice Lieberman            43

1     question.  I don't think they prevented me from doing

2     anything.  I think the situation of having my

3     psychiatrist leave me because if she had misdiagnosed

4     me for years, that was a trauma for me and had an

5     emotional effect on me, but it didn't have an effect

6     on my being able to work.

7              When I would go actually to a mediation,

8     if I may --

9              THE WITNESS:  Ed, tell me if this is okay.

10     A.   In terms of what my work was.  Now that I

11     understand that I have ADHD and back then that helped

12     and then when I would go into a mediation it was a

13     very focused hour and 45 minutes and that was very

14     good for me because I knew, I explained what we were

15     there for and so forth and knew what my role was and

16     didn't have many distractions, you know.  I don't

17     know -- it was fine.  I think I got better because

18     actually the new diagnosis explained some things to

19     me.

20     Q.   Now, the new diagnosis you're talking about is

21     what?

22     A.   Dissociative disorder.

23     Q.   When was that diagnosis made?

24     A.   At the end of March of '94, tentatively.

Elberta Bernice Lieberman          44

1      Q.   What are the symptoms that you feel of
2   dissociative disorder?
3      A.   Actually, some of the symptoms are from the
4   attention deficit hyperactivity disorder.  I think the
5   ADHD was affecting me more at work than the
6   dissociative disorder.  Once I learned I had the ADHD
7   and we had the recommendations from Dr. Erb, I
8   remember bringing up at a unit meeting that I wanted
9   the staff to understand that I had been told I have
10   this disorder and it would help me to have my door
11   closed when I was doing my paperwork and not in
12   mediation.
13           So that I didn't want them to feel I was
14   being angry or my closing my door was for any other
15   reason than to help me remain focused on what I was
16   doing.
17      Q.   And did it help you remain focused on what you
18   were doing?
19      A.   Oh, yes.
20      Q.   In 1994 and 1993, in the year prior to that,
21   were you having problems keeping up with the
22   paperwork?
23      A.   Yes.
24      Q.   And were you having problems with being on

1    time?

2        A.   Which year?  I'm sorry.

3        Q.   In '94, '93.

4        A.   In '93, yes.  And at the beginning once in a

5    while in '94.

6        Q.   Were you warned in 1993 about excessive

7    tardiness or anything like that?

8        A.   Yes.

9        Q.   And did you go through counseling, do they have

10   like what they call counseling where you meet with

11   your supervisor and you discuss it?

12       A.   I believe so, yes.

13       Q.   In other words, they gave you an opportunity of

14   resolving the problem by a period of time you would go

15   where you would not be late for work or miss days?

16       A.   I do remember reading that somewhere.  I don't

17   remember all of the specific facts, but I did get

18   better.  I remember I learned not to try to come to

19   work on 95.  I found another way and it was much --

20   Maryland Avenue was much less, you know, by going all

21   of the back roads and straight through, that helped.

22            But it didn't help the explosions of

23   diarrhea and I didn't know until March of '94 or

24   approximately then that it was the lithium that I was

Elberta Bernice Lieberman                46

1    required to take that was causing that.  And I can't

2    explain why my psychiatrist or gastroenterologist who

3    I consulted with didn't say lithium can cause that.

4              I --

5              MR. McNALLY:  Wait a minute.  Let's wait

6    for the questions because I think you're not answering

7    his questions.  Please focus on that.

8              THE WITNESS:  Thank you.

9    BY MR. NIEDZIELSKI:

10   Q.   So since that time the diagnoses have changed,

11   your psychiatric diagnosis to this dissociative

12   identity disorder?

13   A.   It was not -- it was after I left the

14   hospital -- the hospital?  Excuse me.

15   Q.   The Family Court?

16   A.   The Family Court.  Thank you.

17   Q.   Do you still have that disorder?

18   A.   Yes.

19   Q.   And how is it controlled?

20   A.   Well, controlled?  What do you mean by

21   "controlled"?

22   Q.   Well, you indicated, for instance, in the case

23   of your reflux that by taking a pill essentially it's

24   not a problem anymore?

Elberta Bernice Lieberman          47

1     A.   Right.

2     Q.   The medication takes care of it so you don't

3     have the problem.

4          Do you get the same effect from taking

5     medication for your dissociative identity disorder?

6     A.   Well, part of the dissociative identity

7     disorder, a major part of it is depression and I am on

8     medication and the medication does help with

9     depression.

10    Q.   What medication are you on for that?

11    A.   I'm on Effexor, E-f-f-e-x-o-r, and Lexapro,

12    L-e-x-a-p-r-o.

13    Q.   Anything else?

14    A.   I'm on not -- well, I'm on a half milligram of

15    clonazepam, Klonopin, K-l-o-n-o-p-i-n, I think, at

16    bedtime just to help me relax a little because my

17    doctor doesn't want me on anxiety medicine during the

18    day because I don't need it.

19         And I'm on the medicine Adderall for the

20    ADHD.

21    Q.   Did you review any documents in preparation for

22    your deposition here today?

