**EXHIBIT B**

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
(Cite as: 2002 WL 32194730 (W.D.Pa.))

**Motions, Pleadings and Filings**

United States District Court,
W.D. Pennsylvania.
Nancy J. NORMAN, Plaintiff,
v.
UNIVERSITY OF PITTSBURGH, Rege Koslof, Pat
McAfee, and Janet Rothey,
Defendants.
**No. Civ.A. 00-1655.**

Sept. 17, 2002.

Nancy Norman (pro se), North Versailles PA, for
Plaintiff's.

University of PGH, Attn Susan L. Wormer,
Pittsburgh PA, for Defendants.

*OPINION* and *ORDER OF COURT*

AMBROSE, J.

*1 Pending before the Court is a Motion for
Summary Judgment by Defendants University of
Pittsburgh ("the University") and Glenn Koslof. For
the reasons discussed below, the Motion is denied in
part and granted in part.

I. *INTRODUCTION*
A. *Factual Background* [FN1]

> FN1. Unless otherwise noted, the facts in
> this section are taken from Plaintiff's
> Amended Complaint, Docket No. 8, and
> Plaintiff's Response to the Motion for
> Summary Judgment, Docket No. 29.

The facts of this case are set out in detail in the
Opinion and Order of Court filed on June 12, 2001,
in which I granted in part and denied in part
Defendants' Amended Motion to Dismiss. (Docket
No. 20, "June 2001 Opinion.") Briefly stated,
Plaintiff Nancy J. Norman worked as a custodian in
the Facilities Management Division ("the Division")
at the University of Pittsburgh for approximately
eleven years, despite suffering from long-term
depression, anxiety disorder and panic disorder. She
claims that during her employment, her supervisors
subjected her to an ongoing hostile work
environment, refused to make reasonable
accommodations for her disability, and retaliated
against her for filing complaints about their
discriminatory treatment.

Ms. Norman's anxiety disorder was exacerbated as a
result of a job-related injury incurred while cleaning
a University laboratory in 1996. She filed a workers
compensation claim regarding her resulting severe
mental and physical illnesses which was denied;
however, the University agreed to exempt her from
cleaning labs in the future.

In late 1998, the Division instituted a University-
wide reorganization which included new job
assignments for all custodial staff employees. As
stated in a memo to "All Work Group One Cleaners,"
including Ms. Norman, the purpose of this
reorganization was to "not only improve the overall
quality of the service we [i.e ., the Division] provide,
but also ... more equally divide the workload amongst
the cleaning staff." (Exhibits attached to Defendants'
Memorandum of Law in Support of Motion for
Summary Judgment, "Defs.' Exhs.," Docket No. 27,
Tab C.) Consistent with the collective bargaining
agreement ("CBA") between the University and the
custodians' union, all 200 union members would have
an opportunity to bid on new job assignments
according to their seniority. Each assignment was
described in terms of shift, days worked, and work
area. Ms. Norman lost her then-current assignment in
Craig Hall as a result of the re-bidding process but
successfully bid on a job in Benedum Hall, not
realizing from the job description that the position
required cleaning laboratories.

The new work assignments became effective on
February 8, 1999, when Ms. Norman was assigned to
clean five and a half floors of Benedum Hall.
Plaintiff objected to this workload, not only because
it contained laboratories, but because two other
custodians assigned to the building had lighter
workloads. When she complained that her assignment
was impossible for one person and requested a more
equal distribution of tasks, she was told by her
immediate supervisor that the head of the department,
Mr. Koslof, had said she "just had to do it." After
four days of attempting to comply with her
assignment, Ms. Norman broke down and left on
February 11, 1999.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

Page 2

**\*2** The University granted her leave under its short-term disability insurance policy and the Family and Medical Leave Act. While she was on leave, the University Office of Human Resources contacted her twice regarding other custodian positions. The first position, offered in March 1999, required Ms. Norman to work alone at night in a relatively isolated building. Although she acknowledged that she could do the work "in a heartbeat," she believed the situation would exacerbate her anxiety disorder. The second position, offered in July, would have allowed her to work during daylight hours, but, according to Ms. Norman, also required a workload that could not be accomplished reasonably by one person. Had she taken that job, she was certain that she would be "written up" for failing to perform to standards. Ms. Norman has never returned to work at the University.

### B. *Procedural Background*

Plaintiff exhausted her administrative remedies by timely filing simultaneous complaints with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC") on July 27, 1999, claiming that the University had discriminated against her because of her disability. (Defs.' Exhs., Tab B.) Following receipt of an EEOC right-to-sue letter, Ms. Norman brought suit in this Court on August 21, 2000.

Plaintiff subsequently filed an Amended Complaint on September 21, 2000, against the University, Mr. Koslof, and two other University employees, Pat McAfee and Janet Rothey. ("Am. Compl.," Docket No. 8.) In the Amended Complaint, she alleged violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); and the Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951 *et seq.* ("PHRA"), together with some eleven common law contract and tort claims.

Defendants moved to dismiss several counts of the Amended Complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. (Docket No. 15.) I granted Defendants' motion to dismiss all claims against Ms. Rothey and Ms. McAfee, and the Title VII, Section 1983, ADEA, and common law claims against the University and Mr. Koslof. (June 2001 Opinion.)

Following discovery, Defendants filed a motion on March 7, 2002, seeking summary judgment in their favor with regard to the remaining claims against the University brought under the ADA and the PHRA and against Mr. Koslof for aiding and abetting the University's acts in violation of the PHRA.

Ms. Norman, who had been represented by counsel through completion of discovery, dismissed her attorney in March 2002 and filed a response *pro se* to the Motion for Summary Judgment.

### C. *Jurisdiction*

The ADA provides that jurisdiction is appropriate in the federal district courts. 42 U.S.C. § 12117. This Court has jurisdiction over the PHRA claims pursuant to the supplemental jurisdiction provided by 28 U.S.C. § 1367.

### II. *STANDARD OF REVIEW*

**\*3** A court may grant summary judgment if the party so moving can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, ... that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c); *Rossetti v. Busch Entertainment Corp.,* 87 F.Supp.2d 412 (E.D.Pa.2000). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Celotex, id.* at 322-23; *Rossetti, id.;* Fed.R.Civ.P. 56(e). The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs. *Liberty Lobby, id.* at 250-252; *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995).

In considering a motion for summary judgment, the court must view all the evidence in the light most

favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. *Rosetti, id., citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)* and *Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992)*. In short, the defendants must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the plaintiff could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the defendants' favor. *Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).*

I am cognizant that pleadings filed by *pro se* litigants are not held to as high a pleading standard as pleadings filed by counsel; thus Ms. Norman's pleadings will be liberally construed. *Ryales v. Phoenixville Sch. Dist., 177 F.Supp.2d 391, 395 (E.D.Pa.2001), citing Haines v. Kerner, 404 U.S. 519, 520 (1972).* In an effort to give Ms. Norman the broadest latitude possible, I have carefully reviewed her pleadings in order to discern facts which would refute Defendants' arguments even though Ms. Norman has failed to provide legal analysis in support of her position. I also acknowledge that Ms. Norman has submitted her response to the Motion for Summary Judgment in the form of an affidavit and therefore take her statements in that response as sworn statements of fact. (Plaintiff's Response to Defendants' Memorandum of Law in Support of Motion for Summary Judgement [sic], Docket No. 29, "Plf.'s Response," at unnumbered page 18.)

III. *LEGAL ANALYSIS*
A. *Count I--Violation of the ADA and Count III-- Violation of the PHRA by the University*

**\*4** The purpose of the Americans with Disabilities Act is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the PHRA states in relevant part that "it shall be an unlawful discriminatory practice ... for any employer because of the ... non-job related handicap or disability of any individual ... to discharge from employment ... or to otherwise

discriminate against such individual." 43 Pa.C.S.A. § 955(a).

Third Circuit precedent provides that the analysis for disability discrimination F.3d 102, 105 (3d Cir.1996) ("While the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, ... its courts generally interpret the PHRA in accord with its federal counterparts.") The conclusions regarding Plaintiff's claims under the ADA therefore apply equally to the claims brought against the University under the PHRA.

1. Disability Discrimination:

Ms. Norman claims that soon after she was employed by the University in October 1987, Defendants began harassing her in violation of the ADA because of her panic and anxiety disorder and discriminated against her because of this known disability, creating a hostile work environment. (Am.Compl., ¶¶ 13.)

To survive summary judgment on a discrimination, harassment or hostile work environment claim brought under the ADA, a plaintiff may offer either direct or circumstantial evidence. *Bullock v. Children's Hosp. of Philadelphia, 71 F.Supp.2d 482, 485 (E.D.Pa.1999), citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n. 4 (3d Cir.1995).* The Supreme Court has set out the framework for analyses of these two sets of circumstances. First, *Price Waterhouse v. Hopkins, 490 U.S. 228, 244-46 (1989),* addresses the so-called "mixed motive" cases resting on direct evidence which reflects a discriminatory bias (or animus) by the person or persons responsible for employment decisions negatively affecting the plaintiff. *See also, Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512-13 (3d Cir.1997). McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),* and its progeny address those instances in which the plaintiff alleges through indirect evidence, i.e., actions or statements from which unlawful discrimination may be inferred, that the defendant's basis for the employment decision "was in fact pretext." *McDonnell Douglas, id.* at 804.

Plaintiff has not described her evidence as either direct or circumstantial nor stated which analysis she will follow. A careful review of all pleadings submitted by both parties reveals no direct evidence sufficient to sustain a discrimination claim, and I conclude, as have Defendants, that the *McDonnell Douglas* analysis is appropriate to the facts of this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
(Cite as: 2002 WL 32194730 (W.D.Pa.))

Page 4

case.

