IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ELBERTA LIEBERMAN,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )    Civil Action No.
                                      )       96-523
FAMILY COURT, STATE OF DELAWARE,      )
                                      )
            Defendant.                )



        Deposition of ELBERTA LIEBERMAN taken
pursuant to notice at the offices of Morris James
Hitchens & Williams, LLP, 222 Delaware Avenue, Tenth
Floor, Wilmington, Delaware, beginning at 9:00 a.m. on
Friday, June 10, 2005, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.


APPEARANCES:

            EDWARD M. McNALLY, Esquire
            MORRIS JAMES HITCHENS & WILLIAMS, LLP
              222 Delaware Avenue
              P.O. Box 2306
              Wilmington, Delaware  19899-2306
              on behalf of the Plaintiff,


            MARC P. NIEDZIELSKI, Esquire
            Department of Justice
              Carvel State Office Building
             802 North French Street
              Wilmington, Delaware  19801
                on behalf of the Defendant.



                WILCOX & FETZER
    1330 King Street – Wilmington, Delaware 19801
                (302) 655-0477

```
 1                    ELBERTA LIEBERMAN,
 2            the witness herein, having first been
 3            duly affirmed on oath, was examined
 4            and testified as follows:
 5                         EXAMINATION
 6     BY MR. NIEDZIELSKI:
 7        Q.   Good morning, Mrs. Lieberman.
 8        A.   Miss.
 9        Q.   Miss Lieberman, we've been here with you.  You
10     met me before.  You've been deposed before.
11        A.   Yes.
12        Q.   Do I need to go through any of the instructions
13     or do you think you understand?
14        A.   I think I understand.  Thank you.
15        Q.   If at any time you don't understand a question
16     I ask you, just let me know and I'll try to rephrase
17     the question.  Okay?
18        A.   Okay.
19        Q.   What I'm going to do initially, Ms. Lieberman,
20     is go through these documents that were produced after
21     your other deposition, your prior deposition, and I'm
22     going to ask you to identify them.  Okay?
23        A.   Okay.  And let me make sure I don't knock
24     anything over here.
```

```
 1                   I didn't go in any particular order here.
 2       I think -- I may.  I'm not sure.
 3          Q.   Now, you see on the corner of these documents
 4       there's a number?
 5          A.   Yes.
 6                   MR. McNALLY:  Excuse me.  Please wait
 7       until he's done asking the question.  All right?
 8       Please.
 9          Q.   Do you see those numbers?
10          A.   Yes.
11          Q.   And do you see it's a BL 0803?
12          A.   Yes.
13          Q.   And does it appear to you that each page has
14       been marked sequentially?
15          A.   I have not had a chance to check numbered ones,
16       so I can't -- but I assume -- my lawyer tells me it
17       was done, so I trust that it was.
18          Q.   Just take a few minutes.  Just go through it
19       and at least see whether in fact it seems that the
20       sequence is unbroken.
21                   MR. McNALLY:  That was certainly our
22       intent.  I'll stipulate if there are any cases where
23       the sequence was broken, it was inadvertent.
24                   MR. NIEDZIELSKI:  Let me make this easy.
```

1    Will you stipulate there that the documents here are

2    Bates stamped BL 803 through BL 1283?

3              MR. McNALLY:  Sure.

4    BY MR. NIEDZIELSKI:

5    Q.   Now, the first document that's marked BL 0803,

6    what is that document?

7    A.   Okay.  This is what was called -- used to

8    have -- it's an activity report.  Used to have a title

9    at the top.  Didn't by this time?

10   Q.   Now is this typed or hand filled out?

11   A.   It was -- part of it is typed and part of it is

12   hand filled out.

13   Q.   Would you fill these out?

14   A.   Most of the time, yes.  Not all of the time,

15   but most of the time.

16   Q.   Now, there's a date that appears on the top of

17   these.

18   A.   Yes.

19   Q.   And for instance, it says, August 1984 on BL

20   0803, correct?

21   A.   I think it was '94.

22   Q.   I am sorry.  '94.  It's upside down.  Where

23   would you get these documents from?

24   A.   That's in another -- to make this up, that's in

1    another one of those.  It was called the handwritten

2    mediation calendars.

3      Q.   We'll refer to these as a category, and these

4    would be called mediation statistics and daily

5    activity reports?

6      A.   This is the last step of the process before you

7    do statistics.

8      Q.   In other words --

9      A.   Compiling these.

10     Q.   Odds are we're going to go to those other

11   documents probably.

12          And then you, from those other documents,

13   you generate these documents, correct?

14     A.   That's correct.

15     Q.   And part of them are typed.  Are they typed by

16   you at the time that these are prepared?

17     A.   What happened was I made a mistake.  They had

18   just taught us the computer, and there was a template,

19   and I was supposed to make a copy of the template

20   rather than type on the template.  And I spent five

21   hours on a Friday typing in all of my cases and lost

22   all that work.  So they let me do it a different way

23   because I didn't have another five hours to put into

24   typing all the cases in.  I did type this in.

1              MR. McNALLY:  This being this particular

2     document.

3              THE WITNESS:  This particular -- these

4     that you see.

5     Q.   The left three columns that are typed in there

6     would be names?

7     A.   Mm-hmm.

8     Q.   The first two columns in the third column there

9     would be --

10    A.   And this is cropped.  This one, the respondent

11    was first.  Second column was petitioner.  Third is

12    the court file number.  The next one is the first

13    mediation date that was scheduled, the type of the

14    matter, and if it was rescheduled, to what date.

15             MR. McNALLY:  You're referring to

16    BL 087, not to BL 083, right?

17             THE WITNESS:  Yes.  Because BL 803, it got

18    cropped, and it was -- the list wasn't on top of what

19    the columns represented, so I made sure I was telling

20    you accurately by looking at that one.

21    Q.   I see what you're saying.  You're saying the

22    label at the top wasn't reproduced on 803?

23    A.   Mm-hmm.

24    Q.   Now, so you would type in the four columns and

1    then -- but there also appears to be handwriting.  Is

2    that your handwriting?

3       A.    Yes.

4       Q.    Would that be true throughout all these

5    reports, that would be your --

6       A.    Practically all.  At one point there was a

7    mediator who didn't have anything to do, and she was

8    asked and hand printed some of these.

9       Q.    And you indicated that this is a subsequent

10   step to gathering statistics and making the report,

11   correct?  In other words, there's an earlier step that

12   you go through?

13      A.    That's correct.

14      Q.    Can you just tell me generally, would you do

15   these individual reports on a weekly basis, a monthly

16   basis?

17      A.    It would depend on other factors.  It certainly

18   had to be done on a monthly basis, but often I would

19   do it throughout the month, work on it throughout the

20   month.

21      Q.    At some point, for instance -- now, I'm

22   referring to BL 0843 -- it appears that the form is

23   somewhat different here.

24      A.    That's correct.  This is -- this is when we

1    had -- I'm trying to think.  The process changed

2    throughout.  Like this is when we had on the form when

3    we got it as a new matter.  That changed in what they

4    wanted when it was typed.  I did better when it was

5    handwritten.  And it also changed -- it could change

6    in terms of whether -- over the months it would change

7    over whether they wanted all of the same type of

8    matter together or.  You know, and then -- so if you

9    saw earlier ones, there would be a whole set for

10   custody, then ancillary custody, and down the line.

11      Q.   You had to do them at least monthly.  These

12   monthly reports go from August '94 back to -- are

13   these the earliest ones we have, March of '91?  Is

14   that correct?

15      A.   That's correct.  And I do have to say that

16   these were the documents that Family Court gave my

17   friend's father.  I don't have totally complete

18   reports.  I did the best I could.

19      Q.   I am sorry.  These are documents that your

20   friend --

21      A.   After Family Court made me leave, I called them

22   and told them I -- well, I called that day and said I

23   needed my documents, and someone -- I believe it was

24   my supervisor Dave Weiss -- boxed everything that

Elberta Lieberman - Niedzielski                    9

1    was -- because I made copies of everything, so I had

2    records.  So I cannot promise -- like, for instance, I

3    know that February of '93, the statistics are missing.

