**EXHIBIT B**

# DANMAR ASSOCIATES

### Disability Case Management  ♦  Vocational Rehabilitation Services

Swedesford Corporate Center
631-B Swedesford Road
Frazer, PA 19355
610-993-9941
610-993-9902 fax


November 30, 2005


Edward M. McNally, Esq.
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

**RE: Bernice Lieberman**
**Danmar No.: 15354855**

## *VOCATIONAL ANALYSIS: REASONABLE ACCOMMODATION*

### *Introduction*

This report will provide opinion in regard to whether or not Ms. Bernice Lieberman was provided effective, reasonable accommodations to facilitate her performance as a mediator in the Family Court of Delaware. In providing this opinion, this consultant met with Ms. Lieberman on 8/3/05 to conduct a vocational interview. This consultant also reviewed extensive medical and employment records (see appendix). In providing this opinion, this consultant referenced the EEOC's Technical Assistance Manual and the Employment Provisions of the American's with Disabilities Act, the ADA Compliance Guide, and the Medical Disability Advisor.

### *Interview with Ms. Lieberman*

On the occasion of meeting with Ms. Lieberman, she provided her date of birth and is currently 58-years of age. She reported her last day of work as 10/28/94, at which time she states that she was "required" to take a retirement benefit, or face a termination hearing. According to Ms. Lieberman, the director of personnel advised that should she attempt to return to work, she would be suspended on her first day. Ms. Lieberman stated that her work had been the basis of her self-worth. She complained that having been escorted out of the building on her last day of work by six security guards "traumatized" her. Specifically on 3/24/94, Ms. Lieberman was advised that she had been misdiagnosed, that her long-standing diagnosis of bipolar disorder – treated with Lithium, was a misdiagnosis. Ms. Lieberman notes that since having ceased taking Lithium, her problems with explosive diarrhea have resolved. Lithium is known to have diarrhea as a side effect. Ms. Lieberman states that she has also been diagnosed with Attention Deficit Hyperactivity Disorder, reflux esophagitis grade III, irritable bowel, osteoarthritis (affecting her hands and back), a sleep disorder, and chronic venous insufficiency.

In regard to her current medications, she reports that Dr. Schecker, her psychiatrist, has prescribed Effexor, 150 mg, two times in the morning; Lexapro, 10 mg in the morning; Klonopin, .25 mg in

LC/Lieberman, B/11-30-05 Voc Analysis/lmc/alv

Danmar Associates
November 30, 2005
Page 2

**RE: Bernice Lieberman**

the evening; Ritalin, 20 mg, 3 times per day. Dr. Murphy, who treats Ms. Lieberman for her arthritis and osteopenia, has prescribed 60 mg of Evista for the osteopenia. Her family physician, Dr. David Bercaw, has prescribed Prevacid for Ms. Lieberman's gastrointestinal problems. Ms. Lieberman also has hypothyroidism, and her endocrinologist, Dr. Lenhard has prescribed Synthroid, .1 mg, one time per day and also, Vytorin for cholesterol management. Ms. Lieberman states that she has peripheral neuropathy that affects her feet and that her treating neurologist, Dr. Winer, has prescribed Neurontin, 800 mg, three times per day. Additionally, Ms. Lieberman has two allergy injections per week and takes a variety of well known prescribed and OTC antihistamines and anti-allergy medications.

In regard to treatment, Ms. Lieberman sees her psychiatrist, Dr. Schecker – with whom she has been treating since February 2002 – three times a week. Her appointments are on Tuesday, Wednesday, and Friday. She does intensive 45-minute psychotherapy sessions. She also participates in group therapy. Her prior psychiatrist, Dr. Stehle, placed her in group therapy for individuals with dissociative identity disorder. She attends group therapy one time per week. She notes that both Dr. Stehle and Dr. Jane Mathison, who provided mental health services in the early and mid 1990s, did not have evening hours. Drs. Stehle and Mathison provided treatment over the course of approximately 5 years, each for two and one-half years. Ms. Lieberman reports that she also takes a psychoeducational class on dissociative identity disorders led by Dr. Fine.

In regard to her perception of her physical limitations, Ms. Lieberman reports difficulty ascending/descending stairs. She stated that this would not be a problem for Family Court as they had elevators. She also needs to be able to use a computer as manual handwriting causes pain in her hands, which as noted, are arthritic. She also has difficulty with prolonged standing. She recalls having difficulty retrieving files from the mediation unit file cabinet in September 1994, when working at the Court because they were so tightly pressed together that she didn't have the strength/firm grasp to remove these. Her problems with peripheral neuropathy and venous insufficiency also affect her ability to walk. Ms. Lieberman reports that she has no problems with sitting, she estimates that she can stand for 20 minutes at any one time without pain, and that she is able to walk "very slowly". She estimates her tolerance for lifting at 15 to 20 lbs. occasionally but states that she is unable to carry this amount of weight. She reports no difficulty with driving.

Despite her physical limitations and her ongoing need for treatment of her mental impairments, Ms. Lieberman believes that at the time of her forced retirement, regardless of the trauma and subsequent hospitalization that immediately followed, she would have been able to return to her position and function effectively within three months. At this time, she states that her psychiatrist recommends that she transition back to work due to the fact she has been out of the workforce for some length of time and that although reentering the workforce may prove to be beneficial to her physical/mental status, she should commence working at six to possibly ten hours per week and

Danmar Associates
November 30, 2005
Page 3

**RE: Bernice Lieberman**

increase her work hours in accordance with her tolerance, as determined by her psychiatrist. Ms. Lieberman has engaged in some volunteer activities, working for the American Cancer Society doing typing for two days per week (half-days) in 1995. She also did a volunteer position at the Blood Bank of Delaware in 2004, working half-day filing and half-day telephoning people regarding their appointments. At her doctors' urging, she has involved herself in avocational activities – in particular, duplicate bridge. She participates in duplicate bridge classes between 9:30 AM and 12:00 noon twice a week, after which she will assist in tidying up the recreation area. She may also play an afternoon and evening game. She participates in bridge at least two times and sometimes three times per week. Other activities of daily living include watching TV and reading the newspaper. Ms. Lieberman states that she usually does not read books due to her ADHD. She also plays FreeCell, an Internet game that assists her with relaxing. She reports difficulties with activities of daily living, commenting that she lives in a ground level apartment in Newark, Delaware. She does spend an overnight on the weekends with her sister and her Autistic nephew in Philadelphia. She cleans and does laundry but describes her apartment as disorganized.

In regard to her history and circumstances at the Family Court, much of Ms. Lieberman's discussions had to do with matters that are well documented in the record review that is summarized later. She did note that the onset of her difficulties began at the end of 1992, after a new chief administrator was brought in. Ms. Lieberman reports that she had been staying very late and was also suffering from migraines. The Court indicated that they had been assisting her with her files and paperwork and requested the opportunity to speak with her psychiatrist. Ms. Lieberman commented that at that time, she had been misdiagnosed.

Ms. Lieberman described her work as a state-funded mediator, noting that she handled 20 cases per week. She was able to manage this case load through scheduling one hearing on Friday and ensuring that at least one other case she dealt with during the week was a guardianship petition – a type of case that apparently required less involvement than a custody or child support or custody visitation mediation. Ms. Lieberman acknowledged that she did have difficulty keeping her paperwork current i.e., getting things done by the due date but stated that the quality of her work was excellent. Her evaluations had alluded to her problem with her paperwork "for years". She stated that after the onset of disciplinary actions in 1994, she steadily caught up with her paperwork and to her knowledge there was no backlog, except for her October statistics, at the time of her leaving.