23    A.   Yes.

24    Q.   What documents did you review?

Elberta Bernice Lieberman            48

1    A.   I reviewed a number of documents.  I don't
2    know...
3            MR. McNALLY:  Just give him a general
4    description.
5    Q.   Yes. If you can just generally describe what
6    the documents were that you looked at.
7    A.   I looked at some documents I had prepared for
8    Ed years ago in 2000 before he decided to be my
9    attorney.  And I looked at some of the documents I had
10   provided you a long time ago with documents that I had
11   tried to assemble to show the communication back and
12   forth at least.
13   Q.   Did you review the documents, for instance,
14   that the defendants produced to you?
15   A.   Oh, I had reviewed them before, yes.
16   Q.   You mean, in other words, you got copies of
17   documents that you might already have been aware of or
18   you already knew about?
19   A.   Some of those and some of them I didn't know
20   about at all.
21   Q.   Now, during the entire period of time that you
22   worked for the Family Court, were there other
23   employees that you were aware of that had medical or
24   psychiatric problems?

Elberta Bernice Lieberman                49

1      A.   I know that one person in another unit also had

2   breast cancer because I just sort of went to

3   commiserate with her, mm-hmm.

4      Q.   Was she in remission or did she treat and come

5   back to work?

6      A.   She had -- she was going through some of the

7   treatment like I did.  I was working when I went

8   through the treatment.

9      Q.   Now, the Family Court, did they try to help you

10  when you were going through that?

11     A.   That's back in '88.  Did they try to help me?

12  No.

13     Q.   They didn't make any adjustment to your

14  schedule or anything like that?

15     A.   Well, certainly they let me take sick leave

16  with the doctor's notes that I had cancer and had to

17  have radiation treatment and they were only given at

18  certain times and chemo.  I had to go Friday afternoon

19  for chemo and they certainly let me use my sick leave

20  when I produced proof that I needed it.

21     Q.   In 1993 when you were having problems with

22  being late and missing time because of your various

23  problems, did the people at the Family Court try to

24  work with you?  Did they, for instance, contact your

Elberta Bernice Lieberman                50

1    doctors that you identified?

2      A.    Actually, I think it was the end of '92.

3    Things changed in Family Court in 1992 and the

4    administration changed.  And I had always had problems

5    with paperwork but had never...

6              Excuse me.  Let me go back.  Let me ask

7    you to say your question again because I think I was

8    going in a different direction.

9      Q.    In 1993 approximately there was a period of

10   time you indicated you were missing a lot of time and

11   being late because of your various problems, medical

12   problems.  Okay?

13     A.    Okay.

14     Q.    Now what I was asking you is in relation to

15   that, did people at the Family Court write letters to

16   your doctors and ask what they could do to help you?

17     A.    Not to my knowledge.  They did ask and call

18   Dr. Mathisen during the meeting, a joint meeting that

19   we had at the end of '92 or beginning of '93.  They

20   did try to work with me.  I was staying many hours

21   after work to try to keep up with the paperwork.

22              And part of the problem was that I did not

23   know -- part of the problem was resolved at the

24   beginning of '94.  I want to acknowledge yes, they did

Elberta Bernice Lieberman              51

1    call my doctor and they did try to work with me and

2    they did -- I remember in '93 Kathi Donofrio resolving

3    some of my cases.  I would have notes and she would

4    finish the paperwork and send it to court.  I would

5    have notes about why it was going to court, but all of

6    the paperwork had to be done.

7            So certainly there was some help, but the

8    main help I needed I got in '94.  One of the main

9    pieces of help I got is when I had a change in

10   supervisor and I asked -- and he had been my coworker,

11   David Weiss, and he became my supervisor.  He had been

12   in court.  We became friendly because he would be

13   there for hours after court also when I was and we

14   would meet at the conference table.

15           But I asked him "Would you let me sit in

16   on a couple of mediations with you to see what you're

17   doing that you get your paperwork done that I'm not

18   doing?"  And that was the biggest help.  That's

19   what -- I needed some help.  Ana DePaul is a wonderful

20   supervisor in many ways, but she did not do the

21   training.  She did not train me in how to be a

22   mediator.  She farmed that out.  It's always good to

23   sit with other mediators, but I didn't get how do you

24   get the paperwork done?  How do you -- you know, from

Elberta Bernice Lieberman            52

1    an efficient person and so that was a very big help.

2    It was a bigger help to me.

3            And then David would meet with me and I

4    would identify what the kind of cases were I was

5    having difficulty resolving.  Some of these cases were

6    not just they walk in and you know what you're doing

7    or they don't come and you file a recommendation for a

8    dismissal.  They were legally very difficult and

9    fortunately Family Court had assigned a master, Master

10   Herlihy, to the mediation unit and I was able to go

11   with David's agreement.  He didn't know how you

12   resolve this and go to her and get specific legal ways

13   to resolve a certain petition.  And then I was able to

14   apply it to the other ones that I had been holding

15   onto and I was able to close many more.

16           So that was help.  I remember David took a

17   number of them, the old ones that were just the

18   petitioner didn't appear and we sent the notice to the

19   correct address.  I can't find that in my statistics,

20   but I guess they kept saying he did that, so I guess

21   he did do that.  I just can't find it in my

22   statistics, which I also reviewed part of before this

23   meeting.

24       Q.   Sure.

Elberta Bernice Lieberman                53

1      A.   This petition.

2      Q.   Okay.  You mean this deposition?

3      A.   Yes.

4      Q.   Have your psychiatric problems you think become

5   more profound as time has gone by?

6      A.   What do you mean by "profound"?

7      Q.   More serious.

8      A.   More serious?  I don't even know what --

9   forgive me.  I know what serious means.

10     Q.   Let me put it this way.  Let me ask you.  Maybe

11  this might help.