**\*5** In *McDonnell Douglas Corp. v. Green, supra, Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the Supreme Court laid out the analysis for discrimination based on indirect evidence. The plaintiff must first establish a *prima facie* case of discrimination; if that burden is met, the employer must present a "legitimate, nondiscriminatory reason" for the employment decision which negatively affected the employee. *Burdine*, 450 U.S. at 252-254. If the defendant meets that burden, the plaintiff then must provide specific evidence to show that the proffered reason is merely pretextual, i.e., that the defendant's true reason for the employment decision was unlawful racial, age, gender or other prohibited discrimination. *Burdine, id., citing McDonnell Douglas*, 411 U.S. at 802-804. It is not sufficient for the plaintiff to show that the decision was wrong or mistaken, but rather she is required to show that the decision resulted from an unlawful animus on the part of the defendant. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). Throughout this analysis, the burden of proving intentional discrimination rests with the plaintiff. *Id.* at 763.

The burden of proving the *prima facie* case is "not onerous." *Burdine*, 450 U.S. at 253. Under the ADA, the plaintiff establishes a *prima facie case* by demonstrating (i) that she is a disabled person within the meaning of the ADA; (ii) that she is otherwise qualified to perform the essential functions of the job, without or without reasonable accommodation by the employer; and (iii) that she suffered an adverse employment decision as a result of the employer's discrimination against her. 42 U.S.C. § 12111(8); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir.1998).

Defendants do not contend that Ms. Norman does not have a disability as defined by the ADA. [FN2] Instead, their first argument is that Ms. Norman cannot satisfy the second prong of the *prima facie* test because her generalized anxiety disorder, panic disorder, agoraphobia and depression prevent her from being present on the job site, one of the essential functions of her job as custodian at the University. (Defendants' Memorandum of Law in Support of Motion for Summary Judgment, "Defs.' Memo," Docket No. 27, at 7-12.)

> FN2. The ADA states that a person is "disabled" when he has a physical or mental

impairment which substantially limits one or more of the major life activities (e.g., caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and learning), has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(2). The PHRA definition of disability is essentially equivalent. 43 Pa.C.S.A. § 954(p). Mental conditions such as panic and anxiety disorders, depression and agoraphobia--when they occur on a chronic, non-transient basis--have been recognized by the Third Circuit as disabilities for purposes of the ADA and PHRA. *See, e.g., Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir.2001); *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir.1999); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576 (3d Cir.1998); *Presta v. SEPTA*, CA 97 Civ. 2338, 1998 U.S. Dist. LEXIS 8630 (E.D. Pa. June 11, 1998); *Wilson v. Lemington Home for the Aged*, 159 F.Supp.2d 186, 198 (W.D.Pa.2001), collecting cases.

According to Defendants, the allegations made in the Amended Complaint, medical evidence from her primary care physician and psychotherapist, sworn statements in Plaintiff's applications for disability benefits, and Plaintiff's deposition testimony show indisputably that her mental limitations are so severe that she cannot perform any work on a regular basis. To support this position, Defendants cite to statements made by Ms. Norman on March 31, 1999, June 17, 1999, August 16, 1999, and January 4, 2002, that she is completely unable to work. (Defs.' Memo at 7-8.) They also rely on statements made by Plaintiff's primary care physician and psychologist indicating that since May 2001, Ms. Norman has remained essentially "homebound." (*Id.* at 8-9.) And, while acknowledging that Ms. Norman is not precluded from making conflicting statements in the context of an ADA suit versus a claim for insurance disability benefits, they argue that the fact Plaintiff has sought and received long-term disability insurance benefits and Social Security disability benefits is part of the "overwhelming evidence" that she has been and is now unable to work. (*Id.* at 10-11.)

**\*6** The determination of whether someone is a qualified individual with a disability who can perform the essential functions of the position is made at the time of the adverse employment decision. *Gaul*, 134 F.3d at 580, *citing* 29 C.F.R. pt. 1630 App.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

at 353-354. [FN3] Under this rule, then, Ms. Norman's ability to perform essential functions of her job as a cleaner must be determined by looking at the facts in February 1999, [FN4] her last day of work at the University.

> FN3. The implementing regulations promulgated by the EEOC at 29 C.F.R. § 1630 *et seq.,* pursuant to 42 U.S.C. § 12116, are not binding precedent on this Court, but are entitled to deference where they are consistent with the statute itself. *See, Deane v. Pocono Medical Ctr.,* 142 F.3d 138, 143 n. 4 (3d Cir.1998), *en banc* (EEOC regulations entitled to "substantial deference").

> FN4. As discussed below, I have concluded that Ms. Norman was constructively discharged on or after February 11, 1999.

The record shows clearly that Ms. Norman had probably suffered from anxiety and depression since childhood and certainly since 1987 when she referred to her condition in a letter to the Chancellor of the University requesting assistance in being hired. (Defs.' Exhs., Tab B.) The record also shows that despite these conditions, Ms. Norman generally performed her job without serious difficulties until she suffered a puncture wound from an unknown object while cleaning a laboratory in 1996. At that time, because of her concern about diseases such as hepatitus and HIV, [FN5] she requested a transfer to a position which did not require cleaning laboratories, an accommodation the University made without notable difficulty.

> FN5. Ms. Norman's concerns were apparently well-founded because about a year later, despite receiving injections of hepatitis B vaccine, she learned she had developed hepatitis antibodies, information which precipitated a series of anxiety and panic attacks lasting 10 days. (Plf.'s Response, Exh. NN7 and NN8; Plaintiff's Addendum with Supplemental Exhibits to the Plaintiff's Response, Docket No. 30, Exh. NN45).

The record also shows that Ms. Norman performed her job well from 1996 to 1999, during which time she received accolades in a University publication for her dedication and thoroughness on the job, received numerous letters of commendation, and was never "written up" by a supervisor for failing to meet the University's performance expectations. (See, respectively, Plf.'s Response, Exhs. NN18; NN14-17 and NN19-22; Defs.' Exhs., Tab A, Deposition of Nancy Norman, "Norman Dep.," at 157-159.) Four days before she left Craig Hall to take up the new assignment in Benedum Hall, the staff whose offices she cleaned hosted two farewell parties in appreciation of her good work. (Plf.'s Response at 7.) In sum, the record shows clearly that as of February 1999, Ms. Norman was performing well with the modest accommodation that she not be required to clean laboratories and, despite her disorders, was able to be on the worksite on a regular and sustained basis.

The statements attributed by Defendants to Ms. Norman and her care providers regarding her inability to work were made in the context of applying for disability insurance and Social Security disability insurance ("SSDI") benefits. Defendants properly recognize the Supreme Court's decision that a plaintiff who has claimed total disability for purposes of receiving insurance or social security benefits is not precluded from making a contrary assertion that she is an otherwise qualified individual with a disability in the context of an ADA case. (Defs.' Memo at 10-11, *citing Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 802-03 (1999); *see also Trowbridge v. Scranton Artificial Limb Co.,* 747 A.2d 862 (Pa.2000) for a discussion of this rule in the context of a PHRA disability claim.) Defendants conclude, however, that Ms. Norman has not satisfied the corollary to that general rule, i.e., that the plaintiff in such a case must adequately explain these apparently self-contradictory assertions. (Defs.' Memo, *id.*)

**\*7** In *Cleveland,* a unanimous Court found that the Fifth Circuit Court of Appeals had erred in holding that a plaintiff who had received SSDI benefits was *automatically* estopped from pursuing an ADA claim. 526 U.S. at 802-803. The Court held that to survive summary judgment, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation." *Id.* at 806. The Court specifically recognized that there were some situations in which an individual's disabilities could be severe enough for her to receive SSDI benefits and yet still satisfy the *prima facie* case for an ADA claim. "In large part, this is because, when determining whether to award SSDI benefits, the possibility of reasonable accommodation is not taken into account. Under the ADA, however, a qualified individual includes all people who can perform the essential functions of the job with or without

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

reasonable accommodation." *Motley v. New Jersey State Police,* 196 F.3d 160, 164 (3d Cir.1999) (discussing *Cleveland* ) (internal quotations omitted). [FN6]

> FN6. I also note that a further distinction between SSDI benefits determinations and ADA analyses is that in the former, the administrative law Judge is required to take into account a claimant's age, education, and previous work experience, none of which figures in the ADA analysis of an individual's ability to perform the essential functions of the job in question.

To resolve an apparent conflict between the assertions in an application for disability benefits and the ADA claims, a plaintiff "must proffer a sufficient explanation" in the form of additional rationale to explain her "apparent about-face" concerning the extent of her disability. *Motley,* 196 F.3d at 165. This explanation can address, for instance, the differences in statutory standards of the SSDI and the ADA or how the individual's condition may have changed over time. But, "the attainment of disability benefits is certainly some evidence of an assertion that would be inconsistent with the argument that the party is a qualified individual under the ADA." *Id.* at 166. Where the plaintiff's "previous statements take the position that he could not perform the essential functions of the job, with or without accommodation," the plaintiff cannot reconcile these divergent claims and the ADA claim must be dismissed. *Id.* at 167.

When the evidence here is examined, one could reasonably conclude that this case is very similar to *Cleveland.* There, the Court noted first that the plaintiff had reconciled the two contradictory positions by arguing that the SSDI statements "were made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." *Cleveland,* 526 U.S. at 807. Here, that is clearly also the case with the statements made in the SSDI application by Ms. Norman and discussed above. I further note that the disability claim form signed by Ms. Norman on August 16, 1999, does not describe her inability to work, only her condition at the time and the conclusion that it could not be determined when she would be able to return to work. (Defs.' Exhs ., Tab B.) The letter from UNUM Life Insurance Company dated December 28, 1999, states that the company has concluded that Ms. Norman is disabled, in that she is, in its opinion, unable to perform "the material

and substantial duties of [her] regular occupation due to [her] sickness or injury," i.e., the conclusion that she is "disabled" does not take reasonable accommodation into consideration. (Defs.' Exhs., Tab B.)