4    I'm not going to say I have them when I don't.

5        Q.   So these were provided to you by Mr. Weiss

6    after you left?

7        A.   Or somebody.

8        Q.   But you made a request to Mr. Weiss?

9        A.   I made a request to Kathi Donofrio, and his

10   supervisor at the time and the deputy director from

11   New Castle County, and I explained that my friend's

12   father was willing to come with a truck at an agreed

13   upon time and would have everything boxed of mine, and

14   in the years since, I've worked on putting them

15   together.

16       Q.   And so these would have been your own records

17   kept in your desk?

18       A.   In my office, yes.

19            But they are not totally complete.

20       Q.   I'm going to show you another set of documents

21   in an accordion file.  And the accordion file is

22   marked "typed mediation calendars," correct?

23       A.   That's correct.

24       Q.   And it has a date it was produced to me

1    November 17th, 2004, and it has those Bates numbers,

2    BL 1284 through BL 1541.

3            MR. NIEDZIELSKI:  I take it you will

4    stipulate, Mr. McNally, that that, in fact, is what is

5    in that.

6            MR. McNALLY:  Sure.

7    BY MR. NIEDZIELSKI:

8        Q.   And would you just explain, what are these?

9        A.   Okay.  This is -- we are going from the most

10   recent back.  Okay?  So in terms of developing

11   statistics, this was a calendar that was typed off the

12   handwritten mediation calendar I expect you'll go to

13   next, and usually, the handwritten calendar for this

14   date -- I mean the typed calendar for -- excuse me --

15   for this date would have the same cases that were on

16   the handwritten calendar.  But that was handwritten by

17   the clerk who was assigning cases.  And so -- what do

18   you want me to explain first about this calendar?

19       Q.   Who makes this document?  How is this made?

20       A.   This was made by the clerks in the mediation

21   unit.

22       Q.   It would appear typed?

23       A.   Yes.

24       Q.   And then there was handwriting on it?

Elberta Lieberman - Niedzielski                    11

1     A.   Yes.

2     Q.   Whose handwriting would that be?

3     A.   Usually the mediator's.

4     Q.   So, for instance --

5     A.   These are my handwriting.  Sometimes, if

6     someone else handled a case for each other, sometimes

7     you see a different handwriting.

8     Q.   Okay.  For instance, were these -- did each

9     mediator get their own calendar or was this a calendar

10    for all mediators?

11    A.   There were two pages of this calendar.

12    Q.   Okay.

13    A.   And I believe -- you see, I was not clear with

14    Mr. McNally that not all of this that you got was

15    correctly organized.  But, I think this is mostly -- I

16    did everything in reverse order like Family Court did.

17    So I believe you'll find them in reverse chronological

18    order by month.

19    Q.   Then these mediation calendars appear to -- the

20    most recent one on top is October 3rd, 1994, and

21    that's Bates stamp BL 1284?

22    A.   Yes.

23    Q.   And the one at the very end appears to be April

24    of 1993, correct?

Elberta Lieberman - Niedzielski               12

1      A.   Yes.

2      Q.   And it was Bates stamped -- just so we are

3   accurate about that, the bottom, what's that number

4   Bates stamped on that one for April 9?

5      A.   BL 1537.

6      Q.   So after, for instance, you or another mediator

7   would handle a case, would you go out and make

8   notations on the calendar?

9      A.   Yes.  Except that -- just for one thing for you

10  to know, I noticed when I was reviewing them, he would

11  put the calendar away before the final mediation was

12  done.  And so sometimes what was done on the last, the

13  fifth mediation -- I think it was five -- is not

14  written in there.  And the other thing you don't know

15  is, because you don't have the originals, which I

16  have, is what I added later to make this more complete

17  from my copies of the dispositions.

18     Q.   You have the originals of these?

19     A.   I have my original copy.

20     Q.   Well, explain to me --

21     A.   I don't have the original calendars.  We've

22  asked you for them, and we understand they were

23  destroyed.  So each month I would do statistics from

24  this, and fortunately I -- we had a -- I had time and

1    did -- usually I did it at the end of the month, but

2    fortunately I did this, copied up until the 13th of

3    October, or I would have nothing of this to offer you.

4        Q.   So I'm just trying to get this clear.  So the

5    clerk would generate this mediation calendar?

6        A.   The typed form.

7        Q.   Each day?  Each day there would be one?

8        A.   Yes.  And it would be two pages, one -- and it

9    was alphabetical.  You know, Lieberman.  So the other

10   mediators was -- you know, Judy Sullivan would be on

11   the next page.

12       Q.   And then each mediator would get a copy of that

13   calendar as well, correct?

14       A.   (Indicating.)

15       Q.   Or no?

16       A.   No.  I made these copies.  We were allowed to

17   copy them.

18       Q.   After you were done mediation, you would go

19   back out.  Where was this calendar kept while the

20   mediations were going on?

21       A.   On the front desk.

22       Q.   So you would go back out to the front desk and

23   make notations at that time?

24       A.   Right.  Right.  And if you see checks -- you're

Elberta Lieberman - Niedzielski                14

1    not asking that.

2       Q.   If you see checks, what does that mean?

3       A.   If you see checks, it means it's the -- to all

4    the paperwork that the state-funded mediators were

5    required to do was done on that day before they took

6    the calendar away.

7       Q.   So a check mark after comments meant all the

8    paperwork that you were expected to do --

9       A.   Mm-hmm.

10      Q.   -- was done?

11      A.   If it was still there when I got it done.  Like

12   they kept taking it away early, but that's...

13      Q.   You mean if this mediation calendar --

14      A.   Mm-hmm.  Right.

15      Q.   Now, was this a copy of your copy that you

16   maintained?

17      A.   Yes.

18      Q.   So even though they may have taken away the

19   mediation calendar, you would still be able to make

20   notations on your calendar?

21      A.   Right.

22      Q.   You would do that.  So even, for instance, at

23   4:30 you could make a notation on your own calendar?

24      A.   That's correct.  Mm-hmm.

Elberta Lieberman – Niedzielski                15

```
1     Q.   Like you said, this is the initial starting
2     point for you to gather your statistics, correct?
3     A.   No.
4     Q.   No?
5     A.   No.  Sorry.
6     Q.   What initial documents did you use to make the
7     statistics?
8     A.   The initial ones were the handwritten ones of
9     the mediation calendars.  It was another --
10    Q.   I believe that's probably --
11    A.   The next one, is this what you were speaking
12    of?
13    Q.   Yes.  These are the handwritten mediation
14    calendars?
15    A.   Oh, dear.  See, I'm not sure what inadvertently
16    was given you.  I can't promise that some of them are
17    not out of order.
18         MR. McNALLY:  He didn't ask you that,
19    though.
20    A.   This is the handwritten calendar, yes.
21    Q.   And file that I received this in indicates that
22    the documents in there are Bates stamped BL 1542
23    through BL 1774?
24    A.   Right.
```

Elberta Lieberman – Niedzielski                16

1    Q.   And if you look, you can verify that.  You see

2    the first one there?

3    A.   Okay.  Sure.  Yeah.  Correct.

4    Q.   How was this handwritten mediation calendar

5    made?

6    A.   Okay.  It was made in a couple ways.  Basically

7    there was a clerk who was assigned to, you know,

8    schedule the matters.  These are ancillary matters or

9    petitions for mediators.  So Tara Barnes was her name

10   when I left.  These numbers are something different.

11   Okay.  So these weren't there.  I added those at the

12   end.  What I would get is for November 1st, and I

13   would copy these.  This would tell me that I had a

14   custody petition scheduled for November 1st, Tuesday,

15   of '94.  And these were the five matters that were

16   scheduled for me, and these were the dates that Tara

17   Barnes or I or somebody else scheduled that matter for

18   me.

19   Q.   Just so we are clear on the record, what you

20   are pointing to the right side is a column called

21   disposition, correct?