Ms. Lieberman did provide information pertaining to her educational background and employment experience after completing college. Regarding the former, she graduated from John Dickinson High School and subsequently attended the University of Delaware, achieving a Bachelor of Arts degree in 1968 with a major in Psychology and a minor in Sociology. She began C. W. Post College of Long Island University after her undergraduate school with a plan to

Danmar Associates
November 30, 2005
Page 4

**RE: Bernice Lieberman**

complete a Master's degree in Experimental Psychology, however, she ceased attending school in
August 1969. Ms. Lieberman commenced her employment with Terry Center Children's Facility
in 1969, as a child counselor and stayed there until September 1972, when she entered the
Master's degree program in psychology at the University of Delaware in psychiatric research. By
1974, she commenced her employment with the Family Court and held a variety of positions
which are summarized as follows:

2/16/74-1/31/75:  Counselor in Field Staff and Supervision Units
2/1/75-5/31/77:  Counselor in the Intake Unit
6/1/77-6/30/78:  Coordinator for Referral Services of Juvenile Delinquents (Counselor)
7/1/78-12/31/78:  Coordinator of Community Relations (Counselor)
1/1/79-6/30/81:  Restitution Project Coordinator (Social Service Administrator I)
7/1/81-7/15/87:  Counselor Supervisor
7/16/87-5/31/89:  Investigative Services Officer
6/1/89-10/28/94:  Mediation/Arbitration Officer

*EEOC Complaints*
Ms. Lieberman's complaint includes failure to reasonably accommodate her known disabilities by
the State of Delaware, the Family Court of the State of Delaware.  She cites the following
instances:

1. Ms. Lieberman requested Family Court accommodate her by modifying her work schedule
   to permit her to meet her doctor each week.  To make up lost time, she proposed that she
   conduct mediations on Fridays and/or would work additional hours on other days during
   the week.  According to Ms. Lieberman, this accommodation was not made to the extent
   requested; rather, Family Court reprimanded Ms. Lieberman for missing time from work.

2. Ms. Lieberman requested Family Court accommodate her by allowing her to work
   additional hours to complete her paperwork and to remain in the Family Court Building
   after hours in order to access the case files for which she was responsible.  Family Court
   did not make this accommodation to the extent requested but rather reprimanded Ms.
   Lieberman for not completing her paperwork and processing cases in a timely manner.

3. According to Ms. Lieberman, other similarly situated mediators, who are not disabled or
   perceived as disabled, received assistance from supervisors with their paperwork and case
   processing.  Ms. Lieberman did not receive the same assistance.  In addition, she observed
   other Family Court employees remaining in the Family Court Building to work additional
   time.

4. Ms. Lieberman requested Family Court modify its supervisory methods to accommodate
   Ms. Lieberman's disabilities and/or perceived disabilities.  Family Court did not make this
   accommodation to the extent required.

Danmar Associates
November 30, 2005
Page 5

**RE: Bernice Lieberman**

5. Ms. Lieberman received negative employment evaluations, was reprimanded, and suspended from working. Ultimately, Ms. Lieberman's supervisor recommended her termination.

Ms. Lieberman also perceives that the Family Court engaged in acts of retaliation against her, and cites the following:

1. On or about 3/14/94, Ms. Lieberman received a memorandum from the Operations Director advising her that she would be disciplined for failing to timely process her cases. Accordingly, she was scheduled to be suspended from working for three days without pay. On 3/18/94, Ms. Lieberman filed charges of disability discrimination with the DDOL and the EEOC against Family Court. A few days later, Ms. Lieberman received a memo advising the suspension would be held in abeyance until Family Court could explore her need for accommodations.

2. In October 1994, Ms. Lieberman's supervisor recommended that her employment with Family Court be terminated. On that same day, Ms. Lieberman was suspended from her job pending a termination decision. While she was on suspension, Ms. Lieberman was hospitalized. She did not return to work at Family Court. She is currently receiving a disability pension from the State of Delaware.

### Bernice Lieberman's Mediation Case Load as of 10/28/94

This file reflects cases assigned to Ms. Lieberman commencing 6/29/94 through to 10/27/94 (last case held) and 11/21/94 (last case scheduled). Total number of cases was 116. 22 of the mediations had been scheduled for 10/31/94 through to 11/21/94 and hence there was no paperwork submitted on held mediations. Ms. Lieberman had held four mediations on 10/27/94, and as she had been escorted from the Court's premises on 10/28, the paperwork had not been completed. Of the remaining 90 cases listed/held mediations, 73 were resolved and all required paperwork had been submitted. Seventeen cases did not identify a disposition regarding resolution. Ms. Lieberman indicates that she is not aware of the status of these cases, and through her attorney had requested the information from Family Court. She has yet to receive this information from the court.

### Bernice Lieberman's Performance Evaluations

There is a three-page summary of the performance evaluations of Bernice Lieberman between January 1974 and December 1993 at Family Court, and from 1970 through 1974 at the Terry Center. Scales for performance ratings/ranges were changed by family court over these years. Between 1970 and 1981, the performance ratings were outstanding, good, satisfactory, and unsatisfactory. Ms. Lieberman, in chronological order, received the following performance ratings: January 1970-Excellent, October 1970-Excellent, December 1971-Outstanding, February 1975-Satisfactory, June 1975-Good, June 1976-Good, May 1977-Good, November 1977-Good, February 1979-Satisfactory, July 1979-Good, December 1979-Good, June 1980-Good, June

Danmar Associates
November 30, 2005
Page 6

**RE: Bernice Lieberman**

1981-Good/Outstanding. Between 1982 and 1988, the performance ratings range was changed to above standard, standard, and below standard. Ms. Lieberman's evaluations were as follows: June 1982-Above Standard, May 1983-Above Standard, February 1984-Above Standard, May 1985-Standard, May 1986-Above Standard, May 1987-Below Standard, October 1987-Standard, June 1988-Standard. Between June of 1989 through to December 1993, the range/performance rating criteria was converted to a numeric system where 7.00 was the best score and 1.00 was the worst score an employee could receive. Ms. Lieberman's performance evaluations during this time period were rated as follows: June 1989-5.18, December 1990-5.39, June 1992-5.33, May 1993-4.38, and December 1993-3.67. In every year, with the exception of two or three years where merit raises were not applicable as the performance evaluation took place as a result of a transfer in position, Ms. Lieberman did receive a merit increase raise with the exception of May 1987.

*Summary of Documents Reviewed*
*(See Appendix for Documents reviewed)*

Ms. Lieberman commenced employment with the Family Court in 1974, and has had periods of hospitalization for psychiatric disability in 1981, 1984, 1987, 1991, and – subsequent to her termination meeting – 1994.

Despite a record of psychiatric impairment, she had received satisfactory to excellent performance reviews overall – with the exception of year 1987 (below standard) and 1993 (Scale = 1 to 7/Ms. Lieberman's rank was 3.67, with a ranking of 3 indicating performance meets some expectations but improvement was needed). Ms. Lieberman was consistently praised for her excellent writing skills and arbitration/mediation skills. She was recommended for termination in October 1994 due to tardiness/absenteeism, failure to process case paperwork in a timely manner and to submit monthly statistics on a timely basis.

Ms. Lieberman's May 1993 evaluation her performance at a 4 on a scale of 1 to 7, with the evaluator noting that Ms. Lieberman has chronic tardiness problems and with the help of her doctor, she was trying to eliminate this problem. It is also noted that in regard to daily activities (records of case dispositions, time studies, statistical reports, daily activity reports, helping other units with their backlog, prioritizing workload, and moving cases in a timely manner, etc.) Ms. Lieberman needed to work on completing assignments on a daily basis, eliminating the extra 40 to 50 hours she puts in every month. To help Ms. Lieberman look at her case and time management skills, weekly meetings with her supervisor should continue.

Ms. Lieberman had, since 1987, missed two hours of work per week for psychiatric appointments. This appears to initially to have been offered as an accommodation in 1987, with Ms. Lieberman being allowed to work additional hours to make up for this lost time. At some point, Ms. Lieberman was advised that she needed to use her medical leave entitlement to cover

Danmar Associates
November 30, 2005
Page 7

**RE: Bernice Lieberman**

these appointments.  In May of 1993, Ms. Lieberman was warned that any non-emergency overtime must be pre-approved by a supervisor and would not be authorized for Ms. Lieberman simply for the purpose of allowing her to keep pace with her normal workload. Ms. Lieberman's employer was convinced she could complete her workload within a normal workweek.