12          Has it become more of a problem since, for

13  instance, have your psychiatric problems become more

14  of a problem since 1981, for instance?

15     A.   It is so hard to answer that.  Once you find --

16  they were a problem because I was misdiagnosed.  And I

17  remember in '84 asking -- my psychiatrist had me on

18  medicines that was making it very hard for me to focus

19  at work and I remember asking him to reduce them.  I

20  told him I couldn't be on them because I could do the

21  work, I might be anxious, but I could do my work.

22          So I think the misdiagnosis did not help

23  and the lack of understanding that I had ADHD because

24  then that helped me focus on what was getting in my

Elberta Bernice Lieberman        54

1    way of getting things done.  When I found out after

2    what Family Court did to me which culminated on

3    October 28th of '94, that was such a trauma, taking my

4    right to work away from me that I became more ill.  So

5    that when -- I did.  I got the first memories of what

6    was done to me throughout my life starting as a young

7    child, you know, by my parents and others.  Okay?

8    Serious abuse.  And I did become more ill.

9            What they wrote is not wrong, but it

10   was -- I could have healed from this disorder and

11   still worked.  I believe I gave you the article by

12   Dr. Kluft about high functioning multiple personality

13   disorder people.  But it was the fact that I was told

14   I couldn't go back to work or I would be fired and I

15   knew I had to support myself.  Our family is not, you

16   know, extended family, they're not in touch with us

17   and I have no one.  My sister and brother didn't have

18   the ability to support me.  And I needed, I needed

19   insurance to have therapy and that bind was very

20   difficult and made me very ill.

21           And then -- but, you see, also part of it

22   is choosing the right therapist, but you learn to,

23   I've learned to get cooperation.  You may have heard

24   there are personalities obviously.

Elberta Bernice Lieberman              55

1          MR. McNALLY:  Excuse me.  The question was

2     whether or not your conditions have become worse.

3          THE WITNESS:  It did become worse for a

4     while.

5     A.   And then I -- but part of that was because of

6     the direction of the therapist I was seeing at a

7     certain time and I left her.  And now my goal is to be

8     more focused, less distracted and just work on doing

9     that and it works.  I mean, I think my performance

10    here today -- I may be wrong.  I know I'm nervous and

11    so forth.  But the only time it got worse is when I

12    had a therapist who wanted me to meet, to remember all

13    of what was done to me.

14          And she -- there was a value to that, but

15    it made it difficult to function.  You can do it much

16    more slowly and, otherwise, it has not been serious.

17    Q.   Okay.  Now, when you say what the Family Court

18    did to you in 1994 in October, what was it that they

19    did to you that you're talking about?

20    A.   Okay.  I had -- I'm talking about on October

21    28th but also before.  In 1993, November 17th, 1993

22    Kathi Donofrio wrote me a memo and on the third page

23    the next-to-the-last paragraph I had been asking for

24    the accommodations that the Americans with

Elberta Bernice Lieberman          56

1    Disabilities Act and the Rehabilitation Act afford me,
2    certain ones about being allowed to not use my leave
3    to go for psychiatric appointments less than two hours
4    a week if I made up the time and the work that I had
5    missed.  And what she had said in that was that as
6    long as I did not handle less mediations than the
7    other mediators -- and she suggested using my Friday
8    workday and I did that.
9            And I had done this and I was handling as
10   many mediations.  I had -- and they still wouldn't
11   give me the accommodations that Judge Thompson had
12   given me back in, Chief Judge Thompson had given me in
13   1987.  And before that if I had to leave -- that was
14   one of the reasons I took the voluntary demotion, by
15   the way.  I know I'm jumping here, but that's what I
16   am referring to.  He said he couldn't have a
17   supervisor being out of the court for two hours during
18   the workday.
19           Anyway, I had done all of this.  I had
20   done more than they asked, than she asked.  And David
21   would get angry if I would bring it up.  And so they
22   wouldn't give me those accommodations and they just --
23   and I was really working on catching up.  You know,
24   like I said, David had given me a way and I had

Elberta Bernice Lieberman          57

1    learned that I get distracted.  I wasn't even aware of

2    how distracted I can get.  And I would close my door

3    and I would set certain cases to do and work on them

4    so that I had -- I structured my time better.  I was

5    catching up on my case load.  I did not understand

6    what was written in that October 28th memo and I

7    remember that we did ask you for specifics of what

8    files is David talking about he found in my office

9    because I've done a review and compiled a chart.

10                MR. McNALLY:  But the question was what

11    did the Family Court do to you, not what you did to --

12                THE WITNESS:  What they did to me?  Okay.

13    A.    What they did is they started -- one of the

14    things they did in September, mid-September, I think

15    it was September 17th, I was no longer allowed in the

16    Family Court building before 8:30 and after 4:45

17    unless I called security, which made sense.  I had no

18    problem with that.  You know, if a mediation was going

19    to run late, I was to call security, which was fine.

20                What I had a problem with was that wasn't

21    being required of other staff.  So they were creating,

22    making it more difficult for me to keep up with my

23    work in my mind.  And I was catching up.  I was

24    closing a number of cases.  I mentioned to you how,

Elberta Bernice Lieberman          58

1    the difficult ones.  And on October -- there were

2    other things.

3              My psychiatrist would suggest and they

4    would ask for a note from him in August and he

5    suggested if I was frustrated with something in the

6    system to ask my boss, David -- he was handling the

7    case load, so to ask him when he could meet with me

8    please do it and then I would express my frustration

9    and he wrote me a memo that I shouldn't do that.