**\*8** The second explanation offered by Cleveland was also accepted by the Supreme Court. The plaintiff there stated that the SSDI statements were accurate "if examined in the time period in which they were made." *Cleveland,* 526 U.S. at 807. The same may be said of Ms. Norman's statements. Ms. Norman never claimed in February 1999 that she was disabled; in fact, as discussed below, she and the University discussed alternative jobs as late as July 1999. She did not immediately request disability leave; the University wrote to her on February 19, 1999, stating that it was concerned about her health and, consequently, "effective with the receipt of this letter, you are placed on FMLA leave." (Defs.' Exhs ., Tab B.) Ms. Norman initially refused to sign either the FMLA leave request form or the insurance disability claim until August 1999, stating in a letter to the University on May 20, 1999, that she would not do so because she believed "my getting sick was due to work related stress." (*Id.*) She also stated in her ADA intake questionnaire dated May 18, 1999, that "my doctors are trying to help me return to my job by trying to [find] the medicines that will make that possible." (Plf.'s Response, Exh. 13.)

According to the evidence, neither Ms. Norman nor her caretakers ever described her as totally or permanently disabled until well after February 1999, and consistently pointed out a correlation between her disability and her work situation. She testified that although statements made on the applications for disability benefits were accurate and made under oath, "If I had been able to work, I would have went back out there because the longer I'm off, the harder it's been." (Defs.' Exhs., Tab A, Norman Dep. at 204.) Her primary care physician stated on March 31, 1999, that she was unable to return to work at that time but that "much of her symptoms were precipitated or aggravated from job stress." (Plaintiff's Addendum with Supplemental Exhibits, Docket No. 30, "Plf.'s Addendum," Exh. NN41.) Her therapist stated on September 14, 2000, that Ms. Norman was still consulting her for problems "due to past events at her workplace." (*Id.,* Exh. NN39.) As late as January 2000, Ms. Norman was meeting with rehabilitation service agencies with the hope of returning to some form of work. (Defs.' Exhs., Tab B.) The statement regarding her being "essentially homebound" was not made until May 16, 2002.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Defs.' Exhs., Tab I.) Furthermore, at least one person believed that Ms. Norman was not totally disabled. In a letter written to the workers compensation board judge who had denied her benefits in August 1999, Ms. Norman stated that he had told her to "go back to work and try it." (Plf.'s Addendum, Exh. NN56.)

I find the circumstances of this case parallel to those of *Kennelly v. Pennsylvania Turnpike Comm'n*, 208 F.Supp.2d 504 (E.D.Pa.2002). There, the plaintiff, an emergency response worker hired by defendant to provide medical emergency assistance in automobile accidents, told his supervisor repeatedly that he needed additional training before he would be comfortable working on his own. Despite reassurances that additional support would be forthcoming, subsequent training was superficial and did not alleviate the plaintiff's concerns. As he became increasingly anxious about his ability to do the job, he developed flu-like symptoms, tremors, and other indicia of intense anxiety to the point he was unable to work and was eventually terminated. The defendant later contended that his ADA claim must be dismissed, in part because he was never able to perform the essential functions of any position, with or without reasonable accommodation. *Id.* at 512. The court refused to grant summary judgment on this issue, noting that "while it is true that Mr. Kennelly is currently unable to perform work in any capacity with or without reasonable accommodation, Mr. Kennelly suffered his debilitating emotional breakdown when he allegedly was told by his employer that he was going to be assigned ... to work on his own without any further training." *Id.* at 513.

**\*9** Here, viewing the evidence in the light most favorable to Ms. Norman, she was able to perform the work assigned until she was transferred to Benedum Hall. Like Mr. Kennelly, she suffered her emotional breakdown when she was told by her supervisor that the accommodation requested was not going to be provided and she would just have to do the job. A reasonable jury could conclude that the change in her status from a qualified individual with a disability who was able to work with an accommodation to an individual who was totally disabled (if such a change occurred) was precipitated by Defendants' failure to accommodate her disability.

I also conclude that Defendants' position regarding Ms. Norman's total inability to perform the essential functions of her position is belied by the University's offer of two comparable positions in the months immediately following Ms. Norman's termination. If the University did not believe she could perform the

essential functions of the position in March and July 1999, it would not, logically, have offered her those jobs.

Nor do I find persuasive Defendants' characterization of Ms. Norman's condition as being so severe that she cannot work with other people and would not work alone. (Defs.' Memo at 10.) This conclusion misconstrues Ms. Norman's deposition testimony on these points. While she answered "That's it" to an attorney's question that "You are saying you can't work with other people?," she went on to explain that while at a previous job with the U.S. Postal Service, she experienced a panic attack when asked on the spur of the moment to work at an unfamiliar task with unfamiliar people. (Norman Dep. at 95-96.) That is not the same situation as described by the plaintiff in the case relied on by Defendants who stated that on the day she abruptly left her job, her agoraphobia was so severe that she could not continue working any longer and could not emotionally handle applying for any other position. *See Mendes v. Jednak*, 92 F.Supp.2d 58, 65 (D.Conn.2000). On February 11, Ms. Norman was still composed enough to immediately discuss her situation with three people in University management to try to resolve the problems. (Defs.' Exhs., Norman Dep. at 28; Tab B.) Ms. Norman's statements about not being able to work alone are also taken out of context in that they occur only with regard to the job offered in March 1999, discussed in more detail below.

Defendants' second argument in support of their position that Ms. Norman cannot establish a *prima facie* case of disability discrimination under the ADA is that she did not suffer an adverse employment action. (Defs.' Memo at 12-14.) She cannot, Defendants argue, claim that she was constructively discharged because the conditions of her employment were not so intolerable that a reasonable person subjected to them would resign. (*Id.* at 12, *citing,* among others, *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 169 (3d Cir.2001).)

**\*10** The Third Circuit employs "an objective test in determining whether an employee was constructively discharged from employment: whether 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers*, 957 F.2d 1070, 1079 (3d Cir.1992), [FN7] *quoting Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887-88 (3d Cir.1984). "To make this showing, more than

subjective perceptions of unfairness or harshness or a stress-filled work environment are required." _McLaughlin v. Rose Tree Media School Dist., 52 F.Supp.2d 484, 493 (E.D.Pa.1999)._

> FN7. Overruled in part on other grounds, _Griffiths v. CIGNA Corp., 988 F.2d 457 (3rd Cir.1993)._

Defendants argue that three points support their conclusion that Ms. Norman was not constructively discharged. First, following Plaintiff's last day on the job, February 11, 1999, she received Family and Medical Leave, short term disability insurance benefits and long-term disability insurance benefits, evidence that she remained in an employment status with the University. (Defs.' Memo at 13.) Second, on February 5, 1999, she was given a "send-off" party, complete with a gift from the staff whose offices she cleaned, evidence that the working environment was not intolerable and recognition that "the University had treated Ms. Norman well and recognized her good qualities." (_Id._) Finally, Ms. Norman had "at least some obligation" not to leave after only three days in a job that was restructured along with some 200 other custodian jobs as a result of a facilities department-wide reorganization. (_Id._ at 14.) In sum, Defendants' position is that Plaintiff simply left her job and suffered no adverse employment action.

First, I note that the University decided, apparently unilaterally, to place Ms. Norman on leave. Defendants do not offer, and independent research has failed to disclose, any case law supporting the position that the employer's unilateral choice to place the employee on leave while the details of an allegedly hostile work environment or of a reasonable accommodation are being resolved later precludes the employee from claiming he was constructively discharged.

Second, the staff who gave farewell parties and gifts to Ms. Norman are an entirely different group of University employees from those whom she claims discriminated against her on an on-going basis and told her she "just had to" do a job she considered unfair and dangerous. The working environment and inter-personal relationships in Craig Hall (where Ms. Norman was given the farewell party) were not the intolerable working situation she experienced after the transfer to Benedum Hall and, if Ms. Norman is to be believed, "the conflict between my department and my work" only increased her anxiety. (Defs.' Exhs., Tab A, Norman Dep. at 21.)

As to Defendants' third argument, that Ms. Norman had an obligation to give her new workload a longer test period, a prerequisite to a successful constructive discharge claim is, in most situations, that the plaintiff attempted to explore alternatives before electing to resign. _See,_ e.g., _Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 and n. 6 (3d Cir.1993)_ (noting that "we do not require that such steps be taken in all cases. An employee may be able to show working conditions were so intolerable that a reasonable employee would feel forced to resign without remaining on the job for the period necessary to take those steps.")

**\*11** Although Plaintiff has failed to organize a coherent argument that the adverse working conditions of her employment had reached the point where a reasonable person would be forced to resign, the documentary record and her testimony are replete with such references. She stated numerous occasions on which she was belittled by her immediate supervisor, Janet Bartok; harassment from her co-workers; and reports of comments that she should "go home and have a couple beers" to relieve her anxiety. (Plf.'s Response, Exh. NN13.) She testified that on numerous occasions, Ms. Bartok blamed her for on-the-job disputes and treated her in a demeaning manner. For instance, on one occasion when the Dean had complimented her on her work, her supervisor said "oh, don't tell her that" and then accused her of "catering" to people. "When I did a good job, I was catering." (Defs.' Exh. Tab A, Norman Dep. at 159.) On another occasion when workloads were being temporarily redistributed and Ms. Norman was assigned to clean the stairwells in a building where she had worked for some time, Ms. Bartok said, "Do I need to go around and show you where they are?" (Plf.'s Response, Nolle Deposition Exh. 16.) She provided documentation that her complaints of sexual harassment had gone unresolved; when she went to the affirmative action office, that department "just bounced them back" to Facilities Management which took no action. She also reported that when she filed a formal grievance complaining of gender bias in work assignments and discipline, her next-level supervisor, Mr. Koslof, stated that he was "disgusted" that she was allowed to proceed with her complaint to the next level of consideration by the union. (_Id._) And it was Mr. Koslof who conveyed a message through Ms. Bartok in response to her request for accommodation, that she just had to do the new work assignments.