22   A.   Yes.

23   Q.   That represents, you indicated, the date?

24   A.   Yes.

1      Q.   In which you scheduled this particular matter

2   to be heard on November 1st, for instance, 1994?

3      A.   I didn't.  Tara Barnes did.  Mm-hmm.

4      Q.   Now, you indicated that next to these numbers,

5   under your name --

6      A.   Yes.

7      Q.   -- are some other numbers.  What do they

8   signify?

9      A.   This was a chart I made up for Mr. McNally in

10  2000, I believe, and it was done without names.  I

11  wanted -- I was -- I later made that one up to be more

12  complete.  The first one -- this refers to number 24

13  on the list I did for Mr. McNally, and it didn't have

14  all the information he wanted you to have or the Court

15  to have.  So these don't count any more.  But that's

16  why they are there.

17     Q.   Were they used to identify individuals in lieu

18  of using their names?

19     A.   Yes.  I also had the court file number.

20     Q.   So when you did this report for Mr. McNally,

21  did you just use the court file number?

22     A.   Yes.  And the other information, but not the

23  names because I thought we weren't supposed to give

24  the names.

1      Q.   Now, in sequence, this mediation calendar that

2    we've just been discussing is handwritten?

3      A.   Yes.

4      Q.   We just went through another set of documents

5    which were mediation calendars but they were typed.

6      A.   So this is first, then second.

7      Q.   This was initially done by the clerk.  Did you

8    input those dates when they get scheduled from

9    mediation?

10     A.   Yes.  These mean these are now assigned to me

11   and it was the Court's way to keep track of all

12   matters.  So they were assigned to somebody somewhere.

13   So, for instance, if I may, I think this is a good

14   example right here.  These -- this one, I see

15   September 1st here.  I don't see the October 1st in

16   this file.  And I believe it's in a separate file as I

17   saw it.  This one's a good example, Mr. Niedzielski.

18            You see, this one was assigned to me and

19   of course it -- the copier cropped off the date.  It

20   was two matters that were assigned on November 21st.

21   But it was assigned -- I can't remember the date that

22   I estimated that it was or knew it had been scheduled

23   or estimated.  It had been scheduled -- for instance,

24   she was scheduling on -- for November 3rd other --

Elberta Lieberman – Niedzielski                    19

1    which was another November date that I -- the only one

2    I had.  She was scheduling cases on September 21st and

3    26th.  So this was scheduled in September as I recall.

4    I can't remember specifically.  Okay.

5            So this is another kind of document I

6    could have gotten the information about the matters

7    that were now on my calendar but certainly I had not

8    even mediated yet.  But I was to have them on my

9    statistics.

10    Q.   Okay.  Well, for instance, this document, which

11    is BL 1545, it's entitled "scheduling instructions,"

12    correct?

13    A.   Mm-hmm.

14    Q.   And it says scheduled for November 21st, 1994,

15    at 1:30?

16    A.   Mm-hmm.

17    Q.   And it requires three hours, correct?

18    A.   Right.

19    Q.   Was it scheduled for November 1st however?

20    A.   No.  I'm just showing you --

21    Q.   Okay.

22    A.   -- that, you see, actually this is what Tara

23    Barnes had or made up.  I'm trying to remember.  That

24    looks like her handwriting.  She made these up.

Elberta Lieberman - Niedzielski                20

1     Q.   Okay.

2     A.   All right?  And so then, from this she would

3    write this information here.  But she wasn't

4    scheduling for November 21st.  They did that because

5    there were two attorneys.  See, two attorneys.  And

6    she had to get -- schedule it when they're available.

7    So that's -- I'm just showing you another way

8    information could have come.

9     Q.   Okay.  Does information normally come this way

10   through these scheduling instructions?

11    A.   No.  I would usually get the information from

12   this because this is a summary.  That would be a lot

13   more sheets.  That stayed with the file.

14    Q.   Okay.

15    A.   The other thing -- okay -- is I could have

16   scheduled here, but you would see a different

17   handwriting.

18    Q.   Well, just so I'm clear on this mediation

19   calendar, it has a date on top?

20    A.   Yes.

21    Q.   Is that the date these mediations are going to

22   be heard?

23    A.   Yes.

24    Q.   And on disposition, that's the date they are

Elberta Lieberman - Niedzielski          21

 1    scheduled for this date, November 1st?

 2      A.   Correct.

 3      Q.   Is that the same date they would be assigned to

 4    you, for instance?

 5      A.   Yes.

 6      Q.   I'm going to hand you a file, and if you could

 7    just generally identify what that is, what that stack

 8    of documents are?

 9      A.   Okay.  Let's see.  Like I said, Mr. McNally --

10    I was not clear with Mr. McNally that some of these

11    things were out of order.  And I apologize that they

12    hadn't been put in order before it was given to you.

13      Q.   No.  That's okay.

14      A.   Okay.  First of all, on the bottom somewhere,

15    either like, if I did a personal service notice, in

16    this case I generated it.  Here's a date issued, so

17    you knew from my computer that -- if you want me to --

18    I'm just showing you the different kind of things that

19    are in here.  This shows that, for BL 2101, the

20    document number in this case, on February 25th, I

21    issued a personal service in the civil notice for this

22    person to appear on April 6 of '94.  And there's the

23    second page over -- that's not stapled -- where the

24    process server -- it's on the back usually -- would

Elberta Lieberman – Niedzielski                22

1    say who he delivered it to, he or she.

2            Okay.  Because we could not send something

3    to a judge unless we had proof, if respondent didn't

4    appear, unless we rescheduled it and did personal

5    service notice.

6    Q.   So the first time it was scheduled for

7    mediation, it would not necessarily be personal

8    service, correct?

9    A.   That's correct.

10   Q.   If one or both parties did not show up for that

11   one, then you would do a personal service?

12   A.    It depends.  Usually if the petitioner was

13   notified at the addressed we gave, the petitioner

14   gave, and the petitioner didn't show, then usually it

15   was dismissed.  Usually.  And this first page is a

16   wage attachment.  We were responsible in these -- this

17   changed over time, but we were responsible for

18   generating the state-funded mediators, not the

19   federally funded, the state-funded mediators had to

20   generate a wage attachment.  At this time the masters

21   were signing them.  And make sure it went out to the

22   correct place.

23           So these are just showing different things

24   I had to do.

1          I don't want this -- this is separated now

2     from the back that I had.

3     Q.   It was marked 20 --

4     A.   Yes.  2102.  And it's -- 2109 -- well, somehow

5     it got separated, but if is the back -- no.  It isn't.

6     I apologize.


7          This goes with this.  This 2101 and that's

8     2102.

9          These were, I guess, just showing you the

10    different types of things I was required to do.

11    Q.   Let's just make sure we keep them in the

12    numbered order.

13    A.   Did I give them back correctly?

14    Q.   There you go.

15          Next document is BL 2103.  What is this?

16    A.   Okay.  I tried to keep a copy of what I

17    generated out of each mediation to help me with

18    statistics.  It also helped if the Court misplaced it.

19    I had a copy.

20          So what this says is this is a mediation

21    action request which is often what we generated if

22    there was not consent, or if there was a consent order

23    that was final, we didn't have to do this.  So this

24    just says -- you want me to go through everything it

Elberta Lieberman - Niedzielski                24

1    says?

2       Q.   No.

3       A.   So on April 5th of '94 at 11:30 I met with the

4    petitioner and respondent.  It was important you put

5    in the correct -- correct addresses.  And that they

6    had not reached a consent at mediation, the

7    guardianship.  You had to put the file date.  And this

8    is my assessment, my repeating -- you know, they are

9    going to work with this.  Katrina -- I think it was a

10   sister.  I forgot to put that in.  Catholic Social

11   Services.  Whatever.

12            Then on the back, which is upside down,

13   but I said, schedule for a judge, guardianship for a

14   judge, and on February 6th of -- May 6th -- excuse

15   me -- of '94, I apparently wrote that document.