In November of 1993, Ms. Lieberman requested that the Court allow her to work longer hours (uncompensated) with the provision that she would offer a written promise not to hold anyone at fault for allowing her in the Court after regular work hours.  The Court denied this request, holding to the position that workers must be compensated for completing duties on an overtime basis and the Court is unable to compensate Ms. Lieberman for overtime particularly as the Court was, as noted, convinced that such duties are routinely completed within the normal workweek. Ms. Lieberman was also informed that she needed to resume having the same number of cases as other mediators, and should switch her psychiatric appointments to Friday.  Regarding the latter, this consultant understands Friday to normally be a day to complete paperwork...since the chief complaint against Ms. Lieberman was the completion of her paperwork within regular work hours, eliminating time from the day set apart for paperwork does not appear to be an effective accommodation.

In January 1994, Ms. Lieberman explained to the Director of Operations that the relationship with her immediate supervisor for the past year exacerbated her irritable bowel syndrome (onset 1977). This supervisor (see 11/17/93 memo) acknowledged not feeling professional respect for Ms. Lieberman.  The aggravation of her irritable bowel syndrome had resulted in explosive diarrhea that could not be managed by diet and which caused Ms. Lieberman to be late as she often had to return home to shower and change.  Ms. Lieberman believed that her stress would have been reduced if she had had the opportunity to work overtime to complete her paperwork – and that potentially, this would have led to some physical improvement in regard to her diarrhea.  Ms. Lieberman had consulted a physician but apparently other medical conditions needed to be treated as a priority, which such treatments precluding the immediate treatment of the diarrhea with medications.  In response to this information, Ms. Lieberman was again informed that she needed to maximize the amount of time she was present at work in order to keep pace with her workload and eliminate the need for overtime.  Ms. Lieberman's physician (Dr. Oscar Martinez) offered documentation certifying Ms. Lieberman suffered from irritable bowel syndrome since 1977 with symptoms including explosive diarrhea – with a worsening of this condition in 1990.  Her IBS is compounded by a November 1993 diagnoses of Reflux Esophagitis Grade III associated with duodentis.  He advised that Ms. Lieberman would require ongoing treatment for this disorder. Contemporaneously, Dr. Charles Cantor also offered documentation regarding Ms. Lieberman's diagnosis of bipolar disorder and disturbed nocturnal sleep – with attempts at pharmacological and behavioral management of both problems.

LC/Lieberman, B/11-30-05 Voc Analysis/lmc/alv

Danmar Associates
November 30, 2005
Page 8

**RE: Bernice Lieberman**

Lynn Erb, Ph.D., a learning disability specialist, authored an evaluation on 1/21/94. Ms. Lieberman had been referred to Dr. Erb by her therapist. Dr. Erb noted Ms. Lieberman's longstanding difficulty with concentration and after interviewing Ms. Lieberman and offering a variety of tests, Dr. Erb offered that Ms. Lieberman was exhibiting an attention problem that may be due to an attention deficit disorder, with other factors – such as a mood disorder or sleep disorder – contributing to her difficulty paying attention. Dr. Erb provided a variety of recommendations in regard to enhancing or accommodating Ms. Lieberman's work performance. These included brief intermittent breaks; extra time to complete work (with Ms. Lieberman taking work home, or if this was not something that could be done, providing her with a lighter caseload - reducing her case load by one case per day could provide her sufficient time to complete her paperwork); ensuring that all forms that need to be completed are on the computer and that Ms. Lieberman was able to use a computer would also improve performance and increase the amount of work she could perform; the use of timer; using a color coding file system to improve organization; the use of earphones to block out external noises; providing Ms. Lieberman with the equipment that would allow her to dictate the information into a tape recorder and have someone else type it. Dr. Erb opined that Ms. Lieberman had the writing and verbal ability to perform her job well and that with appropriate accommodations, she should have been able to improve her performance so that she functioned in all aspects of her job well.

Ms. Lieberman did achieve improvement with regard to lateness; she continued to miss time for medical treatment. A recommendation was made for a three-day suspension without pay for failure to process her cases in a timely manner.

On 3/18/94, Ms. Lieberman filed a charge of discrimination with the Delaware Department of Labor and the EEOC. She stated that she was being denied an accommodation to work extra time without pay to complete her paperwork and that she had been disciplined for performance deficits that related to her disabilities. She stated that two other similarly situated employees who were not disabled had been allowed to stay after hours without pay to complete paperwork. Subsequently, Ms. Lieberman's three-day suspension was stayed pending a review of Dr. Erb's recommendations for accommodations. It was recommended that a joint determination be made in regard to what limitations are imposed by Ms. Lieberman's current medical conditions and what appropriate accommodations needed to be made to overcome those limitations and allow her to perform her job position and responsibilities. At this time, only one recommendation of Dr. Erb's had been put in place i.e., the use of color-coded files.

In May of 1994, Ms. Lieberman discussed with her supervisor an intent to come in on Saturday to review cases and to prioritize these by labeling. Ms. Lieberman was advised not to come in on Saturday as it was in everyone's best interest for her to limit her working hours to the regular workweek since, according to her supervisor, the extent and nature of her disability was still being evaluated.

Danmar Associates
November 30, 2005
Page 9

**RE:  Bernice Lieberman**

In August of 1994, Ms. Lieberman brought to her manager's attention that another employee had received assistance with a backlog of cases. Her manager acknowledged this, but Ms. Lieberman was cautioned that personnel dealings with other employees are confidential. Subsequently, Ms. Lieberman advised that not only had another employee been helped regarding hundreds of backlogged cases, but the same employee had been provided regular supervisory meetings and that Ms. Lieberman had not had the benefit of such weekly supervisory conferences per her request. She stated that she had not had the opportunity to meet with her immediate supervisor on a regular basis although she had been requesting this on a weekly basis for at least 20 months. She also informed management that she had been extending extraordinary efforts to keep up with her work because, other than providing her colored files, the Court had not afforded her any of the reasonable accommodations recommended by Dr. Lynn Erb. Ms. Lieberman again requested specific accommodations to include regular Friday meetings with her supervisor to assist her in the development of a system to expedite the completion and flow of information and paperwork. She also suggested a follow-up meeting with Dr. Lynn Erb that would involve her supervisors' participation, as Dr. Erb was most knowledgeable about Ms. Lieberman's attention disorder and qualified to make recommendations about specific reasonable accommodations pertaining to her work situation. Ms. Lieberman stated that she was unable to understand why the Court refused to accept Dr. Erb's 1/21/94 evaluation that included recommendations for reasonable accommodations. In response, Ms. Lieberman was informed by her supervisor that she had been accommodated with "flex time" i.e., her start time had been moved back 15 minutes – with the supervisor commenting that Ms. Lieberman was late on a frequent basis.

In late August, management acknowledged that Ms. Lieberman's supervisor had not always set aside a formal meeting on a weekly basis but that regardless, in the opinion of management, he had devoted time to Ms. Lieberman. Ms. Lieberman was also chastised for not having a written a list of specific accommodations she was seeking. Management (specifically Ms. Donofrio) stated that she did not see a diagnosis of attention deficit disorder in the report authored by Dr. Erb. In regard to Ms. Lieberman's work hours, she was again cautioned that it has been made very clear to her that she was to confine her labors to the regular workweek. She was informed that her disabilities, other than an arthritic condition, had not been specified or verified by the Court. She denied having any information as to what Ms. Lieberman's limitations were and what accommodations would overcome these limitations.

Subsequent to denying knowledge of Ms. Lieberman's disabilities, Ms. Lieberman was issued a warning that her statistics for July and September needed to be completed by 9/6/94 and 9/16/94 respectively. Her immediate supervisor, Mr. Weiss, chastised Ms. Lieberman for attempting to justify her non-performance by listing what he described as haphazard special accommodations. She was advised that she should have a more positive outlook within the unit and the Court.

Danmar Associates
November 30, 2005
Page 10

**RE: Bernice Lieberman**

In early September 1994, Ms. Lieberman requested from personnel an understanding of her sick leave entitlement. She was advised by memo that her balance for sick hours was 55.75 and her balance for annual hours was 42.50 hours. Within this same timeframe, Dr. Erb authored correspondence indicating that Ms. Lieberman had many of the traits of an individual with attention deficit disorder. Due to her complex history and learning disabilities, Dr. Erb urged that she be given accommodations referenced previously in her 1/21/94 report.