10             Now, according to my understanding of the

11   Americans with Disabilities Act and what the EEOC

12   technical guidance is for people with psychiatric

13   disabilities, that certainly falls within a reasonable

14   thing to ask.  But these writings of the memos and so

15   forth -- and I did those all at home.  I didn't do

16   them at work of course.  It was just increasing the

17   stress.  And so then my doctor did not say that I

18   couldn't work when they asked.

19             And I can't remember all of the specifics,

20   but on October 28th -- I know one other thing I would

21   like to mention.  They even started using, earlier

22   they started using the Family Medical Leave Act

23   against me.  They just -- and I called Senator Biden's

24   office and they didn't acknowledge that that was

Elberta Bernice Lieberman          59

1    wrong, but it stopped after my call to Senator Biden's
2    office.
3              And then they used the Fair Labor
4    Standards Act and they tried to say that I couldn't
5    have the accommodations that the Americans with
6    Disabilities Act and the Rehabilitation Act said I
7    could have because of the Fair Labor Standards Act.
8    So it was like they were -- it was just like
9    difficulty after difficulty after difficulty.
10             But I was virtually caught up, meaning
11   that I believe there were four cases on my desk and if
12   I had been allowed to finish working on October 28th
13   there would have been no paperwork due from me.  And
14   the reason that I can -- well, I have verification of
15   that, but also we had been given an extra day.  There
16   had been a domestic violence conference and so they
17   didn't schedule any mediations because some of us went
18   on each day and we were given that extra day for
19   paperwork.  And I used it to go check out all of these
20   cases.  I did not take a case off of my statistics
21   until I knew it had been resolved, even if somebody
22   else handled it, because I didn't want people to get
23   lost in our system.
24             And so I used that day and checked all of

Elberta Bernice Lieberman                60

```
 1    them.
 2              MR. McNALLY:  Bernice, you're talking a
 3    lot about what you did, but the questions had to do
 4    with what did the Family Court do to you to cause
 5    you --
 6              THE WITNESS:  Okay.
 7              MR. McNALLY:  You have listed some things,
 8    but you're drifting away from the question.
 9              THE WITNESS:  Thank you.  Thank you.
10    You're right.
11    BY MR. NIEDZIELSKI:
12      Q.   Let me try to redirect you if I can,
13    Mrs. Lieberman.
14      A.   Miss.
15      Q.   Miss Lieberman.  I'm sorry.
16      A.   Sorry.  You can call me Bernice.
17      Q.   Ms. Lieberman, did they have normal work hours
18    at Family Court as a mediator?
19      A.   The normal work hours to schedule mediations?
20      Q.   Yes.
21      A.   Yes.  They were from 8:30 through 4:30 and they
22    gave me my first one started at 8:45.
23      Q.   Is that something they did for you that they
24    didn't do for the others?
```

Elberta Bernice Lieberman          61

1     A.   The others could ask for it, but they suggested

2     I take it.

3     Q.   And that was in an effort to help you?

4     A.   That's right.

5               MR. McNALLY:  Mark, when you get to a

6     certain point can we take a break?

7               MR. NIEDZIELSKI:  Sure.  Do you want to

8     take a break now?

9               MR. McNALLY:  Whatever is convenient for

10    you.

11              MR. NIEDZIELSKI:  We can take a break now.

12              MR. McNALLY:  Thank you.  Can we just take

13    a couple minutes break?

14              (A brief recess was taken.)

15              THE WITNESS:  I wasn't finished with my

16    answer.

17    BY MR. NIEDZIELSKI:

18    Q.   Please continue.

19    A.   If you want me to?

20    Q.   Please continue.

21    A.   I didn't understand, I have to say this, that

22    this was a normal procedure.  Here I was.  I had

23    worked for Family Court for over 20 years and they

24    took, what Family Court did is they took -- they told

Elberta Bernice Lieberman                62

1    me I had a meeting in five minutes in Kathi Donofrio's

2    office and they took me into this meeting and handed

3    me this paper.

4              We sat around the table and Bob Closiewicz

5    was there and David Weiss and Kathi Donofrio.  I

6    cannot remember who else was there right at this

7    moment.  Anyway, they asked me to read this memo and

8    the bottom line was they were putting me -- I said I

9    can't read it.  You know, would you tell me what's in

10   it?  Because what I started to read I felt was not

11   true and I was getting upset and I just thought I

12   can't focus on this now, I mean promise that I have

13   taken in everything.

14             Anyway, so it was that I was being put on

15   suspension and pay.  That was on October 28th, Friday,

16   to have a hearing on the following Wednesday, November

17   2nd at 3:00 o'clock in the State Office Building to

18   have it decided if I would be fired or not.

19             I was told I had -- we had to go back to

20   my office.  I was being treated like a prisoner is how

21   it felt to me.  And I wasn't allowed the time -- they

22   did allow me the time.  I wanted to tell Kathi this

23   lady is waiting for a phone call back about a certain

24   thing; these are the four, five cases and there are

Elberta Bernice Lieberman          63

1    notes on them what has to be written about why they're

2    going to court or what needs to be done on them.

3              And I just didn't want to leave clients in

4    the lurch and I wasn't allowed to get my belongings.

5    I was told I had to leave the building and here I knew

6    I was having this hearing and I wasn't allowed to

7    take, get proof that what they were saying was not

8    true.