In _Aman v. Cort Furniture Rental Corporation,_ the Court of Appeals found that a constructive discharge

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

claim could arise from a plaintiff's decision to leave her position as the result of "a continuous pattern of discriminatory treatment over a period of years." 85 F.3d 1074, 1084 (3d Cir.1996.) The Court refused to require an "aggravated circumstances" requirement in constructive discharge claims and acknowledged that there were conditions of continuous discrimination that could culminate in a plaintiff coming to the conclusion that although she previously "had the fortitude to stay, her strength finally failed." Id. at 1085. In Ms. Norman's ADA intake questionnaire, she precisely states: "For 11 years I have been discriminated again [sic]. This time I guess I have reach [sic] my breaking point.... Three times before this I had called and received information from the EEOC about filing discrimination but always stopped short of doing so. I am doing it this time because it is discrimination." (Plf.'s Response, Exh. 13.)

Moreover, a reasonable jury could find that the reported comment by Mr. Koslof that she "just had to do" a workload she perceived as unequal and which included her greatest phobia--cleaning laboratories-- was an aggravating circumstance that created a work environment so unpleasant or difficult that a reasonable person would feel compelled to resign rather than continue under those conditions. While, as the Third Circuit explained in Gray, "every job has its frustrations, challenges and disappointments [inherent] in the nature of work," a jury could find that Ms. Norman had coped with these stresses with varying degrees of success for eleven years and that she was not seeking the palliative of simply quitting. See Gray, 957 F.2d at 1083.

*12 Finally, I am not persuaded by Defendants' argument that Ms. Norman did not suffer a constructive discharge because she did not give the University a chance to fix the problem. (Defs.' Memo at 13-14.) To the contrary, Ms. Norman stated on the first day of her employment in Benedum Hall that she thought the workload was unequal and included laboratories, but she continued to try to do the job at least three more days while waiting for Ms. Bartok to discuss the situation with Mr. Koslof. When Mr. Koslof said she just had to do it, she then went to the department of human resources and the office of labor relations to see if any short-term accommodation could be made. This was also not effective. She then continued to interact with the University by discussing two other positions. In sum, a reasonable conclusion might be that Plaintiff gave the University several chances to fix the problem and satisfied the Clowes criteria of exploring alternative solutions.

I conclude that Ms. Norman has established a prima facie case in that (i) she was a disabled person within the meaning of the ADA; (ii) that she was otherwise qualified to perform the essential functions of her job as a cleaner, with or without reasonable accommodation; and (iii) that she was constructively discharged on or after February 11, 1999.

Because Defendants rely on their arguments that Ms. Norman cannot satisfy the first prong of the McDonnell Douglas paradigm, they do not address the second two steps of that analysis. I therefore deny summary judgment on Ms. Norman's claims of disability discrimination.

2. Hostile Work Environment:

Although neither the United States Supreme Court nor the Third Circuit has conclusively determined whether the ADA creates a cause of action for harassment, the Third Circuit has proceeded on the assumption that a hostile work environment cause of action is created under the ADA without confirming that such a cause of action exists. McCarron v. British Telecom, CA CV-6123, 2002 U.S. Dist. LEXIS 15151, *37-*38 (E.D.Pa. Aug. 7, 2002), citing Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 667 and n. 2 (3d Cir.1999). A claim for harassment and a hostile or abusive work environment requires a plaintiff to show that (i) she was a qualified individual with a disability under the ADA; (ii) she was subject to unwelcome harassment; (iii) the harassment was based on her disability or a request for an accommodation; (iv) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (v) that the University knew or should have known of the harassment and failed to take prompt effective remedial action. Walton, id. at 667.

In determining whether the working environment is sufficiently hostile to give rise to a legal claim, this Court must consider the totality of the circumstances, including " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' Walton, 168 F.3d at 667, quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

*13 A hostile work environment claim is based on

the "cumulative effect" of separate acts occurring over "a series of days or perhaps years." *AMTRAK v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106, 123 (2002). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *AMTRAK,* 122 S .Ct. at 2074; *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 155 (3d Cir.1999) (It is "settled law" in this circuit that claims of hostile environment must be considered in light of the sum total of abuse over time, not by looking at each incident of harassment in isolation.)

Defendants do not explicitly address Ms. Norman's hostile environment claim, but do contend that they are seeking summary judgment on all remaining claims. (Defs.' Memo at 1.) Ms. Norman has produced a litany of events which occurred with her co-workers and supervisors beginning in 1990 which she found humiliating and severe enough to interfere with her work performance. (See, in addition to those discussed above in the context of the constructive discharge claim, Plf.'s Response, Exhs. Nolle Deposition Exhs. 12 and 13; NN24; NN25; and Norman Dep. at 66.)

In the face of no evidence other than Defendants' reference to the farewell parties Ms. Norman was given to show that her work environment was not hostile, I conclude that summary judgment cannot be granted on this claim.

3. Failure-to-Accommodate:

Discrimination under the ADA includes failure by an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The PHRA also recognizes a need for accommodation: "An employer shall make reasonable accommodations by modifying a job, including, but not limited to, modification of duties, scheduling, amount or nature of training, assistance provided, and the like, provided that the modification does not impose an undue hardship." *Trowbridge,* 747 A.2d at 866, *citing* 16 Pa.Code § 44.14(a).

Although the disability discrimination and failure-to-accommodate analyses are conflated by Defendants

in their Memorandum of Law, these are analytically distinct claims. *Walton v. Mental Health Ass'n of Southeastern Pennsylvania,* CA 96-5682, 1997 U.S. Dist. LEXIS 18224, *29 (E.D.Pa. Nov. 18, 1997). "A claim brought under failure to accommodate does not require any evidence or inference of intentional discrimination" and the *McDonnell Douglas* framework is therefore not used to evaluate that type of claim. *Id.* at *30. "Instead, for the purposes of summary judgment, the court must evaluate whether the facts presented by the nonmoving party, if taken as true, could establish failure to accommodate in violation of the ADA." *Id.*

*14 Defendants argue that they did not fail to accommodate Ms. Norman's disability as evidenced by the fact that the University, through the "interactive process" suggested by the ADA, offered her two alternative positions, both of which Plaintiff rejected. (Defs.' Memo at 14-15.) What they fail to address in any depth is why they refused to consider the accommodation suggested by Ms. Norman herself, that is, a reallocation of responsibilities in Benedum Hall among the three daylight shift workers and removing laboratory assignments from her, an accommodation that had been made before.

Under the ADA, the phrase "reasonable accommodation" includes modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of that position or to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities. 29 C.F.R. § 1630.2(o). These accommodations may take the form of "job restructuring, [FN8] part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). To withstand summary judgment on a failure-to-accommodate claim, the burden is on the employee to show that "there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [her former job.]" *Mengine v. Runyon,* 114 F.3d 415, 418 (3d Cir.1997); *see also Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 230 (3d Cir.2000) (same). This standard requires Ms. Norman to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that the accommodation was feasible for the employer under the circumstances. *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir.2001). At

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

that point, "the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details." *Id.*

> FN8. Job restructuring, i.e., "reallocating or redistributing non-essential, marginal job functions," is one form of reasonable accommodation. An employer is not required to reallocate essential functions. 29 C.F.R. § 1630.2(o).

In determining whether an accommodation is reasonable, the employer must consider (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee. 29 C.F.R. § 1630.9(a). Whether an offer of accommodation by an employer constitutes a reasonable accommodation under the ADA is a normally a question of fact for the jury. *Watson v. SEPTA,* 1997 U.S. Dist. LEXIS 13306, *11 (E. D.Pa. Aug. 28, 1997), *aff'd,* 207 F.3d 207 (3d Cir.2000), *cert. denied,* 531 U.S. 1147 (2001). However, "where the nature of the accommodation offered by an employer is undisputed and no reasonable jury could find the offered accommodation to be unreasonable, ... summary judgment is appropriate." *Kuehl v. Wal-Mart Stores,* 909 F.Supp. 794, 803 (D.Colo.1994); *Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 833 (4th Cir.1994), collecting cases. Summary judgment is only appropriate where the plaintiff's proposed accommodation "is either clearly ineffective or outlandishly costly." *Walton,* 168 F.3d at 670.

**\*15** Here, Ms. Norman initially proposed a two-part accommodation. First, she requested reallocation of the workload in Benedum Hall. Defendants characterize this proposal as a request for a "limited workload" or "part-time work" and state that the CBA between the custodians' union and the University would not permit a limited or part-time position. (Defs.' Memo at 15-16.) To the contrary, I find no evidence in the record of a request by Ms. Norman for "part-time work," only references to a limited workload on a temporary basis so that she could return to work. A reasonable jury could conclude that Ms. Norman was actually requesting an *equal* workload and that such an accommodation would be eminently reasonable. Indeed, that type of distribution was a purported goal of the Facilities

Department reorganization and was apparently approved by both the union and University management.

Further, I conclude Ms. Norman has come forth with sufficient evidence to present a genuine question of whether the workloads truly were equivalent in Benedum Hall. Defendants contend that Ms. Norman is mistaken when she claims that she had more duties than other cleaners and argue that the two comparators Ms. Norman identified had 243 and 212 "tasks" while the job description for her position involved only 183 tasks. [FN9] (*Id.*) In support of this position, they provide three job descriptions dated March 11, 1999.