16      Q.   Now, how is it you had these copies?  You've

17   had these copies.  Where did you acquire these copies

18   of these documents?

19      A.   That I mentioned about calling Kathi Donofrio

20   and --

21      Q.   All these documents here were given to you at

22   the same time?

23      A.   And more.  Boxes.

24      Q.   Okay.

Elberta Lieberman - Niedzielski          25

1     A.   So this is from April 5th, and I don't know --

2     I thought they -- the ones that you were given --

3     here's April 5th.  This is 11:30.  Here's 1:30.  I

4     don't know if you have them in order or not.  I hope

5     so.

6     Q.   I got them the way they were given to me.

7               MR. McNALLY:  There was no question

8     pending.

9               THE WITNESS:  I'm sorry.  Thank you.

10              And then these are consent orders.  That's

11    an example of a consent order.  I signed it.

12    Q.   Two parties sign it?

13    A.   The parties permanent.  So you wouldn't see a

14    mediation action request.  There's nothing further to

15    do except maybe a wage attachment that I had to do and

16    the docketing.

17    Q.   Now, that file, large stack of documents was

18    marked "4/94 mediations," is that correct?

19    A.   That's how it's marked.

20    Q.   And it was also marked that it contains Bates

21    stamp BL 2099 through BL 2342?

22    A.   That's what it says.

23    Q.   We confirmed that the first one is BL 2099?

24    A.   Right.

Elberta Lieberman – Niedzielski          26

1      Q.   And the last one?

2      A.   And that's the first page.

3      Q.   What's the last page?

4      A.   On this?

5      Q.   In your file.

6      A.   Is BL 2343.

7      Q.   Which is marked in the folder, correct?

8      A.   Yes.

9      Q.   Now, unless I hear differently from you,

10   Miss Lieberman, would it be fair to assume that the

11   rest of these files that you can see marked similar

12   way for mediations for different months --

13     A.   Yes.

14     Q.   -- contained essentially the same kinds of

15   documents we just discussed?

16     A.   Mm-hmm.

17     Q.   And again, documents representing your work

18   product, is that fair to say?

19     A.   During that month, yes.

20     Q.   I don't want to go through them all unless you

21   want me to.

22     A.   No.

23     Q.   I was given this document yesterday and

24   probably should have this marked as an exhibit.

Elberta Lieberman - Niedzielski            27

```
 1              (Lieberman Deposition Exhibit 1 was marked

 2      for identification.)

 3      BY MR. NIEDZIELSKI:

 4      Q.   Let me hand you the document that was marked

 5      Lieberman 1.

 6      A.   Yes.

 7      Q.   Have you seen that document before?

 8      A.   Yes, I have.  I generated it.

 9      Q.   Can you tell us when you generated it?

10      A.   Well, it was -- I'm sorry.  I didn't memorize

11      that date.  I'm -- on the date of the last deposition,

12      it was already done, your first deposition with me.

13      Q.   So you had done it some time prior to that?

14      A.   Yeah.  Mm-hmm.

15      Q.   In addition to being marked as Lieberman 1,

16      it's actually a series of documents, is it not?

17      A.   It has a series of pages, and there's one --

18      actually, I think this was attached, this memo, and I

19      just did this to try to facilitate your or anyone

20      else's reading of this document of where I got this

21      information.  So that was recently.

22      Q.   Okay.  Was --

23      A.   Last week.

24      Q.   What you did was you made this document
```

Elberta Lieberman – Niedzielski          28

1    yourself sometime prior to your deposition, and I

2    forget when that was.  November 8, 2004?

3      A.   Mm-hmm.

4      Q.   And do you recall how much prior to that

5    deposition you had completed this document or

6    generated this document?

7      A.   My estimate is two to four weeks before.

8           MR. McNALLY:  That's fine.  All you can

9    tell us is what you recall.  Don't worry.

10     A.   It might be on my computer when I generated it.

11     Q.   I take it you have a home computer?

12     A.   I do.

13     Q.   Have you always had a home computer?

14     A.   Since my parents passed away.  I used some of

15   the money to buy a home computer.  So that was when I

16   was at Family Court.  This is a different one where my

17   mother passed away in '92.  So since '93 or '94 I had

18   one.

19     Q.   And my understanding is, from reading the last

20   page of this document, which is your explanation of

21   how you compiled this document, that you would go to

22   the various other documents that we have gone through

23   and you would generate numbers for that or you would

24   use those numbers.  You use the Family Court file

Elberta Lieberman – Niedzielski          29

1    number.  You looked at the date it was assigned and

2    then the mediation date, correct?

3      A.   Right.

4      Q.   And at the right side is paperwork due from

5    EBL, correct?

6      A.   Yes.

7      Q.   That's you, EBL?

8      A.   Yes.

9      Q.   Then you would put a yes or no or a question

10   mark depending on what the response was?

11     A.   Yes.

12     Q.   You notice the very first case on the first

13   page?  It's ancillary custody, correct?

14     A.   Yes.

15     Q.   And it's marked as number 1, and it's date

16   assigned is May 2nd, 1994.

17     A.   Yes.

18     Q.   I didn't find any, going through this document,

19   that were earlier assigned than May 2nd, 1994, is that

20   correct?

21     A.   I do not remember.  I trust your judgment.  It

22   looks like you're right.

23            I believe that's correct.  I hope I've

24   done it correctly.  I've done it as best I could.

Elberta Lieberman - Niedzielski          30

1     Q.   Do you have an explanation for why that is, why

2    is it there appears on this caseload list that you

3    generated nothing earlier than May 2nd, 1994?

4     A.   Because I had been working very diligently to

5    bring my caseload up-to-date, and so, while some of

6    these had been mediated already as of October 28th and

7    were still my -- would still show as open, there was

8    nothing for me to do.  You know, if a stipulation was

9    pending, I had written this letter and it was in the

10    file to the attorneys giving them a date by which they

11    had to have a stipulation in or asked for another

12    mediation.  So that my work was complete until I heard

13    from the attorneys like in this case.

14     Q.   In 1994 did somebody at Family Court help you

15    with your caseload?

16     A.   Yes.

17     Q.   By reducing it?

18     A.   Yes.  At the beginning, in January of '94,

19    there was a change.  It was in January of -- it may

20    have been in December of '93.  There was a change in

21    my supervisor, and I had asked my earlier supervisor

22    for similar help and she wasn't able to do it for me.

23    But David Weiss had been my co-mediator, and I said to

24    him when he became my supervisor, may I sit in on two

1    or three mediations with you and to try to see how you

2    get the paperwork done, you know?  Now, he would be

3    behind too.  I mean, that just happens.  But you know,

4    you catch up.  You can't always do exactly within the

5    hour and a half or 45 minutes you have.

6              But I sat in with him and got ideas.  I

7    hadn't thought of ways to structure my own activities

8    during the mediation so that I wouldn't have to do so

9    much after the mediation to complete a case.  That was

10   wonderful help.  I was reviewing -- if I may say, by

11   June -- I went through the month of June and August

12   yesterday myself just to see how I was doing, and in

13   most cases, not all, but in most cases, if it was --

14   if there weren't outside reasons beyond my control, I

15   was getting most of that paperwork done on the day of

16   the mediation, which is very different.  And I was

17   also -- I noticed in June, for instance, my

18   supervisors didn't know how to resolve some of these

19   things that were old because they didn't fit the

20   normal -- if this happens, you do that.

21             But we had a master.  The Court had given

22   us a master.  Herlihy was assigned.  She's a

23   commissioner now, but they were called masters then.

24   And I went to her, and I said, I have these kind of

Elberta Lieberman - Niedzielski                32

1    situations and she would tell me of a court rule that

2    I hadn't been taught about and this is how you could

3    resolve it or another way to resolve it and close it

4    with myself.