By mid-September, Ms. Lieberman is issued another warning pertaining to a mediation session (9/12/94) that ran past 5:00 PM. Ms. Lieberman was cautioned that no mediation should extend past 4:45 PM except in extreme circumstances at which point security would have to be notified for safety and protection purposes. Ms. Lieberman was reminded that she was authorized to work Monday through Friday, 7.5 hours per day, between 8:30 AM and 4:45 PM – and that she was not authorized to remain in Family Court past 4:45 PM.

By late October 1994, Ms. Lieberman's immediate supervisor (Mr. Weiss) recommended dismissal. He referred to Ms. Lieberman's 1993 performance evaluation, which indicated tardiness and he also noted that since July 1, Ms. Lieberman had been late on 13 occasions. Reference was made to Ms. Lieberman's frequent requests to work overtime in order to manage her caseload, which Mr. Weiss attributed to her absenteeism. He also referenced that her statistics for September were late, that they were due by 10/3/94 and submitted on 10/14/94. Mr. Weiss recommended that Ms. Lieberman be dismissed from State employment for a continuing pattern of unreliable attendance. On 10/28/94, Ms. Lieberman was escorted from the Family Court premises after being afforded a few moments to gather her personal belongings. She was advised to return on 11/2/94 to present reasons to the Director of Operations as to why she shouldn't be dismissed. According to Dr. Scott Stehle, the recommendation for dismissal elevated Ms. Lieberman's stress to an intolerable level. She was admitted to Rockford Center on 10/29/94 under the care of Dr. Bauchwitz. Ms. Lieberman had been under Dr. Stehle's care for long-standing psychiatric illness and had evidenced chronic problems with instability of mood and difficulties with concentration. These problems interfered with her ability to remain current with the documentation requirements of her position, and have in the past necessitated working after hours in order to compensate. The effect of a recent employee regulation prohibiting such after hours work was very stressful. In view of her extreme emotional lability, Dr. Stehle offered that it was difficult to predict a time course for stabilization. Subsequently, Ms. Lieberman was notified that when she was medically cleared to report to work, her termination hearing would be held immediately and she would be placed on suspension without pay. She was later notified that she would be suspended but with pay. Ultimately, Ms. Lieberman commenced receipt of her disability pension, as she perceived the alternative was dismissal.

Danmar Associates
November 30, 2005
Page 11

**RE: Bernice Lieberman**

*Opinion*

It is clear that Ms. Lieberman is an individual with both physical and mental impairments. These encompass a long history of mental illness to include major depressive disorder, dysthymia, bipolar disorder, borderline personality disorder, and ultimately a diagnosis of Dissociative Disorder and per Ms. Lieberman, ADHD. Physical impairments or disorders include irritable bowel syndrome, peptic ulcer disease, GERD, chronic venous insufficiency with related skin inflammation, and osteoarthritis. These physical and mental impairments substantially limited a variety of major life activities to include working – particularly when compared to an average person in the general population. Ms. Lieberman's physical and mental impairments were known to her employer, as documented by a variety of memos and correspondence, and through the award of the employer's disability pension on at least three occasions. Her first hospitalization for her mental impairment was in 1981, 7 years subsequent to commencing her employment with the Family Court/State of Delaware. In January of 1994, Ms. Lieberman underwent further evaluation with Dr. Erb, with this learning disabilities specialist offering that Ms. Lieberman had exhibited an attention problem during the evaluation/ testing and that the problem may be due to an attention deficit disorder. Other factors - Ms. Lieberman's mood and sleep disorders – may be contributing to her attention deficits. Dr. Erb recommended referral to a psychiatrist for further consultation in regard to Ms. Lieberman's attention problems. These difficulties with attention were also known by the Family Court, again as referenced in the exchange of memos and correspondence.

This consultant would also opine that Ms. Lieberman was a "qualified" individual with a disability in that her lengthy tenure with the Court and her predominantly satisfactory to excellent performance evaluations indicate that she met the necessary prerequisites for her job as a mediator.

Records also indicate that Ms. Lieberman requested (1) reasonable accommodations for her mental and physical impairments, and (2) also requested a formal interactive process – potentially with Dr. Erb present to facilitate further understanding of methods for accommodating Ms. Lieberman's limitations.

According to the EEOC's Technical Assistance Manual on the Provisions of the American's with Disabilities Act (published by JIST Works, 1993), a reasonable accommodation is a modification or adjustment to a job, the work environment, or the way things usually are done that enables a qualified individual with a disability to enjoy an equal employment opportunity. An equal employment opportunity means an opportunity to attain the same level of performance as an average similarly situated employee without a disability.

The EEOC's Technical Assistance Manual provides samples of reasonable accommodations that include restructuring a job by relocating or redistributing marginal job functions; altering when or

LC/Lieberman, B/11-30-05 Voc Analysis/lmc/aly

Danmar Associates
November 30, 2005
Page 12

**RE: Bernice Lieberman**

how an essential job function is performed; part-time or modified work schedules; obtaining or modifying equipment or devices; permitting use of accrued paid leave or unpaid leave for necessary treatment, etc. In the ADA Compliance Guide (Thompson Publishing Group, Inc., April 1992) details are provided regarding a "modified work schedule". The guide suggests that an employer should consider modification of a regular work schedule as a reasonable accommodation. Modified work schedules may include flexibility in work hours or the workweek, or part-time work. "Many people with disabilities are fully qualified to perform jobs with the accommodation of a modified work schedule. Some people are unable to work a standard 9-5 workday, or a standard Monday to Friday workweek; others need some adjustment to regular schedules". Examples of modified work schedules are offered, some of which are quite comparable to Ms. Lieberman's situation. For example, "an accountant with a mental disability required two hours off, twice weekly, for sessions with his psychiatrist. He was permitted to take longer lunch breaks and to make up the time by working later on those days." Further noted: "people whose disabilities may need modified work schedule include...people who need rest periods such as those with a mental illness."

Most of the accommodations specified by Dr. Erb ten months prior to Ms. Lieberman's recommendation for termination read as textbook examples of appropriate reasonable accommodations. Of the recommendations offered by Dr. Erb, it appears that Family Court implemented only one, i.e., the provision of a few color-coded files.

Historically, it appears that Ms. Lieberman had been able to use overtime to compensate for her two psychiatric appointments per week. This ability to make use of overtime, either during evening hours or over the weekend, was subsequently denied to Ms. Lieberman in year 1994. The Court offered a variety of reasons for eliminating the opportunity for Ms. Lieberman to work overtime without compensation. These include:

- The Court was convinced Ms. Lieberman could complete her workload within the normal workweek. It is interesting to note that although the court opined that Ms. Lieberman could complete her paperwork within the normal workweek, the formal printed/formatted performance evaluation from 1993 specifically notes that employees are rated in regard to their *willingness to help other units with "their backlog"*. Hence, it does not seem that the occurrence of a backlog was unique to Ms. Lieberman. As the nature of her disabilities increased the probability of a paperwork backlog, the need for "time" beyond a normal workweek would be anticipated or probable and appears a reasonable accommodation.
- The Court argued that Ms. Lieberman could not be accommodated by being allowed to work late or on weekends as overtime by law would need to be compensated. As noted previously, established guidelines on interpreting the ADA and the process of reasonable accommodation suggests that allowing an employee to work later without pay would be a reasonable accommodation in certain situations.

Danmar Associates
November 30, 2005
Page 13

**RE: Bernice Lieberman**

- The Court argued that Ms. Lieberman should not be allowed to work overtime or on weekends due to the need for safety and protection of her and other parties. In establishing a threat to health or safety of an individual as a qualification standard in employment, an employer must be cognizant of the fact that such a qualification must meet very specific and stringent requirements under the ADA. There must be a <u>significant</u> risk of substantial harm; there must be a <u>specific</u> risk of substantial harm; and there must be a current rather than speculative or remote risk.

As a specific accommodation, Ms. Lieberman requested the opportunity for weekly supervisory meetings. It was acknowledged that formal weekly meetings with her supervisor had not been held, but rather Ms. Lieberman had been offered intermittent and informal access to her supervisor. Ms. Lieberman perceived and expressed the need for a structured meeting with her supervisor to facilitate her job performance – particularly in regard to the flow of paperwork. This did not occur and this consultant would note that in Ms. Lieberman's May 1993 performance evaluation, it was recommended that weekly meetings be held with her supervisor to assist her with case and time management skills.