9              So then I was escorted out without any of

10   my, most of my belongings.  I was escorted out by four

11   or six security guards out of the building.  Now, they

12   had moved the mediators into a meeting away from that

13   area, which was respectful.  That was appropriate, I

14   thought, that I didn't have to go through that.

15             And the one nice thing was that one

16   security guard said something like, and I felt it was

17   supportive, Jesus, you know, I mean she saw me as a

18   very positive person and worker in Family Court.  And

19   so -- then they escorted me out of the building.

20             I called Bob Closiewicz later that day.

21   I'm just focusing on Family Court, not anything else.

22   And I told him I need copies of the sign-in sheets for

23   this whole year because what's written there I do not

24   believe is true and any time I signed in -- I remember

Elberta Bernice Lieberman                64

1    your pointing this out, Ed -- the receptionist would

2    see that I was signing in and would know if I was

3    signing in an incorrect time and so forth.  I asked

4    for that and some other documents which I never got

5    from him.  And that was -- it was, it was so

6    devastating I can't tell you, I mean that it broke

7    through.  It made me much more psychiatrically ill.

8    It broke through all of the defenses I had developed

9    as a young child to not remember what was done to me.

10            MR. McNALLY:  Okay.  The question is are

11   you done --

12            THE WITNESS:  What Family Court did to me.

13   BY MR. NIEDZIELSKI:

14       Q.  I want to get back.  As I understand what

15   you're describing -- and if I'm not describing it

16   accurately, please let me know -- on the 28th you were

17   given a letter or a document which said that they

18   intended to discipline you by terminating you,

19   correct?

20       A.  Yes.

21       Q.  And they suspended you in the interim with pay?

22       A.  Yes.

23       Q.  And they gave you a notice for a hearing

24   sometime later?

Elberta Bernice Lieberman                65

1      A.   In five days.

2      Q.   You never had that hearing, did you?

3      A.   No.

4      Q.   So someone was going to be appointed to hear

5      that matter and make a decision whether you should be

6      terminated, if that had happened?

7      A.   Randy Williams as I remember.

8      Q.   But that never happened?

9      A.   No.

10      Q.   Why did that never happen?

11      A.   I consulted an attorney, not Mr. McNally, I

12      hadn't met him yet, who had handled employment

13      discrimination cases.  I called Master Paikin first.

14      Excuse me.  First I called Master Paikin.  She

15      suggested I file a lawsuit, including a matter that's

16      not in this case now, and gave me the name of a couple

17      of attorneys.  And I called one of them and he advised

18      me to immediately go on disability, temporary

19      disability because I had to support myself and I had

20      to be able to get therapy and have my medical needs

21      handled because they wouldn't give me, they wouldn't

22      allow me the documents to prove that what was said was

23      incorrect.  So I would walk into this hearing the

24      following Wednesday without the proof and they

Elberta Bernice Lieberman          66

1    wouldn't let me -- they had taken away of course my

2    badge and my entry cards into Family Court.

3              So I was feeling desperate.  I didn't know

4    what to do.  So I became more psychiatrically ill and

5    eventually that's what happened before October --

6    November 2nd.  Excuse me.

7    Q.   Did somebody call and have that date extended

8    for the hearing?

9    A.   Not to my knowledge.  My psychiatrist -- I

10    called Delaware State Hospital and I said Family Court

11    won't give me what I need to prove what they're saying

12    is wrong.  They're going to fire me.  I'm very

13    suicidal and I need to be in the hospital.  So I guess

14    since I'm not going to have insurance next Wednesday I

15    better be calling Delaware State Hospital.

16              I was taken there with my agreement by

17    some of the people from crisis intervention and they

18    called my insurance and I went to Rockford Center

19    initially.  And I know that I was in touch with my

20    psychiatrist, Dr. Stehle, N. Scott Stehle,

21    S-t-e-h-l-e.  That's a hard one to spell.  And he

22    wrote a letter for me, got me to sign a release

23    through faxes that he could send it to Family Court

24    and asked that I be put on temporary disability.

Elberta Bernice Lieberman                67

1                    So my knowledge --

2       Q.   Did that happen?  Were you placed on temporary

3    disability?

4       A.   Yes.  And maybe Dr. Bauchwitz called Family

5    Court, but I don't think she asked for an extension of

6    the date of the hearing.

7       Q.   In any event, there never was a hearing to

8    terminate you, correct?

9       A.   That's correct.

10      Q.   And you were never terminated?

11      A.   That's correct.

12      Q.   Instead, you went from temporary disability to

13   permanent disability?

14      A.   Yes.

15      Q.   When was your permanent disability granted?  Do

16   you recall that?

17      A.   The effective date?

18      Q.   Yes.

19      A.   February 1st of '95.

20      Q.   And are you presently still on that disability?

21      A.   Disability, yes.

22      Q.   Did you also apply for Social Security

23   disability?

24      A.   I'm sorry.  I'm trying to remember.  That's the

Elberta Bernice Lieberman          68

1    disability.  That's the SS -- no.  I'm wrong.

2              That's the date of my disability, that's

3    right, in the State of Delaware.  And I applied for

4    Social Security disability and the effective date I

5    think was in May.  I mean, it went back to October

6    28th, but you had to go a long period of time with no

7    income.

8    Q.   Okay.  And in both cases was it the same doctor

9    that provided documentation to the fact that you were

10   disabled?

11   A.   Yes.

12   Q.   In both cases.  Do you recall what he indicated

13   to those individuals, both Social Security and the

14   pension office?