> FN9. The parties base their arguments regarding the allocation of work on position descriptions that identify the specific floor and room which the person is to clean, along with a coded list of tasks to be done on a daily ·or weekly basis. (See, e.g., Defs.' Exhs., Tab D, Attachments to Koslof Deposition, and Tab B, "Cleaning Steps," decoding the alphanumeric tasks.) In some descriptions, the amount of time allocated for each task is also prescribed. I find it impossible to determine whether these lists accurately and completely describe the jobs but conclude that I need not do so for purposes of deciding this motion.

I agree with Ms. Norman's argument that Defendants may be asking the Court to compare apples and oranges in the sense that the March job descriptions and the February assignments to the three custodians in Benedum Hall may not be the same. (Plf.'s Response at 1-3.) Ms. Norman provides a copy of a job assignment dated January 28, 1999, which includes 243 tasks on the seventh through twelfth floors of Benedum Hall and contains handwriting that appears to be consistent with hers in other documents noting such things as "no keys" to some offices and that a recycling bin was needed in another. (Plf.'s Addendum, Exh. NN1.) According to the job descriptions, the one assigned to Ms. Norman in January 1999 not only contained more tasks but also involved working 36 minutes longer than the other two employees.

Ms. Norman testified that during the first few days of the new assignments, her female co-worker had complained, "I got more work than [the male co-worker], it's not evenly distributed," at which point Ms. Norman "looked at her and I said I got more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                   Page 12
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

work than you two." (Defs.' Exhs., Tab A, Norman Dep. at 31.) She also testified that she had the top 5 1/2 floors, "Diane" had 4 1/2 lower floors and "Howard" had the basement, subbasement and floors 1 and 2. (Plf.'s Addendum, Norman Dep. at 108.) This testimony is consistent with her job description dated January 28. A reasonable jury could infer from her testimony and documentary evidence that Ms. Norman did, indeed, have a heavier workload than her two co-workers and that a reasonable accommodation would be to reallocate the assignments.

**\*16** The second part of the accommodation requested by Ms. Norman was to relieve her of the responsibility of cleaning laboratories. Defendants do not address this request specifically, but neither do they explain how she was relieved of this duty in 1996 when, presumably, the same or a similar CBA was in effect. [FN10] Defendants do not offer a copy of the collective bargaining agreement or relevant portions thereof, relying only on Mr. Koslof's affidavit that the CBA "does not authorize permanent limited workload jobs." (Defs.' Memo at 17.) However, as the court found in *Kralik v. Durbin*, 130 F.3d 76, 81 (3d Cir.1997), a CBA "is not necessarily decisive" because the union and employer could agree to waive certain provisions, thereby vitiating the employer's argument that it could not accommodate the plaintiff without violating the agreement. Moreover, I do not find this argument entirely compelling because there is substantial evidence in the record that changes in work assignments and workloads had been made in the past. For instance, Ms. Norman had been assigned several floors in the University's Cathedral of Learning building in 1992; when she complained to her supervisor that the workload was too much for one person, part of her assignment was transferred to someone else. (Plf .'s Response, Norman Dep. at 57.) On another occasion, she was given a different job away from a supervisor who caused her anxiety. (*Id* . at 73-74.) And, most significantly, there is no evidence that when she was wounded in 1996 she had to wait until a vacant position on which she could bid became available; rather, the record would seem to suggest (although it is by no means clear at this point), that she was simply moved to another job not involving laboratories.

FN10. Ms. Norman belonged to the union during her entire employment at the University. (Defs.' Exhs., Tab A, Norman Dep. at 103.)

Moreover, the mere existence of a seniority system in which an accommodation would result in bumping another employee does not automatically preclude an ADA claimant from such a position. In *Shapiro v. Township of Lakewood*, 292 F.3d 356, 360 (3d Cir.2002), the Court of Appeals recently considered the impact of *US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), in which the Supreme Court considered the question of whether an employer may be required under the ADA to deviate from a disability-neutral rule, e.g., the company's seniority system which would have bumped Barnett from his mailroom position to which he had been transferred as the result of a back injury. The Third Circuit described *Barnett* as prescribing:

a two-step approach for cases in which a requested accommodation in the form of a job reassignment is claimed to violate a disability-neutral rule of the employer. The first step requires the employee to show that the accommodation is a type that is reasonable in the run of cases. The second step varies depending on the outcome of the first step. If the accommodation is shown to be a type of accommodation that is reasonable in the run of cases, the burden shifts to the employer to show that granting the accommodation would impose an undue hardship under the particular circumstances of the case. On the other hand, if the accommodation is not shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case.

**\*17** *Shapiro*, 292 F.3d at 361.

The University has not shown that this same type of accommodation was not available in February 1999. Instead, it appears to argue that equalizing the workload and removing laboratories from her assignment would impose an undue hardship because it would force a violation of the CBA, an argument which is undercut by its own goals and previous accommodation. As the Court stated in *Barnett,* even under those circumstances, "the employee remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested accommodation is reasonable on the particular facts." *Barnett,* 122 S.Ct. at 1525. Plaintiff here has at least raised a question of why, when accommodation through change of workload and workplace had been made in the past despite a collective bargaining agreement, comparable accommodation could not have been made in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
(Cite as: 2002 WL 32194730 (W.D.Pa.))

February 1999. [FN11]

> FN11. Moreover, there is no evidence that the University and/or union considered whether accommodation could be accomplished by allowing Ms. Norman to bump an employee with less seniority. One court in this Circuit has opined: "Sound policy principles also dictate ... that a position is 'vacant' for purposes of the ADA if it is occupied by an employee the disabled employee may bump under the terms of the CBA. If the reasonable accommodation requirements of the ADA are to be meaningful, they must be read to take into account the particular circumstances of an employer, the disabled employee and her fellow employees, including the provisions of a CBA. If a disabled employee can demonstrate at trial that the CBA allowed her to bump junior employees and that junior employees occupied the positions at issue, those positions are vacant for purposes of determining an employer's obligation to provide reasonable accommodation." *Whitfield v. Pathmark Stores, Inc.,* CA 96-246 MMS, 1999 U.S. Dist. LEXIS 7096, * 22-*23 (D.Del. Apr. 29, 1999). Here, it is unclear what Ms. Norman's bumping rights were under the CBA but one may reasonably conclude that an employee with eleven years of seniority would have some rights in that regard.

While the plaintiff has the initial burden to identify a reasonable accommodation, both parties must, in good faith, engage in an "interactive process" to explore other possibilities. *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311 (3d Cir.1999). Although the ADA does not refer to such a process, the Third Circuit has endorsed the concept as a means of furthering the purposes of the ADA because it allows the employee to consider accommodations of which he may not otherwise be aware (particularly in a large organization) and, simultaneously, allows the employer to better understand the potential range of jobs the employee can do. *Mengine,* 114 F.3d at 420; 29 C.F.R. § 1630.2(O)(3). [FN12] "If it turns out that there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA ... violation."

> FN12. "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3)

"Employers can show their good faith in a number of ways, such as ... ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor,* 184 F.3d at 317. Ms. Norman was asked at her deposition, "Did you ever send ... anyone at the University anything indicating that you couldn't do these jobs [referring to the jobs that she was offered in March and July], but this is how I could do the job?" She responded, "No. Nobody asked me that." (Defs.' Exhs., Tab A, Norman Dep. at 162.) This alone may reflect a failure by Defendants to participate in good faith in the process of determining a reasonable accommodation. *See Taylor,* 184 F.3d at 315, noting that once the employer knows of the disability and the employee's desire for accommodations, it "makes sense to place the burden on the employer to request additional information that the employer believes it needs." Here, there is no evidence that the University seriously explored Ms. Norman's request to equalize the workload and eliminate laboratories from her assignment, but instead went directly to investigating alternative positions.

**\*18** The first position offered by the University required Ms. Norman to work at night in a relatively isolated building which had been deemed by Facilities Department management as being in such a dangerous location that night custodians were not required to take trash out outside but could leave it for the staff who worked during daylight hours to remove. (Defs.' Exhs., Tab A, Norman Dep. at 122-123.) Although Ms. Norman stated she was able to perform the required work "in a heartbeat," she refused to take the position because she was unwilling to work alone under those conditions. She testified at her deposition, "And I thought now ... my anxiety's already skyrocketing and everything, ... and I wouldn't feel safe down there by myself in a building, you know, and if I would get hurt or anything, no one would be there.... I felt it was unsafe for me and it would cause my anxiety to heighten, being by myself in a building at night." (Defs.' Exhs., Tab A, Norman Dep. at 123, 125.) A jury could

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

conclude that by offering a position which involved working alone, at night, in an area known to be dangerous, the University had not proposed this accommodation in good faith to a person known to be suffering from anxiety and panic disorders.

The second job offered was for a daylight position in Craig Hall where she had worked before and did not include laboratories. However, this position required more work than Ms. Norman believed could be reasonably done within the time allotted. In support of this conclusion, she offers a copy of the job description which shows that it included 181 tasks. Defendants do not dispute the fact that this was the description of the job offered in July, but argue that it was less of a workload than she had originally been assigned at the Benedum Hall location. (Defs.' Memo at 17.) Ms. Norman also testified that the work was unevenly divided between night and day shifts and that "because of past experience with my department, I knew that if I had taken that job, I would have not been able to do everything, and they would have been writing me up. There was no way. I was stuck. If I took it, they would have started writing me up." (Defs.' Exhs., Tab A, Norman Dep. at 156-57.) She also testified regarding the offer of having someone "show her the ropes" on the proposed job at Craig Hall, "I felt that it was almost like they were saying I was stupid. And that I needed help. I didn't need help. What I needed was an equal amount of work, and enough time that I could do it, so that I could do the job as it was written and would not leave any openings for facilities to write me up, because they would have." (*Id.* at 163.)