5            So like I remember -- and you don't have

6    the organization I have, of course.  Mine I've

7    reorganized.  But in June there were a whole lot of

8    those each month.  I was getting information.  So

9    Master Herlihy and David Weiss with helping me --

10   David was helping me learn how to keep up.

11           And also in January of '94, I had learned

12   I had ADD.  I'd never known that.  The Delaware

13   Department of Labor representative, EEOC

14   representative suggested I get evaluations about why

15   this might be I have trouble keeping up with my

16   paperwork.  I had that problem the whole over 20 years

17   I worked for Family Court.

18   Q.   I'm trying to put a time limit on this.

19   A.   Sure.

20   Q.   When did Mr. Weiss become your supervisor?

21   A.   As I said, it was either the end of '93, like

22   in December, or the beginning of '94.

23   Q.   Did you like him as a person?

24   A.   Yes.

Elberta Lieberman - Niedzielski                    33

1     Q.    Did you think he was honest and straightforward
2   with you?
3     A.    No.  I don't think -- thought it was his job to
4   keep -- I mean, he was a supervisor.  So it was not
5   his job to tell me what he had been told he was to do
6   about me.
7     Q.    Well, let me ask you this.  Prior to him
8   becoming your supervisor, had he been a mediator
9   himself?
10    A.    Yeah.  He was a federally funded mediator.  He
11   just handled the support cases from DCSE.
12    Q.    At some point he was promoted --
13    A.    Yes.
14    Q.    -- to supervisor?
15    A.    Mm-hmm.
16    Q.    And was he open with you?  Did he treat you
17   honestly?
18    A.    He -- you see, his supervisor -- what I mean
19   about not being open is he's told things about how
20   he's to act with me, that he is not supposed to tell
21   me.  I was a supervisor, so I know that.  But in terms
22   of -- I asked him for the help of letting me sit in on
23   some mediations and give me some ideas, tell me -- let
24   me see what you are doing to keep up with your

Elberta Lieberman - Niedzielski          34

1    paperwork.  In that way, especially at the beginning,

2    he was very fair.  Later he -- you know, he wouldn't

3    meet with me.  And he wasn't always fair.  He knew I

4    needed certain accommodations.  They had it in

5    writing, and he would put it in writing.  He would put

6    me down for asking for a change of something because

7    of my need for accommodations.  And then he would put

8    it in writing that -- complaining that I had even

9    asked.

10   Q.   Well --

11   A.   As an example.

12   Q.   Okay.  As an example.

13        Had they attempted to do things to make

14   your job easier so you could do your job?  1994 I'm

15   talking about.

16   A.   Dr. Erb did the educational evaluation.  They

17   gave me some colored files.  Kathi Donofrio.  That was

18   the only thing -- no.  Two things they did that I

19   remember of what Dr. Erb recommended.  The one was

20   they gave me some colored manila folders because they

21   recommended that, and the other was Mr. Klosiewicz

22   showed me how I could buy something to buffer out

23   noise.  That was all of Dr. Erb's recommendations that

24   they did.  You're asking -- your question is, did they

1    do anything to help me?

2        Q.   Mm-hmm.

3        A.   Kathi Donofrio closed a few cases, six or more.

4    I remember I saw the note from her recently that I

5    used in my statistics and told me how they were

6    resolved.

7              You're talking '94, so it's not Ana

8    DePaul.  David closed 18 easy dismissals.  Easy

9    meaning petitioner didn't show.  All you have to write

10   is the information, petitioner didn't show up, and the

11   notice was sent to the address petitioner provided.

12   That was a help.  But it was only, you know, 24 cases.

13       Q.   Were you relieved of a 170-case backlog?

14       A.   In '94?

15       Q.   Mm-hmm.

16       A.   No.  Not that I remember.

17       Q.   Were you relieved of a large backlog?

18       A.   Not that I remember.  Not in '94.  I may be

19   wrong, but I do not remember that in '94.

20       Q.   You indicated you were given color-coded files?

21       A.   Just colored files like those, but in color.

22       Q.   You were told about a noise buffering system?

23       A.   Yes.

24       Q.   Did you get that?

Elberta Lieberman - Niedzielski          36

1     A.   No, because mediators had enclosed offices, and

2     I was able just close my door.  Her issue was I was so

3     easily distracted that I found -- I couldn't afford

4     what he showed me.  It was nice.  He showed me.  But I

5     was able to cut out noise in another way.

6     Q.   Were you excused from performing custody

7     investigations?

8     A.   I did not perform any in '94.  I don't know how

9     many or even -- I don't think there were many referred

10    to mediation.  I didn't see on any -- you know, those

11    calendars you showed me, there weren't any that the

12    other mediators were given a day to work on a custody

13    mediation.

14    Q.   Were you excused from emergency mediations

15    during this period of time?

16    A.   Not to my knowledge.  If I had, for instance,

17    if I had on my calendar -- if I knew ahead of time

18    that things were resolved, I would go at the beginning

19    of the day and tell whoever was in charge, David or

20    whoever he placed in charge, that I had this slot

21    open.  And if they needed me to cover, I was available

22    to do it and I did it.

23    Q.   Were you excused from holding a mediation

24    hearing if it had to be rescheduled?

Elberta Lieberman - Niedzielski                37

1    A.   No.  I don't understand the question.  I'm

2    sorry.  Maybe I better -- before I say no --

3    Q.   In other words, if they ever had to reschedule

4    one from the initial mediation date --

5    A.   Mm-hmm.

6    Q.   -- were you excused from having to hear it, the

7    rescheduled one?

8    A.   Usually the mediators heard their own, and I

9    did -- when I mentioned to you that on the handwritten

10   calendar could be my writing, I rescheduled my own

11   mediations.  I did all the notices.  I prepared the

12   whole file.

13   Q.   Were you given additional computer training

14   during this period?

15   A.   I was given -- I don't remember if it was in

16   '94 or '93.  I certainly was given computer training,

17   yes.  This was very helpful.

18   Q.   In '94 were you permitted to flex your time?

19   A.   I do not remember the date, but yes, at some

20   point, mm-hmm.  But it wasn't the way I wanted it.  It

21   was what they gave me.  So it was -- they called it an

22   accommodation.  It really wasn't.

23   Q.   But they allowed you to move your work hours to

24   some degree?

Elberta Lieberman – Niedzielski                38

1    A.   Correct.  For 15 minutes, yes.  And we made --
2    I made sure that all of my first mediations were
3    scheduled to start at 8:45 so the people knew once
4    they gave me that.
5    Q.   If you had mediations scheduled for a
6    particular day and you were not able to go to work
7    that day, how would they be taken care of?  How would
8    those people be taken care of that were scheduled for
9    that day?
10   A.   That was up to the supervisor.  They would look
11   and see.  Some of them I may have already resolved.
12   Otherwise somebody else would mediate it or the
13   supervisor would have the people called and asked not
14   to come in and rescheduled it that moment.
15   Q.   Do you recall if Mr. Weiss had to take over
16   some of your cases for you because you were absent
17   from work, do you recall that?
18   A.   I remember seeing his name like when I reviewed
19   some cases yesterday.  I saw his name once.  I mean,
20   there were times when I was ill.  I did have two
21   abscessed teeth.  I changed one of the dentists under
22   the state plan, and he pulled two teeth.  I have bad
23   teeth.  And so I was working at the end for a period
24   of months with two abscessed teeth that were getting

Elberta Lieberman – Niedzielski                39

1    more and more abscessed.

2            MR. McNALLY:  The question was, did David

3    Weiss take over some of your cases when you weren't

4    there?

5            THE WITNESS:  Or he assigned them to

6    somebody else or he cancelled them and rescheduled

7    them.

8    BY MR. NIEDZIELSKI:

9      Q.   I'm going to hand you a set of documents and

10   ask you to look at them first, and then I will ask you

11   just some brief questions.

12           The ones I'm going to ask about, you see

13   they are stamped at the bottom?

14     A.   Yes.

15     Q.   JENK 03 through --

16     A.   It was 001 through --

17     Q.    012, correct?

18     A.   Yes.

19     Q.   Now, 003 through 004 --

20     A.   Yes.

21     Q.   -- is that your handwriting?

22     A.   Yes.

23     Q.   You filled those in?

24     A.   Yes.

1       Q.   That was all your --

2       A.   When I first went to him, March 12th of '93 it

3    looks like.  I mean, that's the date I put down.