Much is made of Ms. Lieberman's lateness and attendance issues. In reviewing her performance appraisals from May and December of 1993, the former rated her attendance as a 4 on a scale of 1 to 7. At that time, the rater noted Bernice was attempting to work with her doctor to eliminate her tardiness problem. In December of 1993, Ms. Lieberman was rated at a 1, with the rater noting that she had missed 282 hours through the end of November for illness or doctors' appointments, two weeks of which were in-home care instead of hospitalization. Referring to the 1/7/94 memo of Randall Williams, Director of Operations, Ms. Lieberman advised that she had been working under stressful circumstances during 1993 and that such circumstances exacerbated her irritable bowel syndrome and diarrhea necessitating that she often turn around when in route to work in order to go home, shower, and change her clothing. In the 11/17/93 memo of Kathleen Donofrio, it is acknowledged that Ms. Lieberman's supervisor "does not feel professional respect for [her]".

Ms. Lieberman has a documented history of irritable bowel syndrome, onset 1977. According to the Medical Disability Advisor,[1] certain conditions can lengthen disability related to irritable bowel syndrome. These would include chronically stressful or anxiety producing situations. It does appear that between May and December of 1993, Ms. Lieberman's tardiness and lateness increased, reflected by performance rating evaluation for attendance declining to a 1 from a 4. In September of 1994, a month before Ms. Lieberman's termination, it appears that she had an outstanding balance for allowable sick hours amounting to 54.75 hours and a balance for allowable annual hours of 42.50 hours. The Court opines that Ms. Lieberman had been granted

---

[1] <u>Medical Disability Advisor</u> (authored by Dr. Presley Reed; designed for use by medical and non-medical professionals whose positions require familiarity with the injuries and illness of working people – in particular, the anticipated duration of disability.)

Danmar Associates
November 30, 2005
Page 14

**RE: Bernice Lieberman**

flextime i.e., she was allowed to arrive at 8:45 AM instead of 8:30 AM. This accommodation however seems to have been withdrawn as in the 9/14/94 memo from Ms. Lieberman's supervisor, she is cautioned that she is to adhere to her authorized work schedule – 8:30 AM to 4:45 PM. Regardless, the 15 minutes of flextime that had been offered did not appear to be an effective accommodation in regard to Ms. Lieberman's problem.

Ms. Lieberman did continuously request the opportunity to work overtime as she perceived this would reduce her stress and possibly under less stressful circumstances, her irritable bowel syndrome would not be aggravated and she would not be subject to incidences of explosive diarrhea. As noted, her requests for overtime were denied despite Ms. Lieberman having been able to work overtime in previous years. Hence, as Ms. Lieberman's requests for overtime were denied, she struggled to maintain her paperwork (*which appears to be close to current at the time of her termination*) under stressful circumstances and disciplinary measures that exacerbated her health problems, that in turn increasingly negatively impact her attendance. In a 2/23/94 management memo, it is noted that Ms. Lieberman "has made improvement in regard to lateness" but continues to miss time for medical treatment. Ultimately, following the recommendation for termination, Ms. Lieberman's stress – according to Dr. Stehle – reached an intolerable level and she was hospitalized.

Ms. Lieberman was frequently disciplined in regard to being behind in her paperwork. Of note, one of Dr. Erb's recommendations in January of 1994, was that Ms. Lieberman be provided accommodation in regard to the completion of paperwork. Several recommendations are made but one option, labeled the "best solution" by Dr. Erb was that Ms. Lieberman be able to dictate the information necessary for her paperwork and have another individual type this. The purchase of equipment is considered a reasonable accommodation within the EEOC's Technical Assistance Manual and Guidelines for Accommodation. Additionally, these same guidelines indicate that the provision of a reader or interpreter for a blind or deaf employee would not be unreasonable. Therefore, the latter accommodation suggested by Dr. Erb appears reasonable upon review of examples of accommodations referenced in the EEOC's Technical Assistance Manual. Of note, Ms. Lieberman did suggest that potentially management would want to conference with her and Dr. Erb to better identify appropriate accommodations. This meeting did not occur. According to the Technical Assistance Manual, when reasonable accommodations are not easily identified, the employer and the individual with the disability should engage in an informal interactive process to find an effective accommodation. If such interactions do not yield effective accommodations, then the employer may seek technical assistance in determining how to accommodate a particular individual in a specific situation. Such assistance could be sought from the EEOC, from state or local rehabilitative agencies, from disability constituency organizations, etc. From a review of the records, it appears that the Family Court did not engage in an interactive process sufficient to effectively accommodate Ms. Lieberman and failed to implement any of the recommendations

LC/Lieberman, B/11-30-05 Voc Analysis/lmc/alv

Danmar Associates
November 30, 2005
Page 15

**RE: Bernice Lieberman**

offered by Dr. Erb in January of 1994, other than – as previously noted – the provision of color-coded files.

This consultant recognizes that employers are not required to make reasonable accommodations that impose undue hardship on the operation of a business. The interactive process however, would have clarified the reasonable accommodation process and subsequently enhanced a determination as to whether or not an undue hardship would result. In general, according to the EEOC's Technical Assistance Manual, "a larger employer would be expected to make accommodations requiring greater effort or expense than would be required of a smaller employer". Undue hardship includes any action that is unduly costly, extensive, substantial, disruptive, or that would fundamentally alter the nature or operation of a business. In considering whether or not an accommodation presents as an undue hardship, the overall financial resources, size, number of employees, and type and location of facilities of the entity covered by the ADA (if the facility involved in the accommodation is part of a larger entity – such as the state) needs to be considered.

Ms. Lieberman has a lengthy record of mental and physical impairment, and she received her first disability pension from the state in 1981. Between July of 1987 and July of 1988, per her performance review/the Family Court of Delaware, it is noted that Ms. Lieberman's health was a concern to the evaluator and due to her chronic health problems there was chronic absenteeism due to illness and doctors' appointments. It is noted however that Ms. Lieberman complied with supervisor's requests in submitting doctors' excuses. Hence, intermittent periods of disability have been historically accommodated by Ms. Lieberman's employer through to years 1993-1994. As noted previously, despite these intermittent periods of disability, Ms. Lieberman's overall performance ratings ranged predominantly between satisfactory and excellent. Hence, it appears that the established record of accommodating Ms. Lieberman's bouts of disability deteriorated to the extent that by September of 1994, her supervisor viewed her request for accommodations as, "haphazard attempts for her to explain her non-performance." (9/7/94 memo). In this consultant's opinion, there can be no determination of whether or not Ms. Lieberman's requests for reasonable accommodations would have resulted in undue hardship as (1) no effective accommodations were offered, (2) previously offered accommodations were revoked, and (3) there was no furthering of the interactive process to define reasonable accommodations despite Ms. Lieberman's requests for such a process.

In summary, Ms. Lieberman is a qualified individual with a disability whose physical and mental impairments were well known and historically accommodated during the course of her employment with the Family Court of Delaware. From review of the record, this consultant cannot determine any substantial effort on the part of the court to reasonably and effectively accommodate Ms. Lieberman or to further those processes that would have enabled her to attain the same level of performance of average similarly situated employees without disabilities. Of

Danmar Associates
November 30, 2005
Page 16

**RE: Bernice Lieberman**

note, it was documented in this consultant's record summary, that the Court did provide assistance with backlogged paperwork to other non-disabled employees, and according to Ms. Lieberman, did provide the opportunity for other employees to remain late in the Court. Such activities, provided to non-disabled personnel, would further substantiate that comparable activities extended to Ms. Lieberman would constitute reasonable accommodations.