15   A.   I don't remember what he said to Social

16   Security.  You had obtained those records and sent

17   them.  I have not made the time to fully read his

18   report to them.

19              I did read the one to the State of

20   Delaware.  It was shorter.

21   Q.   And he indicated, did he not, just generally,

22   that, in fact, you were too ill because of your

23   psychiatric conditions to work?  Is that a fair

24   statement?

Elberta Bernice Lieberman          69

1      A.   Yes.  Yes.

2      Q.   Now, after you were awarded both the disability

3    pension and disability from SSI, do they have a review

4    process?

5      A.   Yes.

6      Q.   And when is that usually?  Do you know?

7      A.   For a while I believe it was for four or five

8    years the State of Delaware did a review each year or

9    asked for a review each year.

10     Q.   And would you pick the doctor?  I mean, would

11   you go to your regular doctor for that?

12     A.   The one that I was with at the time.  I left

13   Dr. Stehle at the end of -- I forget the specific

14   dates.  I was with him two-and-a-half years, I think.

15   It would go to another, whoever was my psychiatrist.

16     Q.   Whenever that period of time was, did he,

17   again, tell the authorities, both the pension office

18   and the Social Security Administration that you were

19   still too ill to work?

20     A.   Yes.  He or she.

21     Q.   He or she.  You indicated in your testimony

22   that since probably 1981 you've had symptoms of mental

23   illness.  Is that a fair statement?

24     A.   Yes.

Elberta Bernice Lieberman                70

1      Q.    Since at least 1981?

2      A.    Yes.

3      Q.    Probably before that do you think?

4      A.    Oh, yes.  I was in therapy since I was 17.

5      Q.    And while the diagnoses have changed over the

6    period of time, you believe you were misdiagnosed

7    earlier on, your symptoms have always remained the

8    same, haven't they?

9      A.    No.  No.  Because --

10              MR. McNALLY:  That's a yes or no answer.

11              THE WITNESS:  That was a no.  No.  Stop.

12    Thank you.

13              MR. McNALLY:  If he has another question

14    he will tell you.

15    BY MR. NIEDZIELSKI:

16      Q.    You believe they have changed then?

17      A.    Yes.

18      Q.    The symptoms have --

19      A.    Yes.

20      Q.    Why don't you tell me how they have changed?

21      A.    The incident of what happened in 1981 I've

22    never experienced again of going a long period of time

23    without being able to eat and sleep and becoming manic

24    I've never experienced again.  That's the salient one

Elberta Bernice Lieberman          71

1    that stands out in my mind.

2      Q.   When you worked at the Family Court were you

3    able to contact other employees that had depression?

4      A.   Was I able to?

5      Q.   Yes.

6      A.   I don't know how to answer that.  I mean,

7    nobody kept me from it, if you're asking that.

8      Q.   Did you know that there were other employees

9    that suffered from depression?

10     A.   No, I don't think I remember -- I don't want to

11   misrepresent, but I don't remember that.

12     Q.   Do you remember any employees with any kind of

13   physical or psychiatric disability working at the

14   Family Court?

15     A.   I remember -- it wasn't a psychiatric

16   disability.  I remember that they employed a person

17   who was mentally less able to function in a low

18   functioning position.

19     Q.   Was that during the entire period of time that

20   you worked at the Family Court?

21     A.   No.  I'm trying to remember if there was

22   anybody.  I don't mean to misrepresent here.  I may

23   just -- I hadn't thought about that and it's been a

24   long time.  I may remember somebody later and if you

Elberta Bernice Lieberman            72

1   want me to ask Mr. McNally to tell you, I'll be glad

2   to.

3       Q.   Okay.  Do you presently treat with any of the

4   healthcare providers you treated with in 1994 and '93?

5       A.   The ones I treat with started after I left

6   Family Court.

7       Q.   The ones that you're presently treating with

8   are ones -- are you saying yes, I no longer treat with

9   the doctors I treated with in 1993 and four?

10      A.   That's correct.

11      Q.   Have you ever been involuntarily hospitalized?

12      A.   No.

13      Q.   How many times have you been hospitalized for

14  your psychiatric condition?

15      A.   A number of times.  I don't know the number,

16  the specific number.

17      Q.   Can you tell me what years you have been

18  hospitalized for your psychiatric conditions?

19      A.   I can try.

20      Q.   Okay.

21      A.   All right.  In '81, in '84, in '87.  I think in

22  '92 for two weeks and for five days in '93 and that

23  was for the supposed evaluation.  And in the end of

24  '94 there were three separate times in the hospital

Elberta Bernice Lieberman                73

1    from the day after, I think it was October 29th of '94

2    through December 9th of '94 with like -- but they were

3    three separate hospitalizations.  I was in the

4    hospital most of the time for that period.

5              Then in '95 I believe it was a week and I

6    don't think I've been hospitalized since.  I don't

7    know if I'm forgetting something.

8    Q.   So you don't know if you have been hospitalized

9    since 1995?

10   A.   In a psychiatric hospital, no.  I don't believe

11   so.

12   Q.   Have you ever threatened to kill yourself?

13   A.   Yes.

14   Q.   How many times?

15   A.   I used to have a disorder that Dr. Stehle

16   helped me get over and that was a piece of that

17   disorder, I mean it was a symptom of that disorder.