An employer is not obligated to provide an employee with the accommodation she requests or prefers. *Hinnershitz v. Ortep of Pennsylvania,* CA 97-7148, 1998 U.S. Dist. LEXIS 20264, * 14 (E.D.Pa. Dec. 22, 1998), citing *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1305 (D.C.Cir.1998); *see also Waite v. Blair, Inc.,* 937 F.Supp. 460, 472-473 (W.D.Pa.1995) denying plaintiff's ADA claim in part because employer had offered numerous times to transfer plaintiff to a different department or to light duty. On the other hand, rejection of all of the offered accommodations does not preclude a plaintiff from bringing an ADA claim as a matter of law. *See Watson,* 1997 U.S. Dist. LEXIS 13306, *10-11, refusing to grant summary judgment where plaintiff rejected the jobs SEPTA offered and SEPTA argued the jobs plaintiff sought were not available because they were subject to a CBA.

**\*19** As noted above, whether an accommodation is

reasonable is a question for the jury. I conclude that Ms. Norman has raised genuine issues on the question of whether her proposed accommodation was reasonable and whether either of the positions offered by the University was reasonable, given the facts of Ms. Norman's condition. Summary judgment is denied on the failure-to-accommodate claim.

4. Retaliation under the ADA and PHRA:

The ADA provides a remedy for retaliation by an employer against an employee who has "opposed any act or practice made unlawful by the ADA or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." *Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 786 (3d Cir.1998); 42 U.S.C. § 12203(a). Similarly, it is also a violation of the PHRA for an employer to retaliate against an employee for exercising her other rights under the Act. 43 Pa.C.S.A. § 995(d).

Defendants' first argument is that Ms. Norman failed to exhaust her administrative remedies on her retaliation claim prior to bringing suit. (Defs.' Memo at 18.) They claim, based on affidavits offered by the University attorney who responded to the EEOC claim and Mr. Koslof (Defs.' Exhs., Tabs D and E), that neither Defendant had any notice of a retaliation claim, no knowledge of retaliatory incidents, and that such incidents were not investigated by the EEOC.

Although the scope of a complaint brought in court is not limited to the "four corners of the administrative charge," it is limited, however, to "acts fairly within the scope of the charge or the investigation which can be reasonably expected to result from it." *Nerosa v. Storecast Merch. Corp.,* CA 02-440, 2002 U.S. Dist. LEXIS 16210, *11 (E.D.Pa. Aug. 28, 2002), citing, *inter alia, Love v. Pullman,* 404 U.S. 522, 527 (1972) and *Hicks v. ABT Assoc.,* 572 F.2d 960, 963 (3d Cir.1978). At an earlier stage of this case, I allowed Plaintiff to proceed on her claim of retaliation despite the fact that the original and amended EEOC charges of discrimination did not refer to retaliation, reasoning that prior to discovery the scope of the EEOC investigation could not be ascertained. (June 2001 Opinion.) As noted in that opinion, Ms. Norman had not checked the "retaliation" box as a basis for her charge of discrimination and the text did not refer to such actions. Neither did she claim that she had protested previous discrimination based on her disability and was thereafter subjected to an adverse employment action. *See Fogleman v. Mercy Hospital, Inc.,* 283

Not Reported in F.Supp.2d
2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630
**(Cite as: 2002 WL 32194730 (W.D.Pa.))**

Page 15

F.3d 561, 567-568 (3d Cir.2002) (To state a claim of retaliation under the ADA, a plaintiff must show (i) that she engaged in protected activity under the Act, (ii) that she contemporaneously or subsequently suffered an adverse employment action, and (iii) a causal connection existed between the protected activity and the adverse action.)

**\*20** Plaintiff does not address this issue in her Response to the Motion for Summary Judgment and I am unable to discern from the record any evidence which would support a conclusion that the EEOC investigated claims of retaliation. Under very similar circumstances, the district court in *Watson* dismissed retaliation claims for failure to exhaust administrative remedies since plaintiff's EEOC charge of discrimination did not address retaliation or state the protected activity in which she had participated. *Id.,* 1997 U.S. Dist. LEXIS 13306 at \*19-\*21. As the *Watson* court stated, the "EEOC may have stumbled across" other claims made in her lawsuit but not in the EEOC charge, "but it would not have initiated a retaliation inquiry based on the information [the plaintiff] gave in her charge." *Id.* at \*21.

Because I have concluded that Ms. Norman failed to exhaust her administrative remedies with regard to her claims of retaliation, I need not address Defendants' second argument that Plaintiff cannot satisfy the *prima facie* case of such a claim. (Defs.' Memo at 19-20.) Defendants' Motion for Summary Judgment is granted with regard to Ms. Norman's complaint of unlawful retaliation in violation of the ADA and PHRA.

B. *Count IV--Claims under the PHRA against Mr. Koslof*

In Count IV of her Amended Complaint, Ms. Norman asserts that Mr. Koslof violated 43 Pa.C.S.A. § 955(e) by aiding and abetting the unlawful actions of the University, "perpetuating a hostile work environment designed to force Plaintiff to quit," and doing nothing to stop--and even perpetuating--the unlawful harassment and retaliation. (Am.Compl., ¶ ¶ 45-46.)

Under the PHRA, only an "employer" may be held liable for employment discrimination. 43 Pa.C.S.A. § 955(a). The definition of "employer" under the PHRA cannot be construed to include "employee;" to the contrary, "employee" is defined as a wholly separate term under the Act. *Dici v. Pennsylvania,* 91 F.3d 542, 552 (3d Cir.1996), *citing* 43 Pa.C.S.A. § 954(b) and (c) in the context of a Title VII case.

However, unlike the ADA, the PHRA also prohibits "any person" from aiding, abetting, inciting, compelling, or coercing or otherwise directly or indirectly attempting to commit an unlawful discriminatory practice. 43 Pa.C.S.A. § 955(e). The Third Circuit has explicitly held that co-employees may be liable for aiding and abetting the employer's violation of anti-discrimination laws. *Dici,* 91 F.3d at 553 (the PHRA provides for individual liability for a supervisory employee who, among other actions, fails to take prompt action to end discrimination by other employees).

Defendants do not explicitly address the claims made against Mr. Koslof, merely concluding in a footnote that since the underlying claim against the employer is unfounded, the claims against the individual defendant should be dismissed as well. (Defs.' Memo at 12, n. 4, *citing Varela v. Phil. Neighborhood Housing Serv., Inc.,* 68 F.Supp.2d 575, 584 (E.D.Pa.1999).) Because I have concluded that Ms. Norman's discrimination, hostile environment and failure-to-accommodate claims survive under the ADA and PHRA, the claims against Mr. Koslof brought under the PHRA for aiding and abetting these actions will also survive.

*ORDER OF COURT*

**\*21** And now, this 17th day of September, 2002, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is ordered that the Motion for Summary Judgment by Defendants University of Pittsburgh and Glenn Koslof (Docket No. 26) is denied except with regard to the claims of retaliation under the ADA and PHRA.

2002 WL 32194730 (W.D.Pa.), 14 A.D. Cases 1630

**Motions, Pleadings and Filings (Back to top)**

•     2:00CV01655    (Docket) (Aug. 21, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**

Westlaw.

Not Reported in F.Supp.2d

Page 1

2000 WL 1239962 (D.Del.)

**(Cite as: 2000 WL 1239962 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Larry D. MARVEL, Plaintiff,
v.
PRISON INDUSTRIES, INC., et al., Defendants.
**No. Civ.A. 99-113-GMS.**

Aug. 24, 2000.
Larry D. Marvel, Plaintiff, pro se.

Deputy Attorney General <u>Mary Page Bailey</u>, Delaware Department of Justice, Wilmington, Delaware, for Defendants Prison Industries, Inc. , Stanley Taylor, Joyce Talley, Dave Kahlili, Ed Bowers, Ed Moore, and Robert Snyder.

<u>John D. Balaguer</u> and <u>Linda M. Carmichael</u> of White and Williams LLP, Wilmington, Delaware, for Defendant Prison Health Services, Inc.

*MEMORANDUM OPINION*

<u>SLEET</u>, J.

I. INTRODUCTION

**\*1** Larry Marvel, the plaintiff in this *pro se* prisoner civil rights action brought under <u>42 U.S.C. § 1983</u>, is currently incarcerated at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. In his complaint, <u>[FN1]</u> Marvel asserts a variety of federal and state law claims based on allegedly unsafe conditions at his prison workplace and the failure to provide adequate medical treatment for an injury he suffered while at work. <u>[FN2]</u> Specifically, Marvel claims that various prison officials and employees knew that he was being exposed to dangerous chemicals in an auto body shop operating out of the DCC, but refused to provide him with necessary safety equipment. This, he claims, ultimately resulted in injury to his eyes and respiratory system. In addition, Marvel alleges that Prison Health Services, Inc. ("PHS") and its employees were deliberately indifferent to his serious medical needs when they refused to treat him for painful eye injuries.

FN1. Marvel has twice moved for leave to amend his complaint. *See* Docket Item

("D.I.") Nos. 24, 46. Neither of his amendments appear to add additional claims or name additional defendants. Rather, the amendments essentially provide more factual detail to the allegations asserted in the original complaint. Some of the defendants opposed Marvel's first amendment on the grounds that the revisions were not sufficient to cure alleged deficiencies in the original complaint. None of the defendants have opposed Marvel's second amended complaint. All of the defendants have had the opportunity to address the more detailed allegations in their reply briefs to their respective motions to dismiss this action. There being no reason not to permit amendment, the court will grant Marvel's motions to amend the complaint. By the order accompanying this opinion, the second amended complaint attached to Marvel's second motion (D.I.46) shall be deemed filed, and all references herein to "the complaint" shall refer to that second amended complaint.