4       Q.   Is this the new dentist you're talking about?

5       A.   Yes.

6       Q.   Do you still go to this dentist?

7       A.   No.

8       Q.   Who are you presently treating with for -- do

9    you go to see a psychiatrist?

10      A.   Yes.

11      Q.   What's his name?

12      A.   Neil, N-e-i-l, Schecker, S-c-h-e-c-k-e-r, M.D.

13      Q.   And where does Dr. Schecker practice?

14      A.   At 111 North 49th Street -- I'm doing this out

15   of my head -- in Philadelphia, PA, 19139.

16      Q.   And how long have you been seeing Dr. Schecker?

17      A.   I transferred to him at the end of February of

18   '92.

19               MR. McNALLY:  '92?

20               THE WITNESS:  Sorry.  Thank you.  2002.

21   Thank you.

22               MR. McNALLY:  '92 didn't sound right.

23               THE WITNESS:  That's exactly right.

24

Elberta Lieberman – Niedzielski            41

1    BY MR. NIEDZIELSKI:

2      Q.    How frequently do you see Dr. Schecker?

3      A.    Usually three times a week.

4            MR. NIEDZIELSKI:  I don't believe I've

5    ever seen the records from Dr. Schecker.

6            MR. McNALLY:  I can't remember, but I

7    don't know we have any records.  I don't think I have

8    subpoenaed records from Schecker.

9            THE WITNESS:  I wasn't seeing him at the

10   time I worked.

11   BY MR. NIEDZIELSKI:

12     Q.    What was the purpose?  Why did you prepare this

13   document marked as Lieberman 1?

14     A.    Because I -- okay.  First of all, there had --

15   the last statistics I had to do, they were done at the

16   end of the month, and they were due on either the 3rd

17   or 7th of the next month.  So they made me leave

18   Family Court on October 28th of '94.  So October's had

19   not -- statistics not been done.  Okay?

20           In October, they gave us an extra day to

21   work on backlog or whatever else.  And so I was able

22   to go back on the old cases, go down to the file room.

23   I spent the day in the file room with these old cases

24   to make sure that the case was really done with me.  I

Elberta Lieberman - Niedzielski                42

1   never wanted a client to fall through the cracks.  And

2   because I did that and got that documentation and they

3   gave us the extra day and I used that way, I knew

4   that, as of October 28th, this is what I had left.

5       Q.   No.  What I'm asking you is, my understanding

6   was you prepared this document sometime four to three

7   weeks prior to your deposition of November 8th, 2004.

8       A.   Mm-hmm.

9       Q.   Why did you prepare it?

10      A.   Because part of what David Weiss said in his

11  October 28, '94, memorandum was incorrect.  And so I

12  wanted to provide documentation of what was correct.

13               MR. NIEDZIELSKI:  Would you mark this as

14  the next exhibit?

15               (Lieberman Deposition Exhibit 2 was marked

16  for identification.)

17  BY MR. NIEDZIELSKI:

18      Q.   Is this the document you that you are talking

19  about that you said David Weiss gave you on October

20  28, 1994?

21      A.   Yes.

22      Q.   You indicated the reason that you prepared

23  Lieberman 1 was to show that this document was

24  incorrect?

Elberta Lieberman – Niedzielski          43

1      A.    There were certain things in this document were

2      incorrect.

3      Q.    Okay.

4      A.    To show that I was not behind in my caseload.

5      Q.    Let me ask you this.  In the first paragraph

6      says, "This memorandum will serve as notice that I'm

7      recommending you be dismissed from state employment

8      for your continuing pattern of unreliable attendance."

9      Is that what it says?

10     A.    That is what it says.

11     Q.    And he goes on to document a number of

12     occasions where your attendance has not been good.

13     You agree with that?

14     A.    I disagree because we do not have the specifics

15     of what this refers to.  I don't have -- for instance,

16     the first sentence in the second paragraph, "You have

17     been late to work on 13 occasions."  I had asked on

18     October 28th of Mr. Klosiewicz when the information I

19     was asking for certainly listed -- I wanted a copy of

20     each of the sign-in sheets that we had to sign in

21     because I was honest on those sign-in sheets of the

22     time I arrived.  I wanted specifics because I believe

23     that was incorrect.  I did not keep copies or make

24     copies of those because I didn't know this was going

Elberta Lieberman - Niedzielski                44

1    to happen and I would need them.  This, on October

2    1st, came in and did the physical inventory of pending

3    cases in my office.  I've asked, reasked, Mr. McNally

4    asked in discovery request for this information.

5    We've understood it's not available.  These cases that

6    he looked at could have been ones that were resolved,

7    and he couldn't tell it because it was hard for me --

8    I have trouble with different steps of different

9    things.  There was one book we had to sign out court

10    files on.  Okay?  So if other mediators were waiting

11    to use that one book, the files would stay in my

12    office because then I do get distracted and that

13    wouldn't be a priority.  I knew that case was handled.

14    I would be working on other cases.

15              And I also did not say that, as of October

16    1st, I was up-to-date.  I say on October 28th I was

17    up-to-date except for certain cases I don't know

18    about, and the four cases I had -- four cases that I

19    mediated on the 27th were complicated.  They still had

20    some paperwork to do.

21    Q.   Well, how many times do you believe that you

22    were late to work from July 1st to October 28th, 1995?

23    A.   I don't know.

24    Q.   Do you believe you were late to work five

1     times?

2        A.   I can't estimate.  Because also, when I look

3     through -- remember the ones, the typed calendars,

4     where they are written in?  They were jumping to -- I

5     was allowed to arrive at work at 8:45.  I could then

6     say to the people who were there, "I'm here.  I'll be

7     with you, two minutes, five minutes."  Okay?  They

8     were jumping.  That's why I say I don't think they

9     were being totally honest.  I think they had their

10    agenda.  They were being told to get rid of me.

11            So they were jumping and assigning cases

12    to another mediator or David would take it when it was

13    wasn't necessary.  Their notice had been for 8:45.

14    That's when I was allowed to appear in the court.  And

15    so they had another agenda, you know, and without the

16    specifics and without those --

17       Q.   Well, let me ask you this.

18       A.   -- copies, I won't agree to that.

19       Q.   Between October 2nd and October 28th, 1994, you

20    don't know how many times you were late?

21       A.   That's correct.

22       Q.   But you were late for work during that period

23    of time?

24       A.   I don't know if, how much at all I was late.

Elberta Lieberman - Niedzielski                46

1      Q.   What you're saying is you don't know how many

2   times you were late, correct?

3      A.   And don't know that it's what they said.

4      Q.   Now, it indicates that in 1993 your EPPA --

5   which is an evaluation, correct?

6      A.   Yes.  Can you -- oh, you're jumping to the next

7   paragraph.  Okay.

8      Q.   It says your 1993 EPPA indicates your chronic

9   tardiness as an ongoing problem.

10     A.   Mm-hmm.

11     Q.   In fact, your EPPA does say that, does it not,

12   for 1993?

13     A.   It may say those words.  I can't remember.

14   Tardiness is certainly mentioned, yes.

15     Q.   And David Weiss was not your supervisor for the

16   1993 EPPA, was he?

17     A.   No.

18     Q.   Who was it?

19     A.   It was Ana DePaul, but Kathi Donofrio, now

20   Weiss, is the -- was the deputy director, so it was

21   signed by both of them.

22     Q.   It indicates in the next paragraph that you

23   were given a formal reprimand on December 6, 1993,

24   regarding your persistent tardiness?

1     A.    That may be correct.  I can't remember.

2     Q.    And it indicates that your former supervisor,

3   Ana DePaul cited seven latenesses in the month of

4   November 1993 alone.  Do you recall that?

5     A.    I don't remember exactly what she said.

6     Q.    It indicates the next page, the second

7   paragraph that March 14, 1994, you were suspended

8   without pay for three days for failure to process

9   cases in a timely manner, again, due in large part to

10  your chronic attendance problems, is that correct?