Respectfully submitted,

Daniel M. Rappucci, M.A., LRC, LPC, CRC
Disability Analyst

# *APPENDIX*

11/17/93 – Memo of Kathleen Donofrio to Bernice Lieberman
1/7/94 – Memo of Randall Williams, Director of New Castle County Operations, to Ms. Bernice Lieberman
1/21/94 – Educational Evaluation of Lynn Erb, Ph.D., Learning Disabilities Specialist
2/23/94 – Memo of Kathleen Donofrio to Bernice Lieberman
3/3/94 – Correspondence of Dr. Oscar Martinez
3/18/94 – Correspondence of Dr. Charles Cantor
3/18/94 – Charge of Discrimination filed with the Delaware Department of Labor and EEOC against the Family Court of Delaware
3/22/94 – Memo from Randall E. Williams to Bernice Lieberman
5/6/94 – Memo of David Weiss to Bernice Lieberman
7/18/94 – Correspondence of Dr. Nancy Murphy to Mr. Klosiewicz
8/9/94 – Memo from Ms. Donofrio to Ms. Lieberman
8/15/94 – Memo of Bernice Lieberman to Kathy Donofrio
8/16/94 – Memo from Bernice Lieberman to Kathleen Donofrio
8/19/94 – Memo of David Weiss to Bernice Lieberman
8/29/94 – Memo from Ms. Donofrio to Ms. Lieberman
9/2/94 – Memo from Kathleen Donofrio to Bernice Lieberman
9/7/94 – Memo from Mr. Weiss to Ms. Lieberman
9/9/94 – Memo from Barbara Klosiewicz to Bernice Lieberman
9/9/94 – Correspondence of Lynn Erb, Ph.D.
9/14/94 – Memo from David Weiss, Mediation Supervisor, to Bernice Lieberman
9/14/94 – Memorandum from David Weiss to Ms. Lieberman
10/28/94 – Memo from Mr. Weiss to Ms. Lieberman
10/31/94 – Correspondence of Susan Anders, State of Delaware, Department of Labor
11/1/94 – Correspondence of Dr. Scott Stehle
11/17/94 – Correspondence of Robert Klosiewicz
12/26/94 – Dr. Scott Stehle report to the State of Delaware/State Board of Pension Trustees
1/4/95 – Correspondence from Robert Klosiewicz
3/31/95 – Correspondence of James Baker, Pension Administrator, State of Delaware
8/21/95 – Letter to Mark Moddox at the EEOC

**LICENSE/CERTIFICATIONS**
Licensed Professional Counselor
Commonwealth of Pennsylvania
License # PC000289
Licensed Rehabilitation Counselor
State of New Jersey
License # RC 02503
Senior Disability Analyst and Diplomate
American Board of Disability Analysts
Certificate No. 4148-96
Certified Rehabilitation Counselor
Commission on Rehabilitation Counselor Certification
Certificate No. 13973
Certified Disability Management Specialist
Certification of Disability Management Specialists Commission
Certificate No. 01634
Certified Case Manager
Commission on Rehabilitation Counselor Certification
Certificate No. 02421
Certification in Continuing Engineering Education/Ergonomics: Evaluation & Upper Limb/Back Disorders
The University of Michigan
Course #9334
Ergonomic Certification Program - Roy Mathesson 2002

**EDUCATION**
1973 M.A. Vocational Rehabilitation Counseling
East Carolina University, Greenville, NC
3/73-5/73 Internship
Bureau of Vocational Rehabilitation
Washington, NC
1/73-3/73 Internship
Counseling & Guidance Center
East Carolina University
Greenville, NC
1971 B.A. Psychology Major, Sociology/Economics Minor
East Carolina University, Greenville, NC

Continuing Education/Professional Seminars on ADA, Essential Functions/Job Analyses, Vocational Evaluation, Earnings Analysis, Forensic Rehabilitation, Disability Management, Job Development, and Occupational Safety and Health Standards, and Ergonomic Evaluation.

**EXPERIENCE**
October 1981-Present
Danmar Associates, Frazer, PA
Disability Analyst/Rehabilitation Counselor

Consult to industry on non-discrimination employment practices. Offer vocational expert analyses and testimony pertaining to worker's compensation, liability (personal injury, professional malpractice, product liability, etc.), ADA compliance or non-compliance, social security, etc. Supervise case management staff and direct disability management operations. Complete labor market surveys, confirming available and appropriate employment opportunities and associated wages. Counsel clients with physical limitations to provide vocational rehabilitation services. Interview/evaluate/test individuals and confer with medical and professional personnel to determine degree of disability and eligibility for services. Provide counseling, coordinate return to work services; direct job development and

placement services. Provide post-employment services to include job accommodation and the purchase of ergonomically designed tools and work aides to facilitate adjustment to re-employment. Complete plant-wide ADA compliant job analyses for multi-state manufacturing and service organizations. Provide employers (both public and private) with consulting services on non-discriminatory employment practices; assist with mediation/resolution of disability claims.

November 1979-October 1981
Comprehensive Rehabilitation Services, Wayne, PA
Rehabilitation Consultant/Marketing Representative

Marketed rehabilitation services to insurance industry. Reviewed cases for referral, determined appropriateness of referral and completed initial rehabilitation plan. Provided direct rehabilitation services to head trauma and catastrophic referrals.

October 1977-November 1979
The Elwyn Institutes, Elwyn, PA
Director of Vocational Training

Managed intake, evaluation, trade training and job placement departments. Completed grants to private, public and governmental funding sources. Responsible for program expansion and rehabilitation plan supervision for clients served.

October 1975-October 1977
The Elwyn Institutes, Elwyn, PA
Coordinator, Job Development and Placement Program

Supervised placement staff and developed cooperative employment programs with industry. Provided direct client placement services and requisite post-employment services.

September 1974-October 1975
The Elwyn Institutes, Elwyn, PA
Vocational Placement Counselor

Provided job development and placement services to clients who completed trade training programs. Recipient of the Counselor of the Year Award--1976, by the NARC.

September 1973-September 1974
The Elwyn Institutes, Elwyn, PA
Rehabilitation Counselor

Established client rehabilitation plan, reviewed all client assessments and evaluations, recommended client for required training, coordinated ancillary and placement services.

## PROFESSIONAL AFFILIATIONS AND RECOGNITIONS
- President--International Association of Rehabilitation Professionals (1995-96)
- Counselor of the Year Award/NARC (1976)
- National Rehabilitation Association
- Recognized as a rehabilitation specialist in head trauma and traumatic spinal cord injury.
- 32 years of experience in the rehabilitation community with multiple populations.
- National Rehabilitation Counseling Association Job Placement Division
- National Rehabilitation Administration Association
- Vocational Evaluation and Work Adjustment Association
- International Association of Rehabilitation Professionals in the Private Sector
- Pennsylvania Counseling Association
- Guest Lecturer, Pennsylvania Bar Institute; ADA, Vocational Analysis
- Adjunct Professor, University of Scranton, Fall 2000, "Vocational Aspects of Disability"

## PUBLICATIONS

*Pennsylvania Trial Lawyers Association*.   Damages: Proven Strategies & Trial Tactics, <u>Establishing Vocational Damages</u>, Pub. No. 253-2002

*Pennsylvania Bar Institute*.   Pennsylvania Workers' Compensation Practice & Procedure, <u>The Concept of Skills Transferability</u>, PBS No. 2002-2768

*Pennsylvania Bar Institute*.   Workers' Compensation Law Section, Spring Meeting, <u>Labor Market Survey – Consultant Perspective</u>, Pub. No. 1999-2346J

## PROGRAM PARTICIPANT

*Pennsylvania Bar Institute*.   Examining Medical and Non-Medical Experts in Civil Litigation, June 2001

*Pennsylvania Bar Institute*.   Trial of an ADA Case, June 1999

*Pennsylvania Bar Institute*.   Litigating Employment Discrimination Cases.   Using Vocational Expert Testimony to Establish that an Employer Perceives the Plaintiff as Having a Disability under the ADA, December 2004

## OTHER

*<u>World Trade Center Victim Compensation Fund/The Trial Lawyers Care</u>*

Provided services on World Trade Center lead cases.   Presented testimony before Special Master Kenneth R. Feinberg. Cases involved Loss of Earning/Income Capacity and Life Care Planning.