18   And my present psychiatrist says that he doesn't see

19   those symptoms anymore so I'm very lucky to have had

20   that treatment.  I cannot tell you how many times, but

21   I certainly remember I certainly said that many times,

22   but I've learned what that meant to me and I don't

23   need to do that anymore.

24   Q.   Have you also in the past made homicidal

Elberta Bernice Lieberman            74

1    ideations that you wanted to kill someone?

2      A.   The only time I felt that was in that period

3    right after what Family Court -- after October 28th of

4    '94 I was feeling homicidal towards certain Family

5    Court staff.  I never did anything.  I just wished

6    them.

7      Q.   Well, did you express homicidal thoughts

8    towards hospital personnel after October of 1994?

9      A.   I don't remember that.  I remember being very

10   angry at hospital staff, but I don't remember

11   homicidal thoughts about them.

12     Q.   When you were in the hospital, did you have

13   problems getting along with your roommates?

14     A.   (Pause).

15     Q.   If you recall.

16     A.   I don't remember.  It's possible.

17     Q.   What's a typical day like for you?

18     A.   Now?

19     Q.   Yes.

20     A.   It's easier for me if I can tell you my week.

21     Q.   That's fine.

22     A.   Is that all right?  I see -- on Mondays and

23   Thursdays, one of the things I've done to get better

24   is to learn a new way to play bridge and a new way to

Elberta Bernice Lieberman          75

1    communicate with partners and so forth that's very

2    interesting and exciting and involving.  And my doctor

3    thinks it's been good for me.  And I was playing

4    twice, I mean like I was playing twice a day on Monday

5    and Thursday, which would mean like from 12:30 to 4:00

6    and from 7:00 to 10:00, but now I'm cutting it back to

7    the afternoon sessions.

8              I see -- on Tuesday morning I go to my

9    class led by Dr. Catherine Fine.  Catherine is

10   C-a-t-h-e-r-i-n-e F-i-n-e.  That is a class about the

11   disorder of dissociative identity disorder and because

12   it's believed that the patients can help their

13   treatment, that they can -- if they can learn how it

14   happened and how it can change and so forth that you

15   can help your healing.

16             So I go there and then I go and have an

17   appointment with Dr. Schecker, Neil, N-e-i-l,

18   S-c-h-e-c-k-e-r.  He's an M.D.  He is my psychiatrist

19   and clinician. I see Dr. Schecker on Mondays,

20   Wednesdays and Fridays usually.  I have three

21   45-minute sessions with him a week.  And on Wednesday

22   I also have group psychotherapy.

23             Do you want to know who it's led by?  You

24   were asking my schedule.  That's at 3:15 on Friday and

Elberta Bernice Lieberman          76

1    right now, except for the first Wednesday of the

2    month, I have a class that I'm taking again on some of

3    this bridge because there's so much to learn.  I

4    missed some things the first time.  So I do that.

5              What was your question?

6    Q.   I was asking you what your typical week was

7    like.

8    A.   My week?

9    Q.   Yes.

10    A.   I may have appointments with Mr. McNally

11    occasionally, depending on what's going on in the

12    case.  And on Saturdays -- my sister's son is autistic

13    and he just turned 11 and he's in Deveruex.  And I've

14    been very close with him during his lifetime, so on

15    Saturdays I go up and I spend time with Adam.  And I'm

16    there often from 1:00 until sometimes overnight

17    because I'm so tired I can't drive back.

18    Q.   What do you do on Sundays?

19    A.   Well, I had been going out with a girlfriend

20    and -- girlfriend?  She's a retired teacher I met in

21    fifth grade.  We have been friends all these years.

22    And we either talk -- we're the partners doing the

23    bridge.  So we might talk about bridge or play

24    Yahtzee, triple Yahtzee.  It's fun.  And we just talk.

Elberta Bernice Lieberman            77

1      It's a time for us to be together.  I have been

2      missing that because I've been staying longer helping

3      my sister with Adam.  But we're agreeing to go back

4      and I do other things.  I mean, I do my laundry.  I

5      work on my apartment.  I play with my cat.  He

6      insists, you know.

7         Q.   Didn't you used to have a dog?

8         A.   Yes.

9         Q.   Did he pass?

10        A.   Yes.  She had to be put to sleep.

11        Q.   Is the cat a new cat or one that you had all

12     along?

13        A.   No.  Less than a year after Scruffy had to be

14     put to sleep, a neighbor threw this kitten out and

15     these two children I had helped them and their mother

16     brought him -- I thought it was a her -- brought him

17     to me because the younger child was allergic to cats.

18     So they asked me would I take her in -- him in.  I

19     named her Sweetie because I thought it was a she and

20     he's five and a half.

21        Q.   How much do you get in the way on a monthly

22     basis from the State of Delaware pension office?

23        A.   The State of Delaware I think it's 1166

24     something.

Elberta Bernice Lieberman          78

1    Q.   And how much do you get from SSI?

2    A.   I for some reason can't keep that.  It's 1200

3    something.

4    Q.   Now, in addition do you get other benefits?

5    A.   Well, I certainly get -- I have the program.  I

6    do get benefits by being on the State of Delaware

7    pension.  I mean, they pay my hundred dollar

8    deductible of Social Security, of Medicare.  I do have

9    to pay -- I no longer have to pay for the Blue Cross

10   that I used to when I was first on disability, but I

11   have to pay for Medicare B.  So it's like -- I suspect

12   they structured it because they knew I was going to

13   have to pay for this.