FN2. The defendants named in the complaint, along with their positions, are as follows: Prison Industries, Inc.("PII"); Stanley Taylor, Commissioner of the Delaware Department of Corrections ("DOC"); Joyce Talley, Administrative Chief for the DOC; Dave Kahlili, Director of PII; Ed Bowers, Operations Manager of PII; Ed Moore, Work Site Supervisor for PII; Robert Snyder, Warden of Delaware Correctional Center (collectively, the "State Defendants"); and Prison Health Services, Inc. ("PHS") and their John and Jane Doe employees (collectively, the "PHS Defendants").

All of the defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>. <u>[FN3]</u> For the reasons that follow, the court will grant in part and deny in part the defendants' motions to dismiss.

FN3. Two separate motions to dismiss have been filed--one by the State Defendants and one by PHS. In addition to moving for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2
2000 WL 1239962 (D.Del.)
**(Cite as: 2000 WL 1239962 (D.Del.))**

dismissal based on Rule 12(b)(6), the State Defendants also moved to dismiss Marvel's claims asserted under the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.,* for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1). As discussed more fully below, Marvel concedes that there is no private cause of action under OSHA. Thus, while defendants' argument would appear to be more properly asserted under Rule 12(b)(6), the court will dismiss Marvel's OSHA claims.

## II. BACKGROUND.

On or about November 1, 1992, while incarcerated at the DCC, Marvel was hired by Prison Industries, Inc. ("PII") at its auto body shop located in the DCC. [FN4] At the beginning of his employment, Defendant Moore, the work site supervisor, told Marvel to make a list of necessary equipment needed to restart the operation after a three year shutdown. In his list, Marvel included a fresh air respirator and an eye protective mask respirator. However, according to Marvel, these items were removed from the list by Moore, as ordered by Defendant Bowers, PII's operations manager. When Marvel inquired as to why these items had been taken off the list, Moore told Marvel that Defendant Kahlili, the director of PII, had ordered them off, stating that, "They have never needed that stuff before and they don't need it now." *See* Compl. at ¶ 19.

> FN4. PII is apparently a corporation that operates out of prisons and employs prisoners incarcerated therein. In their motions to dismiss, the defendants have not asserted that PII (or any other defendant) is not a "state actor" or does not operate "under color of state law" for purposes of 42 U.S.C. § 1983. Nor have the defendants contended that Marvel's claims fail because he was not required to work for PII. Accordingly, the court expresses no opinion on these matters.

In June of 1993, Marvel was again asked to compile a list of necessary equipment as part of the process for establishing a budget of PII's fiscal year beginning July 1, 1993. Marvel again included the respirators, which he contends are mandated by federal and state regulations and by the labels on the products themselves. The items were again removed. Moore told Marvel that Kahlili would not authorize the purchase of the safety equipment despite the federal and state regulations. Moore then ordered Marvel to work without the equipment or be terminated. Similar requests and rejections occurred prior to the fiscal years beginning July 1, 1994, July 1, 1995, and July 1, 1996.

Marvel further contends that, from March to November of 1996, while working on a project involving the painting of new court vans to be used by the DOC, he was subjected to undetermined amounts of a particular metal conditioning primer. The primer's label clearly warns that its user should wear an air respirator and eye protection . [FN5] Still, the State Defendants did nothing about the lack of safety equipment in the shop.

> FN5. The label states, in pertinent part:
> Notice: Repeated and prolonged overexposure to solvents may lead to permanent brain and nervous system damage. Eye watering, headaches, nausea, dizziness and loss of coordination are signs that solvent levels are too high.... Do not breath vapor or spray mist. Do not get in eyes or on skin. WEAR A POSITIVE-PRESSURE, SUPPLIED-AIR RESPIRATOR ..., EYE PROTECTION, GLOVES AND PROTECTIVE CLOTHING WHILE MIXING ACTIVATOR WITH ENAMEL DURING APPLICATION AND UNTIL ALL VAPOR AND SPRAY MIST ARE EXHAUSTED.... Use only with adequate ventilation.
> Pl.'s Br. in Opp'n to State Defs.' Mot. to Dismiss, at Exhibit B (emphasis in original).

**\*2** In May of 1996, while on tour of the PII workplace to inspect the ongoing court van project, Defendant Taylor questioned Marvel as to the progress of the project. Marvel alleges that, at this time, he explained to Taylor the need for upgraded respiratory equipment due to the specific products being used on the project. Taylor then introduced Marvel to Defendant Talley and told Talley about Marvel's request for the necessary safety equipment. Talley allegedly made a list and told Marvel that she would "get with Kahlili on this right away." *See* Compl. at ¶ 26. Marvel contends that he complained repeatedly to Moore and Bowers, and once directly to Taylor and Tally, of respiratory distress that he was experiencing due to the lack of safety equipment and exposure to the solvents. Furthermore, Marvel contends that he passed out twice from inhalation of the primer vapors. He also alleges that in December

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3
2000 WL 1239962 (D.Del.)
**(Cite as: 2000 WL 1239962 (D.Del.))**

of 1996, he reported to Moore that he was experiencing severe eye irritation due to the inadequate ventilation in the body shop's "spray booth." Moore again ordered Marvel to continue working or face termination.

Ultimately, on February 14, 1997, due to the allegedly inadequate ventilation and lack of safety equipment, Marvel sustained chemical burns to his eyes while working in the spray booth. Although a number of prison officers repeatedly called Defendant PHS to get help for Marvel's painful condition, PHS refused to see Marvel for a number of days. [FN6] Furthermore, Marvel claims that, when he was finally seen by a PHS nurse on February 18, the nurse provided no treatment whatsoever. Marvel was not seen by a PHS doctor until February 21. At that time, the doctor allegedly told Marvel that he had received chemicals burns to his corneas. The doctor also noted that, due to the lack of attention at the time of the injury, and the extent of time that the eyes had been allowed to go untreated, the only course of action was to prescribe corrective lenses to try to help the eyes heal.

> FN6. Marvel was eventually seen by a nurse on February 18, 1997. Although there is some dispute over whether Marvel actually had an appointment with the doctor on February 19th, it is undisputed that PHS would not see him for at least four days.

Moreover, on February 26, 1997, and again on March 3, 1997, Marvel asked Defendant Moore to call PHS to inquire as to treatment for his continued suffering. However, PHS told Moore that Marvel would not be receiving any medication whatsoever and not to call back.

Marvel alleges that, due to PHS's delay in treatment, he has sustained severe pain in his eyes and has suffered permanent injury in terms of vision loss and tear duct damage. He also contends that he has suffered permanent injuries to, *inter alia,* his lungs and esophagus, and that he suffers from various other symptoms, as a result of the lack of proper safety equipment at the PII auto body shop.

III. STANDARD OF REVIEW

When considering the defendants' motions to dismiss, the court must accept as true all of the factual allegations of the complaint. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63,65 (3d Cir.1996). In addition,

because Marvel is proceeding *pro se,* the court must interpret his allegations liberally. *See Zilch v. Lucht,* 981 F.2d 694 (3d Cir.1992) (citing *Haines v. Kerner,* 404 U.S. 519, 520 (1972)). As a result, the court cannot grant the defendants' motions to dismiss unless it appears "beyond a doubt" that Marvel can prove no set of facts that would entitle him to relief. *See Graves,* 117 F.3d at 726 (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *Nami,* 82 F.3d at 65 (citing same).

IV. DISCUSSION

*3 Marvel's primary constitutional claims are alleged Eighth Amendment violations based on the unsafe conditions and inadequate medical care described above. Although Marvel did not clearly specify in his complaint which claims are asserted against which defendants, the court has construed Marvel's inadequate medical care claims as against PHS and its "John and Jane Doe" employees, and his unsafe conditions claims as against the State Defendants. *See* footnote 2, *supra.* In addition, Marvel appears to assert claims under the Equal Protection Clause of the Fourteenth Amendment, the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651, and state law.

A. The State Defendants' Motion to Dismiss.

The State Defendants have moved for dismissal of Marvel's claims on several bases. First, they contend that Marvel's claims against them are barred by the statute of limitations. Next, they assert that this court does not have subject matter jurisdiction over Marvel's OSHA claims. Finally, they contend that Marvel's allegations do not state claims under either the Eighth or Fourteenth Amendments.

1. Statute of Limitations.

The State Defendants contend that the statute of limitations applicable to Marvel's claims is two years. They argue Marvel's claims are barred because his complaint was filed on March 2, 1999, more than two years after his injury on February 14, 1997. Assuming without deciding that two years is the applicable limitations period, the State Defendants' argument fails because Marvel's complaint was "constructively filed" on February 12, 1999.

In *McDowell v. Delaware State Police,* 88 F.3d 188 (3d. Cir.1996), the Third Circuit Court of Appeals adopted the doctrine of constructive filing. Under that doctrine, a complaint submitted along with an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 4
2000 WL 1239962 (D.Del.)
**(Cite as: 2000 WL 1239962 (D.Del.))**

application to proceed *in forma pauperis* (IFP) is deemed to be constructively filed as of the date that the clerk received the complaint, provided the plaintiff ultimately pays the filing fee or his request to proceed IFP is granted. *See McDowell,* 88 F.3d at 191. Marvel submitted his complaint and application to proceed IFP on February 12, 1999. The court granted his request to proceed IFP on March 2, 1999. As such, his complaint was constructively filed on February 12th. Therefore, the State Defendants' statute of limitations argument, which is based on a March 2, 1999 filing date, is not persuasive.