11    A.    That was the order, but if you go on, it wasn't

12  imposed because they finally listened to -- I had

13  filed a -- my first complaint with the Delaware

14  Department of Labor because they had been given --

15  they had done this.  And I didn't file the first one

16  where they took away the day.  They were not listening

17  to I needed accommodations.

18           By -- this was -- he did -- Randy

19  Williams, at that time he was New Castle -- Director

20  of Operations for New Castle County, wrote this, but

21  this -- this is not -- okay.  He wrote it, but then

22  they didn't -- they stayed -- that was just hanging

23  over my head the rest of the time I worked there

24  because I had filed the complaint, and they -- I

Elberta Lieberman - Niedzielski                48

1    believe Randy put -- I can't remember his exact words,

2    but that they needed to look at what all the

3    information I had given them in the hearing before

4    March 14th, '94, in the hearing before whenever the

5    hearing was for this.

6              I had given them documentation from

7    doctors of what I needed and that it affected these

8    things.

9              The other thing is that they keep talking

10   about --

11             MR. McNALLY:  Excuse me.  There's no

12   question pending.

13             THE WITNESS:  Thank you.

14   BY MR. NIEDZIELSKI:

15   Q.   You indicate that the three-day suspension was

16   stayed, correct?

17   A.   Yes.  Mm-hmm.

18   Q.   And at that point, did the people from Family

19   Court write to your various health care providers

20   requesting information from them regarding

21   accommodations for you?

22   A.   I didn't know that at that point if they did or

23   not.

24   Q.   Do you now understand that to be the case?

Elberta Lieberman - Niedzielski          49

1      A.   I don't remember the dates, but from the
2    information you -- that your office gave Mr. McNally
3    and me, I understand it was done at some point.
4      Q.   And you went through some of the things that
5    you testified that they did make changes for you,
6    color-coded files, gave you flex time, took away a
7    backlog that you did have?
8      A.   No.  They did not.
9      Q.   They did not take away a backlog you had?
10     A.   In '94 they did not.
11     Q.   Is that '93 that they did that?
12     A.   In '93 all I remember is that my supervisor at
13   that time, and these are the -- in documents I gave
14   you before I had an attorney where Kathi Donofrio and
15   I talked back and forth.  Ana DePaul took some cases,
16   and I got called or written to from judges that what
17   she had done was not correct.  So then I was spending
18   my time rechecking the ones she had taken because I
19   couldn't trust that -- you know, it's like I wouldn't
20   take something -- my caseload would look like I was
21   behind because if I didn't have a copy of it, I didn't
22   want somebody, a client to go through -- fall through
23   the cracks.
24               So again, what was the question?  Did I

Elberta Lieberman – Niedzielski                50

1     answer it?

2        Q.    I think my question was that you now understand

3     that Family Court sent out letters to your health care

4     providers asking about accommodations, correct.

5        A.    At some point, yes.

6        Q.    You indicated in your testimony that certain

7     changes were made for you?

8        A.    No.

9        Q.    You didn't testify to that?

10       A.    No.

11       Q.    You didn't testify you got color-coded files?

12       A.    Yeah.  I'm saying that when they heard -- when

13    they looked at what the doctor said, they didn't

14    listen to it.

15       Q.    Well, do you understand that the need is for

16    reasonable accommodations?  Do you understand that?

17       A.    And when the doctor suggested a reasonable

18    accommodation, they did not comply.

19       Q.    In any event --

20       A.    Except for those two little things.  And

21    earlier than that they had given me use of a very old

22    typewriter before we had computers, and that was a

23    help because it's easier for me to type.  I have so

24    many problems in my hands.  Easier for me to type.

1    They had done that.  But then they took that away.

2       Q.   This memo goes on to document that, in fact,

3    you had problems with attendance in '92, correct?

4       A.   Yes.

5       Q.   1990 you had problems with attendance?

6       A.   Yes.  It does not talk about the information

7    that I had given them from doctors about why this was

8    occurring as I learned it from doctors.

9       Q.   And what was your understanding for why you

10   were tardy?

11      A.   Okay.  I had my psychiatric diagnosis was

12   incorrect for 30 years.  It's very hard to diagnose

13   what I have.  And because of being incorrect

14   diagnosis, I was put on medications, one of which was

15   lithium, making me have bouts, horrible bouts of

16   diarrhea each morning.  And that was affecting my

17   ability to get to work.

18            In '94, in the end of March of '94, my

19   correct diagnosis was expected which caused -- called

20   for my not being on that medication at all.

21      Q.   In March of '94?

22      A.   Yes.

23      Q.   That problem stopped, then, in March of '94?

24      A.   It didn't totally stop it.  I wasn't taking the

Elberta Lieberman – Niedzielski                52

1    medication until the end of May or in June.

2        Q.   Of '94?

3        A.   But it decreased a whole lot when I wasn't on

4    lithium, yes.

5        Q.   If that's true, the lithium was the problem?

6        A.   Lithium was part of the problem, a big part of

7    the problem, and the stress of how Ana DePaul handled

8    the unit and reacted to me was another part of the

9    problem.

10       Q.   But I thought Ana DePaul was before December of

11   '93?

12       A.   Right.

13       Q.   And I thought that the problem you were having

14   with diarrhea was from lithium?

15       A.   That's a big part of it, not all of it, yes.

16       Q.   You were taken off the lithium by June of '94?

17       A.   I think it was then.  I would have to look up

18   the exact date.

19       Q.   And in this memorandum, Mr. Weiss is asking you

20   or informing you that you've been late to work on 13

21   occasions since July.  That's in the second paragraph

22   of the first page.

23       A.   And I can't verify that.

24       Q.   He goes on to say in that paragraph, "On

Elberta Lieberman – Niedzielski          53

1     Thursday, October 6, you phoned at approximately 8:30

2     a.m., and stated you would be late as a result of

3     having spent all night at Justice of the Peace Court

4     Number 11," is that true?

5     A.   Yes.

6     Q.   "I covered your 8:45 case, and you arrived to

7     work at 10:00 a.m.," is that correct?

8     A.   Yeah.  I mean, he took one situation and wrote

9     out everything specifically that happened and that I

10    said and put it out of context.

11    Q.   Is it accurate what he's saying here, though?

12         MR. McNALLY:  I'm sorry.  The question

13    refers to the fact that --

14    Q.   "On Thursday, October 31st, you phoned in at

15    approximately 8:30 and states you would be late as a

16    result of having spent all night at Justice of the

17    Peace Court Number 11."

18    A.   Yes.

19    Q.   "I covered your 8:45 case, and you arrived to

20    work at 10:00 a.m."

21    A.   Mm-hmm.

22    Q.   "You did not complete your 10:00 o'clock case

23    in time to take your 11:30 case.  Another mediator

24    had to cover."

Elberta Lieberman - Niedzielski          54

1    A.   Do I not know if that's true.  I know that he

2    made -- had another mediator cover.  I don't know that

3    it's true that I couldn't have covered it.  Certainly

4    mediators would certainly walk out a few minutes

5    later.  They were looking for reasons.  They were

6    building a case against me.  It is true that, for

7    whatever reason, I had been up all night going to the

8    Justice of the Peace Court for a Commonwealth action

9    that had occurred that was a continual problem, and I

10   finally had witnessed something that would help.  And

11   that may have been a wrong choice.  Okay?  Looking

12   back.

13   Q.   I'm just asking you if that was accurate.  Is

14   that accurate?

15   A.   Yeah.  Well, that piece is accurate.  Whether I

16   couldn't have handled my 11:30 case, they were -- he

17   was jumping in certainly by -- what date was it?  Of

18   this -- October 6.