*<u>Social Security Administration, Office of Hearings and Appeals</u>*

Vocational Consultant

---

1994
Richard Furia vs. Ohio Casualty
Abitration Hearing/Personal Injury Case
(For Plaintiff)

Joseph Prim, Esq
Duket & Prim
1500 Walnut Street
Suite 900
Philadelphia, PA  19102

---

1996
Eugena McDuffy vs. M. S. Carriers, Inc. & Miguel Vargas/
Personal Injury Case
Civil Court
95-CU-5655
(For Plaintiff)

Dennis M. Abrams, Esq.
Lowenthal & Abrams, P.C.
Suite 440
555 City Line Avenue
Bala Cynwyd, PA  19005

---

1997
Mary Ann Egnotovich vs. Stephen Gillette/Personal Injury Case
Civil  (Scranton)
Trial in Lackawanna County
(For Plaintiff)

Robert Fellheimer, Esq.
Penn's Court
Suite 313-315
350 S. Main Street
Doylestown, PA  18901-4829

---

1997
Dr. John Papola vs. Nationwide Insurance Co.
Arbitration/Personal Injury (MVA)
(For Plaintiff)

William P. Fedullo, Esq
The Philadelphian, Suite 1C-41
2401 Pennsylvania Avenue
Philadelphia, PA 19130

---

1997
Michael Sofi vs. Delaware River Stevedores/Personal Injury Case
Civil Court/Philadelphia
(For Plaintiff)

Peter M. Patton, Esq.
Galfand, Berger, et al.
1818 Market St., Suite 2300
Philadelphia, PA 19103

---

1997
Michael DiSimone vs. U. S. Postal Service
Deposition – Employment Discrimination
(For Plaintiff)

Debra Jensen, Esq.
Galfand Berger, et al.
1818 Market St., Suite 2300
Philadelphia, PA 19103

---

1997
Brian Werner vs. Ivan L. Ostroff/Personal Injury Case
Civil (Judicial Dist. Court of Philadelphia #387)
Deposition
(For Defense)

Jill R. Mezyk, Esq.
Mednick, Mezyk & Kredo, P.C.
1717 Spring Garden Street
Philadelphia, PA  19130

---

1997
James Keiser vs. Philadelphia Bakery/Worker's Compensation Case
Deposition
(For Defense)

Kate A. Smith, Esq.
Marshall, Dennehey, Warner
Coleman & Goggin
1 Montgomery Plaza
Norristown, PA  19401-4814

---

1997
Theresa  Stranere vs. Social Security Administration
(For Plaintiff)

Lou Aurely, Esq.
Wusinich and Brogan
19 S. High Street
West Chester, PA 19382

---

1998
Ted Manna vs. Woolworth Corporation
Deposition – Philadelphia Worker's Compensation Case
(For Plaintiff)

Evan Harrison Snyder, Esq.
Feldman & Pinto, P.C.
Attorneys at Law
1604 Locust Street, 2nd Floor
Philadelphia, PA  19103

---

1998
Wayne Kidder vs. Nationwide Insurance Co.
Arbitration/Personal Injury (MVA)
(For Plaintiff)

Larry Goldberg, Esq.
135 W. Market Street
West Chester, PA  19382

---

1998
Robert Presta vs. SEPTA
Federal Court
Testimony
(For Plaintiff)

H. Thomas Hunt III, Esq.
Hunt & Scaramella
Woodland Falls Corporate Park
220 Lake Drive East
Suite 105
Cherry Hill, NJ  08002

---

1998
Joseph Trigg vs. Penn National Insurance Co./Worker's Comp. Case
Deposition
(For Plaintiff)

Howard Farber, Esq.
Farber & Farber
County Building, Suite 100
1 Veterans Square
Media, PA  19063

---

1998
Kimberly Brunko vs. Mercy Medical Center
Federal Court
Deposition
(For Plaintiff)

Randall Armantrout, Esq.
Moyer & Bergen
Attorneys at Law
Commerce Exchange Building
2720 1st Avenue, Northeast
PO Box 1943
Cedar Rapids, IA  52406-1943

---

1998
Duane Underferth vs. Precision Offset Printing/Worker's Comp. Case
Deposition
(For Plaintiff)

Alan B. Ziegler, Esq.
532 Elm Street
Reading, PA  19601

---

1999
Deborah Gates
Deposition
(For Plaintiff)

Daniel F. Monahan, Esq.
300 N. Pottstown Pike, Ste. 210
Exton, PA  19341

---

1999
Brent Fitzpatrick
Federal Court/Philadelphia
Testimony
(For Plaintiff)

Ralph E. Lamar, IV, Esq.
Law Office of Alice W. Ballard, P.C.
225 South 15th Street, Suite 1700
Philadelphia, PA  19102

---

1999
Patricia Booker-Jackman
Court of Common Pleas/Philadelphia
Testimony
(For Plaintiff)

Stanley M. Schwarz, P.C., Esq.
Attorney At Law
Lafayette Building, Suite 604
N.E. Corner 5th & Chestnut St.
Philadelphia, PA 19106-2406

---

1999
Javier Buitron
Court of Common Pleas/Chester Co.
Testimony
(For Plaintiff)

John P. Winicov, Esq.
Attorney At Law
50 Darby Road
Paoli, PA  19301

---

1999
Charlotte Brooks
Federal Court/Delaware
Testimony
(For Plaintiff)

Richard P. S. Hannum, Esq.
Prickett, Jones, Elliott, Kristol &  Schnee
1310 King Street
Box 1328
Wilmington, DE  19899

---

1999
Walter Belovitz
Worker's Compensation
Deposition
(For Plaintiff)

Kathy Kennedy, Esq.
Larry Pitt & Associates
Attorneys At Law
1918 Pine Street
Philadelphia, PA  19103

---

1999
Garrett vs. Garrett
Divorce

Henry T. Crocker, Esq.
Crocker & Crocker, P.C.
1296 High Street
P.O. Box 1037
Pottstown, PA  19464

---

John Rinarelli vs. Daimler Chrysler
ADA
Deposition
(For Plaintiff)

Matthew F. Boyer, Esq.
Connolly, Bove, Lodge & Hutz, LLT
1220 Market Street
P.O. Box 2207
Wilmington, DE  19899

---

2000
Terrence Geissler vs. Morton International
Worker's Compensation
Deposition
(For Plaintiff)

Don Smith, Jr., Esq.
Liever, Hyman & Potter Law Offices
50 N. Fifth Street, 4th Floor
P.O. Box 782
Reading, PA  19603-0782

---

2001
Timothy Nelson vs. USAir
ADA
Deposition
(For Plaintiff)

Lorrie McKinley, Esq.
McKinley & Vonier
1333 Race Street
Philadelphia, PA  19107

---

2001
Irvin Bare vs. Greg's Mechanical, Inc.
Worker's Compensation
Deposition
(For Plaintiff)

Donald F. Smith, Jr., Esq.
Liever, Hyman & Potter
P.O. Box 782
Reading, PA  19603-0782

---

2001
Donald Moyer vs. Fenn
Product Liability/Court of Common Pleas/Philadelphia
Testimony
(For Plaintiff)

Rosemary Pinto, Esq.
Feldman and Pinto, P.C.
1604 Locust Street, 2nd Floor
Philadelphia, PA  19103

---

2001
Arthur Rosati vs. PV Imports, ET AL
Personal Injury
Arbitration Testimony
(For Defense)

Robert Ruzzi, Esq.
Law Offices of J. Mark Pecci, II
1818 Market Street, Suite 1105
Philadelphia, PA  19103

---

2001
Kathy Stout vs. CH2MUILL
Worker's Compensation
Deposition
(For Plaintiff)

Thomas Aristide, Esq.
528 Maple Street
Bethlehem, PA  18016

---

2001
Wayne Taylor vs. Bethlehem School District
Worker's Compensation
Deposition
(For Plaintiff)

Thomas Aristide, Esq.
528 Maple Street
Bethlehem, PA  18016

2001
Beverly Caplan vs. U.S. System Parking, Inc.
Personal Injury
Arbitration Testimony
(For Defense)

Sally Lytle, Esq.
Law Offices of J. Mark Pecci, II
1818 Market Street, Suite 1105
Philadelphia, PA  19103

---

2001
Andrew Scully vs. Frankford Hospital
Medical Malpractice/Court of Common Pleas/Philadelphia
Testimony
(For Plaintiff)