14           I'm on a special plan which is very

15   important.  You know, I have my Medicare now.  After

16   two years I got Medicare and I had to pick doctors who

17   would accept the Medicare assignment.  I always have

18   to do that.  And then Blue Cross will supposedly pay

19   what Medicare allows, the assignment allows but does

20   not pay.  That's a big struggle because they can't get

21   it right about the psychiatric.  They have to pay 50

22   percent.

23           So it causes me to have to do a lot of

24   work to get Dr. Schecker paid correctly.

Elberta Bernice Lieberman          79

1       Q.   So are there any other benefits that you get

2   from being a State of Delaware retiree?  Do you get

3   life insurance?

4       A.   Yes.  A small amount of life insurance.  I

5   forgot.  Forgive me.  Yes.

6       Q.   Anything else that you get?

7       A.   I don't want to not include something now.  I

8   haven't been thinking about that.  I can join the

9   union.  My goodness.  I don't want to deny something

10  to you.

11            Did you have something in mind that I'm

12  forgetting?

13      Q.   No.  I'm just asking you if you recall anything

14  else, any other benefits or anything that you might

15  get from the state because you're a retiree of the

16  state now.

17            You indicated they pick up your Blue Cross

18  and Blue Shield premium, I believe?

19      A.   Yes.  They sure do.

20      Q.   They pick up the deductible for the Medicaid,

21  correct?

22      A.   For the Medicare.  It's a wonderful plan.

23  They --

24            MR. McNALLY:  There's no question pending.

Elberta Bernice Lieberman          80

```
 1                    THE WITNESS:  I'm sorry.  I cannot
 2     remember.
 3     BY MR. NIEDZIELSKI:
 4       Q.   Now, do you still live in Sandybrae Apartments?
 5       A.   It's called -- they have changed their name.
 6     It used to be Sandalwood Apartments and it's now Glen
 7     Eagle Village.
 8       Q.   All right.
 9       A.   Apartments.  So they can charge more.  Yes,
10     I've been there.
11       Q.   How long have you been living there?  You have
12     been living there for about ten or fifteen years?
13       A.   No.  Over twenty years.
14       Q.   Over twenty years?
15       A.   Mm-hmm.  Well over twenty.  I forget the exact
16     number.
17       Q.   If you wouldn't mind, we can take a break.  I'm
18     going to review my notes.  I may be done.
19                    MR. McNALLY:  All right.  Let's do that.
20                    (A brief recess was taken.)
21                    MR. NIEDZIELSKI:  That's all the questions
22     I have.  Thank you very much.  I hope it hasn't
23     been --
24                    MR. McNALLY:  We're going to want to read
```

Elberta Bernice Lieberman          81

1    and everything else.

2              We can go off the record.

3              (Discussion off the record.)

4              MR. McNALLY:  Ms. Lieberman has reminded

5    me that in the course of preparing for her deposition

6    that we have come up with some good number of

7    additional documents.  There's a set of documents, for

8    example, that deals with the days that she was off.  I

9    don't think I've ever produced those to you.

10             There's a set of documents that were

11   delivered to her by Family Court after she left.

12   There are some pages from her mediations that she's

13   done which she's used for purposes of she referred in

14   her testimony to a chart that she's prepared.

15             What I would propose to do is to give you

16   copies of all of these documents and then you decide

17   what you want to do and if you feel you need to ask

18   her any further questions as a result of what I think

19   is late production she will be happy to come back.

20             None of what she has given me -- we don't

21   need to go into it now.

22             THE WITNESS:  Okay.

23             MR. McNALLY:  None of what she's given to

24   me has anything to do with her medical history.  I

Elberta Bernice Lieberman          82

1    don't think I got anything new on that.  It does have

2    to do with her testimony here today that she feels she

3    was more or less up to date at the time of her ceasing

4    to work at Family Court.  I'll get those over to you

5    in a day or so.

6                MR. NIEDZIELSKI:  Okay.

7                MR. McNALLY:  All right.

8                MR. NIEDZIELSKI:  Thank you.  Thank you

9    for your patience.

10                (Deposition concluded at 12:05 p.m.)

11                (There were no exhibits marked for

12    identification.)

13

14

15

16

17

18

19

20

21

22

23

24

Elberta Bernice Lieberman              83

1

2

3

4

5                    REPLACE THIS PAGE

6

7                    WITH THE ERRATA SHEET

8

9                    AFTER IT HAS BEEN

10

11                   COMPLETED AND SIGNED

12

13                   BY THE DEPONENT.

14

15

16

17

18

19

20

21

22

23

24

Elberta Bernice Lieberman              84


1     State of Delaware    )
                           )
2     New Castle County    )

3

4                    CERTIFICATE OF REPORTER

5

6          I, Kurt A. Fetzer, Registered Diplomate
      Reporter and Notary Public, do hereby certify that
      there came before me on the 8th day of November, 2004,
7     the deponent herein, ELBERTA BERNICE LIEBERMAN, who
      was duly sworn by me and thereafter examined by
8     counsel for the respective parties; that the questions
      asked of said deponent and the answers given were
9     taken down by me in Stenotype notes and thereafter
      transcribed by use of computer-aided transcription and
10    computer printer under my direction.

11         I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
12    examination of said witness.

13         I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.

15

16

17                    Kurt A. Fetzer, RDR, CRR
                      Certification No. 100-RPR
18                    (Expires January 31, 2005)

19
      DATED:
20

21

22

23

24