2. OSHA Claim.

In his complaint, Marvel appeared to assert a claim under the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.,* based on the alleged violations of OSHA standards at the PII auto body shop. *See* Com pl. ¶ ¶ 1-2, 48, 50. In his opposition to the State Defendants' Motion to Dismiss, however, he concedes that there is no private cause of action under OSHA. *See* Pl.'s Opp'n Br. to State Defs.' Mot. to Dismiss at 11; *Reis v. National R.R. Passenger Corp.,* 960 F.2d 1156, 1164 (3d Cir.1992); *Melerie v. Avondale Shipyards, Inc.,* 659 F.2d 706, 709 (5th Cir.1981). As such, Marvel's OSHA claim will be dismissed for failure to state a claim upon which relief can be granted. However, to the extent that Marvel can establish the existence of OSHA violations at the PII auto body shop, and/or the defendants' knowledge of such violations, such evidence would appear to be relevant to Marvel's Eighth Amendment claim discussed below. *See Reis,* 960 F.2d at 1162 n. 5, 1164-65.

3. Eighth and Fourteenth Amendment Claims.

a. Eighth Amendment Claim.

*\*4* To prevail on his Eighth Amendment claim of unsafe conditions, Marvel must show that the defendants knew that Marvel faced a substantial risk of serious harm to his health or safety and disregarded that risk by failing to take reasonable steps to abate it. *See Farmer v. Brennan,* 511 U.S. 825, 836- 38 (1994). The test for determining whether there has been a Eighth Amendment violation contains both an objective and subjective prong. *See id.* at 834. First, the deprivations alleged must be, objectively, "sufficiently serious." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). In a "failure to prevent harm" case such as this, Marvel must prove that the conditions to which he was exposed posed "a substantial risk of serious

harm." *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 35 (1993)). Second, he must show the defendants acted with a "sufficiently culpable state of mind." *See id.* (citations omitted). In prison conditions cases, the state of mind required is one of " 'deliberate indifference' to inmate health or safety." *Id.*

Except as noted below, Marvel has stated a claim upon which relief can be granted against the State Defendants. As discussed more fully above, Marvel alleges that the State Defendants knew of the risk of harm which ultimately caused his injuries, but disregarded that risk. According to Marvel, he was exposed to undetermined amounts of primer in an inadequately ventilated area This, he alleges, caused him both present and future harm. In addition, Marvel repeatedly requested safety equipment and complained about respiratory and eye problems. Despite these requests, complaints, and the fact that a product he was using clearly warned of the need for safety equipment, the State Defendants consistently refused to provide the necessary safety equipment. Because it does not appear "beyond a doubt" that Marvel can prove no set of facts that would entitle him to relief, the court will deny the State Defendants' motion to dismiss Marvel's Eighth Amendment claims. *See Helling v. McKinney,* 509 U.S. 25, 35 (1993) (holding that a prisoner could state a claim under the Eighth Amendment by alleging that the defendants, with deliberate indifference, exposed him to levels of environmental tobacco smoke that posed an unreasonable risk of serious damage to his future health).

The court, will, however, dismiss Marvel's claims against Defendant Robert Snyder, the warden of the DCC. Marvel has not alleged that Marvel Snyder has participated in any actions or omissions that violated his constitutional rights. Thus, it appears that Marvel seeks to hold Snyder liable solely on the basis of *respondeat superior.* It is well established that *respondeat superior* may not serve as a basis for liability under 42 U.S.C. § 1983. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Since there are no allegations as to how Snyder violated Marvel's rights, or even that he knew of the alleged deprivations, the court will dismiss Marvel's claims against Snyder.

*\*5* Further, the court will dismiss Marvel's claims for monetary damages from Defendants Taylor and Talley in their official capacity . [FN7] State defendants in their official capacities are not "persons" for the purposes of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 1239962 (D.Del.)
(Cite as: 2000 WL 1239962 (D.Del.))

Page 5

71 (1989). Monetary damage claims against state officials in their official capacity are also barred by the Eleventh Amendment. *See Hafer v. Melo,* 502 U.S. 21, 30 (1991). However, Marvel has also named all of the defendants in their individual capacities. Such claims are within the scope of § 1983 and are not barred by the Eleventh Amendment. *See id.* at 30-31. As such, Marvel's claims against the State Defendants in their individual capacities may proceed. [FN8]

> FN7. Marvel has sued Defendants Taylor, Talley, and Snyder in both their official and individual capacities. He has sued all other defendants in their individual capacities only. *See* Compl. ¶ 13. As noted above, the court has already dismissed all of Marvel's claims against Snyder.

> FN8. To the extent Marvel seeks *injunctive* relief against the State Defendants in their official capacities, *see* Compl. at 17 (requesting "any other relief" deemed appropriate), those claims may also proceed. *See Will,* 491 U.S. at 71 n. 10.

b. Equal Protection Claim.

Marvel also claims that the State Defendants have violated the Equal Protection Clause of the Fourteenth Amendment. The basis for his claim appears to be that the defendants failed to provide safety equipment equivalent to that provided by private body shops. The Equal Protection Clause, however, is implicated when a state law or practice treats similarly situated individuals differently. *See Plyler v. Doe,* 457 U.S. 202, 216 (1982); *Alexander v. Whitman,* 114 F.3d 1392, 1406-07 (3d Cir.1997). It does not require a state employer to match the terms of employment offered by private employers. As Marvel has not alleged that the State Defendants have treated him differently than *they* treat similarly situated individuals, [FN9] the court will dismiss Marvel's Equal Protection Clause claims.

> FN9. Although Marvel alleges that the PII auto body shop operates in violation of OSHA standards, he does not allege that the State of Delaware has exempted PII from OSHA requirements.

B. PHS's Motion to Dismiss.

The State of Delaware has an obligation to provide "adequate medical care" to the individuals who are incarcerated in its prisons. *See Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.3d 326, 346 (3d Cir.1987) (citing *Estelle v. Gamble,* 429 U.S. 97, 102-104 (1976)). It is well established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. The standard that was enunciated contains two prongs: first, it requires deliberate indifference on the part of the prison officials, and second, it requires the prisoner's medical needs to be serious. *See Lanzaro,* 834 F.2d at 346.

In its motion to dismiss, PHS contends that Marvel's claims fail to satisfy either of the two prongs. PHS attempts to support its position by attaching to its motion a package of unauthenticated medical records purportedly demonstrating that Marvel's eye injury was not serious and that PHS did not act with deliberate indifference. *See* PHS's Mot. to Dismiss at ¶ ¶ 11-12. Aside from its procedural flaws, PHS's submission at best demonstrates the presence of disputed facts. As discussed more fully above, Marvel has alleged that he has suffered serious and permanent damage to his eyes as a result of PHS's refusal to provide prompt medical treatment after the February 14, 1997 incident. This occurred despite repeated calls to PHS made by various prison guards on Marvel's behalf. He has further alleged that PHS refused further treatment on February 26, 1997 and on March 3, 1997. While the extent and cause of Marvel's injuries present factual disputes to be resolved later in this litigation, the court cannot conclude that it is "beyond a doubt" that Marvel can prove no set of facts that would entitle him to relief. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997). As such, the court will deny PHS's motion to dismiss. [FN10]

> FN10. In its reply brief, PHS raises for the first time an additional basis for dismissal. It contends that Marvel has not directed his allegations at a specific individual who performed the allegedly wrongful acts. Aside from being improperly raised in a reply brief, *see* D. Del. LR 7.1.3(c)(2), this argument is at best premature. In his complaint, Marvel names as defendants "Prison Health Services, Inc., and their John and Jane Doe employees." As the Third Circuit has noted, "Doe defendants are 'routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." ' *Hindes v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*FDIC,* 137 F.3d 148, 155 (3d Cir.1998) (citations omitted). Further, while PHS itself cannot be held liable under 42 U.S.C. § 1983 based solely on the operation of *respondeat superior,* it can be held liable for a policy or custom that demonstrates deliberate indifference. *See Miller v. Correctional Med. Sys., Inc .,* 802 F.Supp. 1126, 1132 (D.Del.1992) (citations omitted). Because PHS has yet to provide any explanation for its alleged refusal to provide emergency medical treatment to Marvel in the face of repeated requests from prison guards, the court cannot conclude that it is a "beyond a doubt" that Marvel can prove no set of facts that would establish liability on the part of PHS.

## V. CONCLUSION

**\*6** For the reasons set forth above, the court will grant in part and deny in part the defendants' motions to dismiss the complaint. Specifically, the court will dismiss all claims against Defendant Snyder, the Equal Protection and OSHA claims against all defendants, and all claims for monetary damages against Defendants Taylor and Talley in their official capacities. The court will deny the motions to dismiss in all other respects. In light of these rulings, the court will also deny as moot PHS's motion to stay proceedings pending the court's ruling on its motion to dismiss. An appropriate order shall be issued in conjunction with this opinion.

2000 WL 1239962 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF ELECTRONIC SERVICE

I, Edward M. McNally, hereby certify that on July 15, 2005, I electronically filed

a copy of Plaintiff Elberta Bernice Lieberman's Answering Brief in Opposition to the

Defendants' Motion for Summary Judgment on the Substantive Issues and this Certificate

of Service with the Clerk of Court using CM/ECF which will send notification of such

filings to the following:

>Marc P. Niedzielski, Esquire
>Department of Justice
>Carvel State Office Building
>820 N. French Street
>Wilmington, DE 19801

>Edward M. McNally (#614)
>MORRIS, JAMES, HITCHENS & WILLIAMS LLP
>222 Delaware Avenue
>Wilmington, DE 19801
>(302) 888-6800
>emcnally@morrisjames.com

1255337/1