19           He was already -- I was looking yesterday

20   at June and August.  He was jumping the gun and

21   assigning the case to be able to say when they -- I

22   had this system with the person who was the

23   receptionist of calling them and telling them

24   whatever.  So that they were always available at the

Elberta Lieberman - Niedzielski          55

1    beginning of the day if there was a problem, and

2    that's not here.

3              Then on Tuesday, October 11, phoned in

4    sick at 1:00 o'clock.

5              MR. McNALLY:  He hasn't asked you about

6    that.

7              THE WITNESS:  Okay.  I'm sorry.

8    Q.   It says, on Tuesday, October 11th at

9    approximately 8:30 a.m., you phoned in sick.

10   A.   Yes.

11   Q.   At 1:00 o'clock p.m. you phoned again and left

12   a message that you were going to the dentist and then

13   planned to walk your dog.  Did you do that?

14   A.   That was switched.  I was just giving -- he

15   wrote in all the specifics.  I was saying I wasn't

16   reachable.  I had called in sick.  And I called in

17   again to say, "You wouldn't be able to reach me."  I

18   didn't have a cell phone.  You wouldn't be able to

19   reach me because I have to walk my dog and then go to

20   the dentist.  I had abscessed teeth.  Yes.

21   Q.   On Wednesday, October 12th and Thursday,

22   October 13th, you phoned in sick?

23   A.   That's correct.  He still wasn't -- he put me

24   on the antibiotic.  I cannot actually read the

Elberta Lieberman - Niedzielski          56

 1     documents from Dr. Jenkins, but at some point he

 2     pulled the two wrong teeth.  I had four teeth left.

 3     He was going to leave two to attach to a plate.  And

 4     it ended up he pulled -- and I told him they were the

 5     good ones.  He pulled the wrong ones.  I was very ill,

 6     and he put me on antibiotic and verified -- he signed

 7     a note that I had to be out of work.  I was very ill.

 8               MR. McNALLY:  Okay.  You've answered that

 9     question.

10               THE WITNESS:  Okay.

11     BY MR. NIEDZIELSKI:

12        Q.   Now, in a typical day would they schedule

13     mediations at certain times throughout the day?

14        A.   Yes.  You've seen the schedule.

15        Q.   What were the times generally?  What would they

16     be?

17        A.   For me, after we reached agreement, it was

18     8:45.  Other people it was 8:30.  10:00 o'clock.

19     11:30, 1:30, and 3:00 if that's my correct

20     recollection.

21               Is that five?  Yes.

22        Q.   Was that for you?

23        A.   Just everybody else had 8:30 instead of 8:45.

24     I had 8:45 and then 10:00.

Elberta Lieberman - Niedzielski          57

1     Q.    Was everybody else 8:30 then 10:00?

2     A.    Yes.  That I know of.

3     Q.    And 11:30?

4     A.    That I saw, mm-hmm.

5     Q.    If a mediator is not to work on time at 8:30,

6     then what happens to the people that are there for

7     mediation?

8     A.    I don't know what -- I'm not privy to what was

9     done with all the cases.

10    Q.    No.  No.  What I'm not saying is, if a mediator

11    is not at work on time at 8:30 and they have a

12    mediation, what happens to that mediation?

13    A.    I assume that -- either -- if there's somebody

14    else like me -- and I did this too, but you wouldn't

15    see it on my caseload because it stayed on the other

16    mediator's caseload.  If I had told the supervisor I

17    was available because mine was done, I had that hour

18    and a half and I could take an mediation, they might

19    transfer it to me.

20    Q.    If an employee, a mediator doesn't come to work

21    on time or is not available for a start of a mediation

22    session then some other mediator would probably have

23    to take it, correct?

24    A.    Unless the supervisor or the receptionist had

Elberta Lieberman - Niedzielski                58

1    heard from the mediator that they were down stairs

2    walking up the steps, coming up stairs.

3        Q.   But my point is, it was important for mediators

4    to be to work on time, is it not?

5        A.   Yes.

6        Q.   And it's important, to the extent they can,

7    that they be present during scheduled days?

8        A.   Correct.  Oh, yes.

9        Q.   I mean, would you say that your caseload in '94

10   was heavy?  Was it a large caseload?

11       A.   In '94, but the caseload -- my caseload was

12   similar to the other state-funded mediators except

13   that on two afternoons a week I had it preapproved

14   that I would leave.  And I think it was one day it was

15   a half hour early.  So that day I would be given like

16   a guardianship which usually was shorter.  So that --

17   what was the date and time -- 3:00 o'clock I think.

18   So I'd be done by 4:00 and could leave.

19            On the other day, I can't remember if it

20   was three-quarters of an hour.  There was one day a

21   week that I had four mediations instead of five,

22   except that, on November 17 of '93, I have a memo that

23   you've been given many times, or I suspect, from me.

24   It was a memo from Kathi Donofrio to me.  I had been

Elberta Lieberman - Niedzielski          59

 1    asking for the accommodations of let me make up the

 2    work.  The amount of time for that hour and whatever

 3    it was -- it was less than two hours a week.  And what

 4    she said was -- and not have to use my sick time.

 5    That's an accommodation under the EEOC guidelines for

 6    people with psychiatric illnesses that I had given the

 7    Court, that I had gotten from state personnel.

 8          She wrote that she had discussed it with

 9    Mr. Pollard and Mr. Williams and they agreed that, if

10    I performed as many mediations as the other mediators,

11    then they would grant me -- and they suggested how

12    like Friday was workday.  They suggested I schedule

13    another mediation, which I often did.

14          MR. McNALLY:  Excuse me, Bernice.  The

15    question was, was your workload heavy in 1994?

16          THE WITNESS:  It was equal to the other

17    state-funded mediators.  I was trying to explain how.

18    BY MR. NIEDZIELSKI:

19     Q.    And then you also explained in your response

20    that there were differences, though.  Your schedule

21    was varied, was it not?  You indicated you had a

22    different schedule.  Sometimes you were allowed to

23    leave early at 4:00?

24     A.    Yes.

Elberta Lieberman – Niedzielski             60

 1     Q.   That wasn't the case for the other mediators,
 2   though, correct?
 3     A.   They could have if they had a doctor's
 4   appointment.  It's just that my doctor's appointments
 5   were standard.
 6     Q.   So they made that schedule change for you so
 7   you could go to your doctor's appointment?
 8     A.   Not really because anybody could ask off for
 9   leave.  It was like this was preapproved time for me
10   to be away.  Other people took vacations.  Went to
11   doctors.  Went to school for the children.  They
12   allowed that.
13     Q.   What I'm saying is, in your particular case,
14   they made it as part of your normal schedule?
15     A.   That's how I chose to do it.  Everybody else
16   got the same accommodation if they asked for it
17   because we were afforded an amount of leave as state
18   personnel.
19     Q.   Now, this memo that we have been discussing
20   which is Lieberman 2 on the last paragraph, it has
21   conferences scheduled for November 2nd, 1994, at 3:00
22   p.m.  Do you see that?
23     A.   Yes.
24     Q.   You never went to that conference, did you?

Elberta Lieberman - Niedzielski          61

1      A.    No.  I asked to be excused per my doctor -- not

2      my doctor, the doctor I had at the time.

3      Q.    And that hearing never occurred, did it?

4      A.    No.

5             MR. NIEDZIELSKI:  That's all the questions

6      I have.

7             MR. McNALLY:  Okay.  Thank you very much.

8      We, of course, will read and sign.

9             (Deposition ended at approximately

10     10:25 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

INDEX TO TESTIMONY

ELBERTA LIEBERMAN                          PAGE

    Examination by Mr. Niedzielski        2

_____

INDEX TO EXHIBITS

LIEBERMAN DEPOSITION EXHIBIT NO.            PAGE

1.........................................27

2.........................................42

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

State of Delaware  )
              )
New Castle County  )


                    CERTIFICATE OF REPORTER


        I, Ana M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 10th day of July, 2005,
the deponent herein, ELBERTA LIEBERMAN, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.

        I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.




                    Ana M. Calligan, RMR
                (Certification No. 186-RPR)
                (Expires January 31, 2008)