Martin Brigham, Esq.
Brigham & Trevor
1818 Market Street, Suite 3535
Philadelphia PA, 19103

---

2001
Dennis Hricik vs. Sylvania Trucking
Worker's Compensation
Deposition
(For Plaintiff)

Alan B. Ziegler, Esq.
532 Elm Street
Reading, PA  19601

---

2001
Manucher Fallah-Nejad, M.D. vs. Thomas A. Meloro
        & Nationwide Auto Repair Co., Inc.
Personal Injury
Arbitration Testimony
(For Defense)

Robert Ruzzi, Esq.
Law Offices of J. Mark Pecci, II
1818 Market Street, Suite 1105
Philadelphia, PA  19103

---

2001
James Cooney vs. Don Vile Refuse Removal
Worker's Compensation
Deposition
(For Plaintiff)

Michael Mulvey, Esq.
1520 Locust Street, 10th Floor
Philadelphia, PA  19102

---

2002
Major Bradley vs. City of Philadelphia/
    Office of Fleet Management
ADA
Testimony
(For Defense)

Patricia D. Gugin, Esq.
Assistant United States Attorney
U.S. Department of Justice
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106-4476

---

2002
Michael Infantozzi vs. Joy Mining Machinery
Worker's Compensation
Deposition
(For Plaintiff)

John P. Belak, Esq.
Edgar Snyder & Associates
Gulf Tower, 16th Floor
707 Grant Street
Pittsburgh, PA  15219-1925

---

2002
Gricelda James
WTC Victim Fund
Testimony
(For Plaintiff)

Mr. Anthony L. Marchetti, Jr., Esq.
Cureton Caplan
950 B Chester Avenue
Delran, NJ  08075

---

2002
Frank Oliva
WTC Victim Fund
Testimony
(For Plaintiff)

Mr. Robert Becker, Esq.
880 3rd Avenue
New York, NY  10022

---

2002
Brian Thompson vs. Hahneman Hospital
Court Common Pleas
Life Care Plan/ Testimony
(For Plaintiff)

Laura Feldman, Esq.
Feldman and Pinto, P.C.
1604 Locust Street, 2nd Floor
Philadelphia, PA  19103

---

2002
Josephine Robbins vs. Panchelli, et al
Arbitration
(For Defense)

Margaret Harrington, Esq.
Billet & Conner
2000 Market Street
Suite 2803
Philadelphia, PA  19103-3201

---

2002
Arthur W. Doberstein, Sr.
Court of Common Pleas
Testimony
(For Plaintiff)

Laura A. Feldman, Esq.
Feldman & Pinto, P.C.
1604 Locust Street, 2nd Floor
Philadelphia, PA  19103

---

2003
Richard Arnold vs. Joe Rader Construction
Worker's Compensation
Deposition
(For Plaintiff)

Michael C. Usher, Esq.
Attorney at Law
514 Fullerton Ave., Ste. 200
Whitehall, PA  18052

---

2003
Paul Gallo vs. Pepsi Cola
Worker's Compensation
Deposition
(For Defense)

Mary Lou Karins, Esq.
Royal & SunAlliance
P.O. Box 4701
400 W. Division St.
Syracuse, NY  13221

---

2003
Angela Gill vs. Pennsylvania Hospital
Worker's Compensation
Deposition
(For Defense)

Karen Ayers
BAMS
Valley Forge Office Center
656 E. Swedesford Rd., Ste. 224
Wayne, PA  19087-1689

---

2003
Patricia Polini vs. Lucent Technologies
ADA
Deposition
(For Plaintiff)

David L. Deratzian, Esq.
Hahalis & Kounoupis
20 E. Broad Street
Bethlehem, PA  18018

2003
Jennifer Pruss vs. Hercules, Inc.
MVA
Arbitration
(For Plaintiff)

Dennis D. Brogan, Esq.
Wusinich, Brogan & Stanzione
Attorneys & Counselors at Law
537 W. Uwchland Avenue, Suite 200
Downingtown, PA  19335

---

2003
Robert Schlegel vs. Berks Area Reading Transportation
     Authority (BARTA)
ADA
Deposition
(For Plaintiff)

Ralph E. Lamar, IV, Esq.
141 Spruce Lane
Collegeville, PA  19426

---

2003
Wayne Taylor vs. Bethlehem Area School District
ADA
Deposition
(For Plaintiff)

Thomas D. Aristide, Esq.
528 Maple Street
P.O. Box 242
Bethlehem, PA  18016

---

2003
Jesse Spencer vs. Dugan and Marcon
Worker's Compensation
Deposition
(For Plaintiff)

George Martin, Esq.
Martin, Banks, Pond, Lehocky & Wilson
1818 Market Street, 35th Floor
Philadelphia, PA  19103-3931

---

2003
Carol M. Herlihy
WTC/Pentagon Victim Fund
Deposition
(For Plaintiff)

Alan S. Nemeth
OMG Settlements, LLC
1950 Old Gallows Rd., Ste. 250
Vienna, VA  22182

---

2004
Edwin Taylor vs. USF Red Star, Inc.
ADA/Federal Court/C.A. No.: 03-CV-2216
Testimony
(For Plaintiff)

Lorrie McKinley, Esq.
McKinley & Kramer
1520 Locust Street
Philadelphia, PA  19102

---

2004
Glenn Mannheim, M.D. & Robert Niecestro, Ph.D.
vs. Eisai, Inc., etal
Employer Discrimination
Deposition
(For Plaintiff)

Patricia V. Pierce, Esq.
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA  19103

---

2004
Dwight Smith vs. EMI
Worker's Compensation
Deposition
(For Plaintiff)

Walter F. Lober, III, Esq.
Edgar Snyder & Associates, LLC
Gulf Tower, 16th Floor
707 Grant Street
Pittsburgh, PA  15219-1925

---

Dan/Rappucci Testimony Cases.doc/alv

2004
Patris Talianis vs. Pitcarin Group
Worker's Compensation
Deposition
(For Plaintiff)

Joseph C. Hutteman, Esq.
Martin, Banks, Pond, Lehocky & Wilson
1818 Market Street, 35th Floor
Philadelphia, PA  19103-3931

---

2004
Alan Rockwell vs. G7 Limited
Worker's Compensation
Deposition
(For Plaintiff)

Samuel Pond, Esq.
Martin, Banks, Pond, Lehocky, Wilson
1818 Market Street, 35th Fl.
Philadelphia, PA  19103-3931

---

2004
Dawn Smeltz vs. GAM Manufacturing
Worker's Compensation
Deposition
(For Plaintiff)

Marc Jacobs
Galfan Berger
1818 Market Street, Ste. 2300
Philadelphia, PA  19103

---

2004
Hattie Culbreth vs. Allegheny Airlines
Worker's Compensation
Deposition
(For Plaintiff)

G. Lawrence DeMarco, Esq.
1420 Walnut Street, Suite 1107
Philadelphia, PA 19102

---

2004
William Bartolomei vs. Hilti, Inc.
Product Liability
Testimony
(For Plaintiff)

Rosemary Pinto, Esq.
Pinto & Feldman
1604 Locust St., 2R
Philadelphia, PA  19103

---

2004
Anthony Bentley, Sr. vs. Pittsburgh Board of Education
Worker's Compensation
Deposition
(For Plaintiff)

Richard S. Belkin, Esq.
Edgar Snyder & Associates
Gulf Tower, 16th Floor
707 Grant Street
Pittsburgh, PA  15219-1925

---

2005
Ulett Lewis vs. Arjo, Inc., etal
Product Liability
Testimony
(For Defense)

Robert Ruzzi, Esq.
J. Mark Pecci, II Law Offices
United Plaza
30 S. 17th St., Suite 2010
Philadelphia, PA  19103

---

2005
Tina Domenice vs. Reading Office Maintenance
Worker's Compensation
Deposition
(For Plaintiff)

Alan B. Ziegler, Esq.
The Law Offices of Alan B. Ziegler
532 Elm Street
Reading, PA  19601

---

2005
Jose A. Rodriguez vs. Philip A. Moran
Court of Common Pleas of Northampton County, PA
Testimony
(For Plaintiff)

Ron Creazzo, Esq.
765 Washington Street
Easton, PA  18042